## EXHIBITS

A.     "Talking points for staff layoffs and office closings," Defendants' Responses to Plaintiffs' First Set of Interrogatories, dated September 17, 2003, ¶ 51.

B.     October 27, 2003 Memorandum from Defendant DSS Commissioner Patricia A. Wilson-Coker to Community Human Services Providers and Partners, regarding DSS Regional Realignment.

C.     Deposition of Kevin Loveland, dated July 24, 2003, 113:24-25 to 114:1-2

D.     Defendants' Responses to Plaintiffs' First Set of Interrogatories, dated September 17, 2003, ¶ 47.

Exhibit A

# Talking points for staff layoffs and office closings

The budget situation is very serious and is worsening.

Even with spending reductions, we are still facing a statewide budget deficit of $____ million and up to $1.5 billion for the next *(year? Biennium?)*

In order to live within our means and cut spending, we are forced to lay off employees and close four DSS offices. The administration has proposed to achieve a portion of the needed savings by negotiating concessions with unions but without success. As a result, layoffs will be necessary.

## Staff layoffs

As of Friday, December 6, ____ DSS staff are being issued layoff notices. (____ staff were issued notices last week in response to instructions to let go all new employees who were Connecticut Careers Trainees or who were still in their working test period.)

The staff layoffs will affect ____ regional office staff and ____ central office staff. Eliminated positions include workers who directly serve clients and their supervisors, as well as various administrative positions within the agency such as management analysts, data processing staff, planners, communications officers and clerical workers.

Depending upon seniority and specific contract provisions, laid off staff may have the option of bumping other employees with less service in the agency or within the state, as provided for by union contracts. Employees will be given anywhere between 4 and 6 weeks notice, as provided by their particular union contract.

## Office closings

As a result of the layoffs, four DSS offices will be closed, effective ____. The offices are:

- Bristol – a suboffice of the North Central region
- Meriden – a suboffice of the South Central region
- Norwalk – a suboffice of the Southwest region
- Willimantic – a suboffice of the Eastern region.

The offices serve approximately ____ people receiving Food Stamps, Temporary Family Assistance, Medicaid/Husky, Aid to the Aged, Blind or Disabled, State Administered General Assistance, Child Support and *(what else?)*.

Clients who live in the towns served by these offices will *(be redirected to the nearest DSS office? Be served by staff who will go to the old location 1 day a week? Be reallocated amongst the remaining regional offices?)*. Every effort will be made to

minimize disruption for clients and to continue to provide services, to the full extent possible in the face of the loss of over ____ staff and four locations to serve people.

The offices were selected for closure due to their small size and their relative proximity to another DSS regional office *(is this true?)*.

DSS clients who live in the following towns are being affected:

<u>Bristol suboffice</u>
Avon
Bristol
Burlington
Canton
Farmington
Plymouth
Simsbury
Southington

<u>Meriden suboffice</u>
Meriden
Wallingford

<u>Norwalk suboffice</u>
New Canaan
Norwalk
Weston
Westport
Wilton

<u>Willimantic suboffice</u>
Ashford
Chaplin
Columbia
Coventry
Hampton
Mansfield
Scotland
Union
Willington

## Other Considerations

How will the work of CPU be done – back to regions or just not done?

What will be the impact of staff reductions on application timeframes?

Do we consider keeping the buildings open 1 day a week and outposting staff there?

Have we received instructions on the Comptroller's alleged offer of health insurance for 6 months for laid off employees?

Should we start making priorities of high, mid and low items in terms of regional office operations?

What options, if any, are there for transportation for clients?

At what point exactly do the offices close? Do we close them to the public earlier if the employee notice periods don't match by bargaining unit?

Need to make provisions for legislative notifications in addition to our clients, community groups, contractors and grantees.

How are we going to handle the notifications of central office staff?

What do we do about A&R members who are not in on Friday due to the union holiday party but who are subject to layoffs?

# Questions and Answers Concerning
# Staff Layoffs and Office Closings

Why were those four offices selected?

> They were selected in part on their proximity to another DSS office and because of their relatively small size.

Why aren't we spreading the staff reductions out amongst all DSS offices?

> Because it was felt that the impact of this many staff reductions could be managed better by closing some offices. Trying to achieve ____ in reductions would have severely hampered the ability of all small DSS offices to conduct business. Closing four small offices that are closely located to four other, larger DSS offices would minimize the impact on other clients.

How was the target of ____ staff arrived at?

> Agency targets were developed by the Office of Policy and Management in consultation with DSS leadership.

When will the offices actually close?

> ?

How will DSS serve the clients who used to go to those four offices?

> Caseloads will be apportioned amongst other DSS offices as follows: *(details to come)*.

What if people cannot get to the office they've been reassigned to?

> Fortunately, most DSS clients can do much of their business with the agency by mail or over the telephone. Elderly and disabled clients can apply and re-establish eligibility by mail. Food Stamp recipients may send someone else as an authorized representative. And even clients who are required to come in for a face-to-face interview only have to do so once or twice a year, depending on their program status.

What will DSS do regarding the leases for those locations?

> At this point, no decision has been made regarding the leases. Any attempt to renegotiate or terminate a lease will be done through the Department of Public Works.

How long has DSS had offices in those four locations?

?

What, besides having to travel a longer distance to see their worker, will be the impact on clients and applicants?

It is likely that it will take longer to process applications and make changes to client cases, although the department will do everything in its power to minimize any delays.

Have we notified other community agencies and municipal agencies of the coming closures?

We will begin sending notifications to our community partners, municipalities and other human service providers in the coming weeks.

What are our plans for notifying clients?

We will send clients information about the office closings and their new office locations in the next few weeks. Final information about individual caseworkers will be forwarded once the full impact of seniority bumping by the laid-off employees is known.

Have we considered other means to achieve similar savings?

Spending reductions have already been taken, totaling $___ million, wherever the Governor has unilateral authority to order cuts. Additional programmatic reductions, limitations and eliminations are under consideration as part of an overall deficit reduction package.

What will be the savings from laying off staff and closing offices?

Savings are estimated to be over $8 million from closing the four offices *(what about CO savings?)*.

What provisions have we made for security and protection of the integrity of our computer systems that issue benefits?

?

Exhibit B



# Connecticut Department of Social Services

*--Caring for Connecticut--*

To: Community Human Service Providers and Partners

From: Commissioner Patricia A. Wilson-Coker

Date: October 27, 2003

Re: **DSS Regional Realignment**

As a partner and colleague in service to Connecticut's most vulnerable people, you have shared many changes and challenges with the Department of Social Services and fellow state agencies over the past two years. Together, we have endured staffing and service reductions due to an extended revenue and budget crisis.

While it appears that human services are in for a fairly long period of fiscal uncertainty, we're also hopeful that promising economic signs will eventually result in strengthening the revenue side of the state budget. We appreciate all you are doing under the current difficult circumstances.

I would like to brief you on a new development at the Department of Social Services-our plan for regional consolidation and realignment.

\* \* \*

## *DSS reorganizing into three human service regions*

Effective November 1, 2003, the Department is consolidating from five to three regions

for delivery of services throughout the state. Our realignment follows the move on July 1 by the Departments of Children and Families and Mental Retardation to a three-region structure. Essentially, the state is changing its uniform human service boundaries into Western, Southern and Northern Regions, as shown on the attached map.

The following chart shows DSS regional operations, effective November 1, 2003:

| Region | Office | Administrator/Manager(s) in charge | Office Phone |
|---|---|---|---|
| Western Region | Bridgeport | Frances Freer, Regional Administrator | 203.551.2700 |
| | Waterbury | John Souchuns, Bonnie Wilkes, Social Service Operations Managers | 203.597.4000 |
| | Torrington | Marc Paletsky, Social Service Operations Manager | 860.496.6900 |
| | Danbury | Theresa Polseno, Acting Social Service Operations Manager | 203.207.8990 |
| | Stamford | Evelyn Balamaci, Social Service Operations Manager | 203.251.9300 |
| | Bureau of Rehabilitation Services sites in Bridgeport, Brookfield, Danbury, Stamford, Torrington, Waterbury | | |
| Northern Region | Hartford | Silvana Flattery, Regional Administrator | 860.723.1000 |
| | Manchester | Kenneth Derrick, Social Service Operations Manager | 860.647.1441 |
| | New Britain | Michele Farieri, Social Service Operations Manager | 860.612.3400 |
| | 20 towns in northeast CT; please see text below | Linda Roache, Social Service Operations Manager | 860.823.5000 |
| | Bureau of Rehabilitation Services sites in East Hartford, Enfield, Hartford, Killingly, Manchester, New Britain | | |
| Southern Region | New Haven | Ronald Roberts, Regional Administrator | 203.974.8000 |
| | Middletown | Cheryl Parsons, Social Service Operations Manager | 860.704.3100 |
| | Norwich | Randy McKenney, Social Service Operations Manager | 860.823.5000 |
| | Bureau of Rehabilitation Services sites in Ansonia, Middletown, New Haven, New London, Norwich | | |

**The significant change in this realignment affects our current Eastern Region.** Beginning November 1, the territory and caseload of the current Eastern Region will be shared by the new Northern and Southern Regions. Our clients in the eastern part of the state will continue to be served by the Norwich office until further notice. More specifically, clients who are used to working with the DSS Norwich office will continue to do so, regardless of regional boundary changes. This includes people in the following

towns that will technically be within the Northern Region boundary: Ashford, Brooklyn, Canterbury, Chaplin, Columbia, Coventry, Eastford, Hampton, Killingly, Mansfield, Plainfield, Pomfret, Putnam, Scotland, Sterling, Thompson, Union, Willington, Windham, and Woodstock.

**The bottom line: for clients statewide, all of the above information means no change in their current contacts with the Department when regional realignment takes effect November 1.** Clients will continue to be served by the DSS office they currently call or visit. If future changes are made affecting service areas of DSS offices, we will send direct notices to clients.

### *Contracting information*

If your organization had a contract with a DSS Regional Office, you were sent an explanatory letter dated August 28 about the transfer of Grants and Contracts staff and functions to our Central Office in Hartford. This change is part of an overall agency restructuring that includes the consolidation from five to three regions. By now, you should have received correspondence from applicable Central Office division(s) about permanent DSS staff assignments for your contract(s). If not, please contact Kathleen Brennan, Director of Contract Administration, at 860-424-5693.

Thank you again for your support and understanding as we move forward with these changes. If you would like to contact me directly, please call or email.

Sincerely,

**Patricia A. Wilson-Coker**
Commissioner

Pat.Wilson-Coker@po.state.ct.us
860.424.5896

c:     DSS Executive Team

*[electronic copy]*

Exhibit C

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COPY

| | |
|---|---|
| LORI RAYMOND, ET AL,<br>　　　　Plaintiffs,<br><br>VS.<br><br>JOHN ROWLAND, in his official<br>capacity as Governor of the<br>State of Connecticut and<br>PATRICIA WILSON-COKER, in her<br>official capacity as<br>Commissioner of the State of<br>Connecticut Department of<br>Social Services,<br>　　　　Defendants. | CIVIL ACTION NO.<br>303CV0118(JBA)<br><br><br>JULY 24, 2003<br><br><br><br><br><br><br>CLASS ACTION |

DEPOSITION OF KEVIN LOVELAND

Taken before Marcia M. Allen, Licensed Shorthand Reporter, Registered Merit Reporter and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the law offices of Greater Hartford Legal Aid, 999 Asylum Avenue, Hartford, Connecticut, on Thursday, July 24, 2003, commencing at 9:45 a.m.

Marcia M. Allen, LSR, RMR
CT Lic. No. 00089
Andrews Reporting Service
330 Cook Hill Road
Cheshire, CT  06410
(203) 271-2190

ANDREWS REPORTING SERVICE    (203) 271-2190

113

A   I don't know. I only looked at the end-of-month pending application counts. And they've tended to run -- range in around 12 -- they're typically around 12,000 pending applications at the end of each month. And that has not fluctuated. You know, it's been up and down during this same period. It doesn't appear to be -- you know, that doesn't appear to be growing.

Q   Or falling off?

A   Or falling off -- I didn't look at applications-received activity. I perhaps should take a look at that to see if there's been any reduction, anything of that nature.

    MS. POTTER:  Can I just break for a
    couple of minutes?
    (A recess was taken from 2:06 to 2:09
    p.m.)

BY MS. POTTER:

Q   Can you tell me, back to the office closure, who participated in the decision to close the office?

A   All I know is there were meetings on the 12th floor with regional administrators, the commissioner, the two deputies. And I -- actually, beyond that, I'm not quite certain who was in the room but I was not.

Q   And do you know what the rationale for closing the offices was?



ANDREWS REPORTING SERVICE    (203) 271-2190

114

1       A    No.  I mean it was expressed as a budgetary
2   savings I think was the rationale I understand.
3       Q    Do you know if DSS is still paying rent for
4   any of the closed offices?
5       A    I don't know.
6       Q    And do you know if DSS is planning to close
7   any more offices?
8       A    I don't know. I've been told that there are
9   no plans at this time. But that question came up with our
10  deputy commissioner just a couple of days ago. The answer
11  was no plans at this time.
12      Q    Do you know who would know whether rent is
13  still being paid on those offices?
14      A    I believe that would be on the administrative
15  part of the agency. That would be Michael Starkowski,
16  S-t-a-r-k-o-w-s-k-i, the deputy commissioner of court
17  administration.
18           MS. POTTER: I think that's it. We might
19      call you back at another time but not in the
20      immediate future.
21           MR. BARBER: Okay. We're not necessarily
22      agreeing to come back. We might have to argue
23      about that later.
24           MS. POTTER: Okay.
25           (The deposition concluded at 2:12 p.m.)

                ANDREWS REPORTING SERVICE    (203) 271-2190

Exhibit D

over the phone and the department was able to waive the face to face interviews due to disability or transportation issues. DSS would also make home visits if needed when notified.

45. Identify each DSS employee who is currently a member of, employed in, or who has any duties connected to the Office of Affirmative Action, specifying further the duties of each such employee.

ANSWER: Irene C. Mason, Social Services Program Division Director, Department of Social Services Affirmative Action Division (Job Description provided in response to Interrogatory No. 1; see Folder I. 1); Mary D. Priestman, Affirmative Action Administrator, Department of Social Services Affirmative Action Division. (Job Description provided in response to Interrogatory No. 1; see Folder I. 1); Brenda C. Harris, Affirmative Action Administrator, Department of Social Services Affirmative Action Division (Job Description provided in response to Interrogatory No. 1; see Folder I. 1); Gilbert D. Cortez, Affirmative Action Officer (See Folder I. 45 for Job Description).

46. Specify all actions taken by any individual connected in any way to the DSS Office of Affirmative Action, with respect to assisting disabled recipients or applicants affected in any way by the office closings in Ansonia, Bristol, Meriden, Norwalk, Killingly, and/or Willimantic.

ANSWER: No requests for action or other assistance were received by the Affirmative Action Division from any person affected by the office closings.

47. Identify the individual(s) who made the final decision to close the DSS offices in Ansonia, Bristol, Meriden, Norwalk, Killingly, and Willimantic, and indicate the date of such decision.

43

ANSWER: Under verbal direction from OPM including Steffie Foster, Susan Eccelston, Steve Netkln and Gregory Sullivan decisions were made to close Ansonia, Bristol, Meriden, Norwalk, Killingly, and Willimantic in late November 2002. Commissioner Patricia Wilson-Coker; Deputy Commissioner Michael Starkowski; Deputy Commissioner Rita Pacheco; Astread Ferron-Poole, Executive Assistant; Claudette Beaulieu, Director of Public and Government Relations; and, Lee Voghel, Director of Fiscal Analysis were involved in the decision making process.

48. Specify the numbers of benefit application decisions have been delayed beyond required program deadlines since January 21, 2003, listed separately according to: each DSS office; benefit program; length of delay; and reason for delay.

ANSWER: Report DMF8030A-DMF8027I, "Application Length Pending Report," classifies applications by length of time pending by office by program. The time categories have breakdowns that correspond to the standards of promptness for the various programs. See Folder I. 48 for reports for the months of January through July 2003.

Report DMF8014A-DMF8006I, "Application Overdue Reason Codes," contains counts of applications that are beyond the standard of promptness by program, as of the end of the report month. It has breakdowns according to the reasons why the applications are overdue. See Folder I. 48 for reports for the months of January through July 2003. See also documents entitled "Pending Applications, December 2002-June 2003"; and "Application Overdue Reason Codes, January 2003-July 2003".

49. Specify the number of benefit applications, the number of applications denied and the number of cases terminated since January 21, 2003, involving applicants and recipients respectively, and listed separately according to their formerly being served by: the DSS Offices

in Ansonia, Bristol, Meriden, Norwalk, Killingly, and Willimantic; benefit program; and reason for denial or termination.

ANSWER: See information at Folder I.49.

50. In an unduplicated count of assistance units, specify the number of assistance units receiving food stamps and/or Medicaid benefits who have reported an income level of zero to DSS at any time since January 21, 2003, listed separately according to each DSS office and according to the food stamp and the Medicaid programs.

ANSWER: See information at Folder I.50.

51. Specify the reason(s), including the persons, entities, or agencies stating them, for the closure of the DSS offices in Ansonia, Bristol, Meriden, Norwalk, Killingly and/or Willimantic.

ANSWER: The defendants assert that the document "Talking points for staff layoffs and office closing" is responsive to this interrogatory. See Folder I. 51. The talking points were developed and to be used by the DSS Executive Team.

52. Identify the person(s) who participated in the decision-making, planning, and/or implementation of the closure of the DSS offices in Ansonia, Bristol, Meriden, Norwalk, Killingly and/or Willimantic.

ANSWER: The defendants assert that the answer to No. 7 is responsive to No. 52.

53. Specify the projected and/or realized fiscal budgetary savings for DSS and/or the state, resulting in whole or in part from the closure of the DSS offices in Ansonia, Bristol, Meriden, Norwalk, Killingly and/or Willimantic.

ANSWER: The defendants assert that no information responsive to this interrogatory is currently available.