UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LORI RAYMOND, | : | CIVIL ACTION NO. |
| MIGDALIA MENDEZ, | : | 303CV0118  (MRK) |
| KIMBERLY DADE, | : | |
| MARY PAVLIK, | : | |
| DARRYL PAULDING, | : | |
| TERRI KEATON, | : | |
| ELMORE SWEET, and | : | |
| CHARLES BURDINE, | : | |
| | : | February 23, 2004 |
| Plaintiffs, | : | |
| Individually and on behalf of all | : | CLASS ACTION |
| other persons similarly situated, | : | |
| | : | |
| V. | : | |
| | : | |
| | : | |
| JOHN ROWLAND,   in his official | : | |
| capacity as Governor of the State of | : | |
| Connecticut, and | : | |
| PATRICIA WILSON-COKER, in her | : | |
| official capacity as Commissioner of the | : | |
| State of Connecticut Department of Social | : | |
| Services, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## SECOND  A M E N D E D   C O M P L A I N T

## I. PRELIMINARY STATEMENT

1.  The named plaintiffs and all others similarly situated are indigent Connecticut

residents with disabilities who are or will be dependent upon and eligible for  subsistence

cash and medical benefits under Connecticut Department of Social Services (DSS)

programs and services.   The continuing and summary failure or refusal of the defendant

Governor and DSS Commissioner to enact and effectively implement systemic policies

and practices designed to ensure  that plaintiffs'  rights to  reasonable accommodation of

their disabling conditions are upheld, in violation of  the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.,* and  Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794, and the implementing federal regulations promulgated pursuant to both

Acts, severely restricts  their ability to meaningfully  access  those critical benefits and

services on an ongoing basis.

  2.  Plaintiffs seek declaratory and injunctive relief  from the Court to compel the

defendants  in their official capacities  as, respectively, the Governor and DSS

Commissioner, to enact, implement and enforce ongoing, statewide, systemic policies and

practices designed to ensure opportunities for reasonable accommodations of the

disabling conditions of plaintiffs and the class they seek to represent, so that they may be

afforded meaningful access to subsistence benefits under DSS programs and services as

either  eligible applicants or eligible recipients.

  3.  The subsistence programs plaintiffs and the proposed class members are

eligible for include:  State Supplement to the Aged, Blind or Disabled (AABD),

Temporary Family Assistance (TFA), State Administered General Assistance (SAGA),

Food Stamps and Medicaid.

## II.  JURISDICTION

  4.  The Court's subject matter jurisdiction over this action is conferred by 28

U.S.C. § 1331.   Declaratory  relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and

Rule 57 of the Federal Rules of Civil Procedure.   Injunctive relief is authorized by Rule

65 of the Federal Rules of Civil Procedure.   Redress of violations of the plaintiffs' rights

secured by the U.S. Constitution is authorized by 42 U.S.C. § 1983.


### III.  PARTIES

A.  Plaintiffs

5.  Plaintiff LORI RAYMOND is a resident of Meriden, Connecticut  and is

disabled by depression, panic disorder and anxiety. She is a recipient of Social Security

Disability Insurance benefits, and AABD, Food Stamps and Medicaid through the

Department of Social Services.

6.  Plaintiff MIGDALIA MENDEZ is a resident of Meriden, Connecticut. She is a

disabled single parent of two disabled children. Ms. Mendez  receives Supplemental

Security Income, and she receives TFA for her older son.  She receives Medicaid and at

times  Food Stamps, depending on whether she  receives child support.

7.  Plaintiff  KIMBERLY DADE is a  resident of Bristol, Connecticut and a

recipient of TFA, Food Stamps and Medicaid.  Ms. Dade is disabled by chronic bronchial

asthma, complicated by allergies, morbid obesity, high blood pressure, a prolapsed

bladder, urinary and fecal incontinence, tendinitis in her wrist, damaged ankle and knee

joints and circulatory problems in her legs that cause swelling.

8.  Plaintiff MARY PAVLIK  is 69 years old, blind and survives on Social

Security Administration benefits. She receives Medicaid benefits from DSS.  She is a

resident of Rowayton, Connecticut.

9.  Plaintiff  DARRYL PAULDING lives in Norwalk, Connecticut.  He is disabled and unable to work due to depression and learning disabilities. He receives Supplemental Security Income, and DSS-administered AABD and Food Stamps.

10.  Plaintiff TERRI KEATON resides in Willimantic, Connecticut. She is a single parent of two children, a teenage son and a three-year-old daughter with Kawasaki disease, a chronic health problem requiring ongoing care. Ms. Keaton has disabling problems with her feet which require surgery.  The family receives Medicaid.

11.  Plaintiff  ELMORE SWEET  resides in Willimantic, Connecticut.  He  is disabled, on oxygen 24 hours a day, is diabetic, has blood clots in a leg causing severe pain, and he is obese. He receives Social Security Disability Insurance, and DSS-administered Food Stamps and Medicaid.

12. Plaintiff CHARLES BURDINE resides in Willimantic, Connecticut.   His physical disabilities include renal failure requiring kidney dialysis treatment three times per week and he is unable to work. He receives Medicaid from DSS.

B.  Defendants

13.  Defendant JOHN ROWLAND was and is the Governor of the State of Connecticut, vested with the supreme executive power of the state. Conn. Const. Art. IV, §5;  Conn. Gen. Stat. § 3-1.  In his capacity as Governor, he appoints Commissioners to head state agencies in the executive branch, who then serve at his pleasure and under his direction. Conn. Gen. Stat. §§ 4-6, 3-6, 4-5, 4-8, and 4-38. The Governor, alone in the executive branch, possesses authority for: seeking funds from the legislature, and proposing state budgets and adjustments thereto, Conn. Gen. Stat.§ § 4-71 - 4-74, 4-82;

4

proposing allocations of federal block grant funds awarded to the state including proportionate assignment of such grants between various agencies and for specific programmatic purposes, Conn. Gen. Stat. §§ 4-73(d), 4-28b; accounting for and directing disbursement of federal funds received by the state, Conn. Gen. Stat. §§ 4-28(a), 4-31a, 4-73(d); exercising veto power over legislative acts and line item veto authority regarding appropriations made by the legislature, Conn. Const. Art. IV §§ 15, 16; rescinding legislated budget authority, Conn. Gen. Stat. § 4-85; transferring funds between budget line items, Conn. Gen. Stat. § 4-87(a); and expending from the state contingency fund. Conn. Gen. Stat. §§ 4-84, 4-85. In directing Commissioners in budget related matters, the Governor may act independently or through his fiscal arm, the Office of Policy and Management (OPM). Conn. Gen. Stat. §§ 4-70b, 4-65a, 4-77.

14.  Defendant PATRICIA WILSON-COKER is Commissioner of the Department of Social Services of the State of Connecticut.  In her capacity as DSS Commissioner, Defendant Wilson-Coker administers DSS programs that provide subsistence benefits and services that plaintiffs and the proposed class they represent are entitled to receive.  Conn. Gen. Stat. § 17b-2.  She serves statutorily at the pleasure of the Defendant Governor.   Conn. Gen. Stat. § 4-6.

## IV.  CLASS ACTION ALLEGATIONS

15.  Plaintiffs are impoverished persons with disabilities who sue on behalf of themselves and all others similarly situated, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

16.   Plaintiffs and members of the proposed plaintiff class are persons with disabilities  who have needed and continue to need reasonable accommodations from defendants to obtain and maintain meaningful access to DSS benefits, programs and services.

17. The named plaintiffs seek to represent a proposed plaintiff class  defined as all individuals with disabilities in Connecticut who are or will be eligible for subsistence benefits through programs administered by DSS, and whose meaningful access to such subsistence benefits, programs and services  has been, is being, or will be denied or effectively limited by defendants, due to their continuing failure or refusal to provide reasonable accommodations to those individuals.

18.   The prerequisites to a class action specified in Rule 23(a) of the Federal Rules of Civil Procedure are met in this action by the proposed plaintiff class. The proposed class is so numerous that joinder of all of its members would be impracticable. Precise numbers regarding those potentially adversely affected by DSS office closings and by defendants' failure to comply with federal law governing access of persons with disabilities to benefits, programs and services, are in the possession and control of DSS, which also has possession and control of records for such individuals. Based on a DSS report labeled  DMF 8008A-DMF8031I, there were 375,142 active medical assistance recipients at the end of June, 2003.  A count of those receiving medical assistance is the best measure of total recipients to avoid a duplicate count because many medical assistance  recipients also receive another benefit.  Since DSS does not identify or maintain information regarding disabilities that limit major life activities among the

population it serves, it is difficult to provide a precise number of those served by the agency who have disabling conditions, but they number in the many thousand. In addition, the U.S. Department of Health and Human Services Office of Civil Rights "Prohibition Against Discrimination on the Basis of Disability in the Administration of TANF" policy guidance cites to reports and studies indicating that as much as 40% of the adult welfare population may have learning disabilities and up to 28% of welfare beneficiaries have mental health conditions.

19.  There are questions of law and fact common to the proposed class, including the following:

a.. Whether each of the plaintiffs has at least one  disability, as defined by both the ADA and Section 504 of the Rehabilitation Act of 1973, and implementing federal regulations;

b. Whether each plaintiff  is a "qualified individual with a disability" as defined under the ADA and implementing federal regulations;

c. Whether each plaintiff is a "handicapped person" and a "qualified handicapped person," as defined by Section 504 of the Rehabilitation Act of 1973, and implementing federal regulations;

d. Whether, as a result of plaintiffs' physical or mental disabilities, their abilities to engage in at least one of the major life activities are limited, including functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working, as well as  limitations in at least one of the usual activities of daily life, such as  traveling, walking, standing in line, attendance at

scheduled appointments, concentrating on tasks, interacting with others, effectively communicating by telephone, engaging in employment, and independently obtaining and providing required documentation and completing paperwork required to access DSS benefits, programs and services;

e. Whether defendants continue to fail or refuse to provide reasonable accommodations to plaintiffs, as disabled persons who are eligible for DSS-administered benefits, programs and services, with respect to applying for and maintaining such eligibility;

f. Whether defendants continue to deny plaintiffs meaningful access to DSS benefits, programs and services;

g. Whether defendants continue to fail or refuse to provide to plaintiffs adequate notice of and information regarding nondiscrimination requirements in operation of DSS benefits, programs and services pertaining to applicants and recipients with disabilities; and

h. Whether defendants continue to fail or refuse to adopt appropriate grievance procedures that meaningfully notify plaintiffs of their right to file grievances and which reasonably allow them to obtain relief when their rights under the ADA and Section 504 are violated in the administration of DSS benefits, programs and services.

20. The named plaintiffs' claims are typical of the claims of the proposed class. The named plaintiffs and members of the proposed class all claim defendants' actions and failures to act violate the plaintiffs' rights under Title II of the ADA, Section 504 of the

Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

21. The named plaintiffs will fairly and adequately protect the interests of the proposed class. In supporting their individual claims, the named plaintiffs will simultaneously advance the claims of absent class members.

22. Plaintiffs' counsel are experienced in complex class litigation involving public benefit programs and civil rights laws. Counsel have the resources, expertise and experience to prosecute this action.

23. Plaintiffs' claims satisfy the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure, in that defendants have acted on grounds generally applicable to the proposed class, thereby making appropriate final injunctive relief and declaratory relief with respect to the proposed class as a whole.

## V. <u>FACTS</u>

### A. <u>Individual Plaintiff Allegations</u>

24. Plaintiff Lori Raymond is a resident of Meriden and is disabled by depression, panic disorder and anxiety. She is a recipient of Social Security Disability Insurance benefits, and AABD, Food Stamps and Medicaid through the Department of Social Services. She was served by the Meriden DSS office at the time this case was filed. She has no personal transportation, her disabilities preclude her from using public transportation and she has no other means to get to an appointment for a redetermination of eligibility at her newly assigned DSS office in New Haven. The round trip distance

between Plaintiff Raymond's residence and the DSS office in New Haven is approximately 60 miles.

25.  Since plaintiff Raymond's reassignment to the DSS office in New Haven, her psychiatric condition has been exacerbated by having her DSS Adult case maintenance worker changed twice, by her inability to reach her DSS worker by telephone and by not receiving return telephone calls from her worker.   Additionally, in the Fall of 2003, Ms. Raymond mailed her DSS worker an application for Qualified Medicare Benefits (QMB) so that gaps in her Medicare coverage would be covered by Medicaid rather than the $66 premium for her Medigap insurance being deducted from her Social Security disability check.  When Ms.  Raymond tried to reach her DSS worker by telephone, she heard two rings and then a dial tone.  When Ms.  Raymond finally reached her DSS worker, she was informed that her QMB application had been lost and that she would be sent another application.   A DSS notice, dated December 16, 2003, gave her contradictory information that she was eligible for QMB and denied QMB.  Again, Ms.  Raymond initiated a series of telephone calls and finally determined that she was eligible for and had been granted QMB.  Currently, a voice mail message for Ms. Raymond's DSS worker informs callers not to go to the DSS office in New Haven to see him without an appointment.

26.  There is no disability indicator "green tag" in or on plaintiff Raymond's DSS case file.  Neither is there an indicator of disability under the impairments section of the computer screen for her file.   There is no computer based file indicator of plaintiff Raymond's disability.

10

27. Plaintiff Migdalia Mendez is a resident of Meriden. She is a disabled single parent of two disabled children. Ms. Mendez and her younger son receive Supplemental Security Income, and she receives TFA for her older son. They all receive Medicaid and sometimes they receive Food Stamps, depending on whether they receive child support. Ms. Mendez suffers from multiple impairments, including severe lupus, a herniated disc, and esophagus and stomach problems, requiring her to take at least 14 medications each day, and limiting her mobility and ability to walk.  She does not have a car. Her mobility limitations preclude her from using a bus. Because of the needs of her sons, particularly the younger son who must have blood drawn several times each week and has a G tube through which he is given medications, she cannot be away from home without her children for extended periods.   During the year prior to its closing, she had to go to the Meriden DSS office three or four times. She is unable to get to appointments in New Haven. Even if she could secure transportation to New Haven, the trip would be too taxing on her youngest son because of his disabilities.

28. Ms. Mendez was unable to get a prescription dietary supplement filled for her son in early May 2003.   She was told by DSS staff that his Medicaid had been terminated on May 1, 2003, although he is a recipient of SSI and there was no other change in family circumstances. Ms. Mendez was able to reach her worker to resolve the problem. The pharmacy subsequently provided the prescription pending a resolution of eligibility, rather than leaving the child at risk.

29. Plaintiff Migdalia Mendez has a history of necessary surgery.  Her most recent surgery was in 2003 for the removal of a hernia.  In the recent past and prior to her

11

hernia surgery, Plaintiff Mendez needed surgery to remove her appendix.  She requested

the assistance of a nurse to administer medication to her disabled son for the period of her

hospitalization and recovery, but her DSS worker incorrectly told her that she was

ineligible for such assistance.  Since Plaintiff Mendez had been given incorrect

information that she was ineligible for the services of a nurse under her disabled son's

Medicaid coverage, she thought it was futile to request such assistance again when she

had her hernia surgery in 2003 .

30.  There is no "green tag" disability flag in or on plaintiff Mendez' DSS case

file to indicate that she has been identified as a recipient with disabilities.  Neither is there

an indicator of disability under the impairments section of the computer address screen

for Ms. Mendez' file. There is no computer based file indicator of plaintiff Mendez's

disability.

31.  Plaintiff Kimberly Dade and her seven-year-old daughter are residents of

Bristol and recipients of TFA, Food Stamps and Medicaid through the Department of

Social Services.  She was served by the Bristol DSS office at the time this action was

commenced and is now served by the New Britain office.  Ms. Dade is disabled by

chronic bronchial asthma, complicated by allergies, morbid obesity, high blood pressure,

a prolapsed bladder and urinary and fecal incontinence, tendinitis in her wrist, damaged

ankle and knee joints and circulatory problems in her legs that cause swelling. She has a

pending application with the Social Security Administration for disability benefits. Before

the Bristol office closure she visited  the DSS office for redeterminations of eligibility

every three to six months and frequently at other times to supply documentation required

12

to maintain or adjust benefits when she had changes in income.  She has no personal transportation and her physical disabilities preclude her from reliably being able to use public transportation to her newly assigned DSS office in New Britain. The Dial-a-Ride service in Bristol for persons with mobility issues does not provide transportation to New Britain. Ms. Dade has had a variable work history as a result of her health. When able, she has worked at home and during the  year 2002 earned $1031.00.   She is particularly concerned that her food stamps be properly adjusted upward when she has had no work income,  as she relies on them to meet subsistence needs.  While she could manage to visit  the Bristol DSS office to bring in documentation to arrange adjustments in her food stamps, she could not get to the New Britain office.  She was permitted to mail in submissions of her work stubs, but these were repeatedly never acted upon.  Her request for adjustment was denied and she was told she had not timely submitted documentation, so she requested a fair hearing.  With her attorney's intervention (Greater Hartford Legal Aid), on the eve of the hearing a retroactive adjustment was granted. In March 2003, DSS found her exempt from the time limits and work requirements of the TFA program.  She also lost her flexible job.  DSS scheduled a redetermination for her on April 10, 2003 at the New Britain office.  She left messages on the worker's answering machine that she would be unable to attend the appointment because she had no transportation and her disabilities limited her mobility. When she was unable to attend the redetermination, she received a notice terminating her benefits effective May 31, 2003.  She subsequently called her DSS worker and left repeated messages with the supervisor. Only after such repeated messages, and following her attorney's intervention with the food stamp matter,

was she told by DSS that she would be permitted to complete her redetermination paperwork by mail.

32.  Beginning in  May  2003, following the commencement of this action and the intervention of her attorney at various junctures, DSS has sent a social worker out to Ms. Dade's  house on several occasions to assist her with paperwork and also with securing medical documentation needed  for ongoing eligibility.  Her TFA,  food stamps and Medicaid benefits have continued without interruption since that time.

33.  Plaintiff Mary Pavlik is 69 years old, blind and survives on Social Security Administration benefits. She is a resident of Rowayton (part of Norwalk), and at the time this case was filed, she was served by the Norwalk DSS office where she applied for Medicaid coverage of her Medicare expenses on January 15, 2003. She cannot use a cane to get around or a seeing eye dog because of balance problems. She cannot go out alone and always needs assistance.    She cannot use public transportation alone. The round trip distance between Plaintiff Pavlik's residence and the DSS office in Bridgeport is approximately 40 miles.  She was able to get assistance to get  to the DSS office in Norwalk, but does not have anyone who could assist her in getting to Bridgeport.   Ms. Pavlik is limited in her ability to effectively communicate with DSS and independently resolve problems. She relies on two community volunteers to help her read and respond to her mail.   Ms. Pavlik is without family supports. One volunteer wrote to Ms. Pavlik's worker in March 2003 and provided medical bills to demonstrate Ms. Pavlik had met her Medicaid "spend-down."  DSS sent Ms. Pavlik a notice on March 18, 2003 indicating DSS had determined her eligible for Medicaid effective March 3, 2003. Subsequent to

this notice, her pharmacy bills were rejected by DSS for coverage and her DSS worker failed to resolve her problems obtaining access to needed medical coverage, despite requests for assistance. Her attorney (Connecticut Legal Services, Inc.) intervened with DSS central office and learned Ms. Pavlik's eligibility had not been processed until March 29, 2003, resulting in the medical bill rejections. Payment of the bills was resolved in Ms. Pavlik's favor only following this legal intervention.

34.  Plaintiff Darryl Paulding lives in Norwalk. He is disabled and unable to work due to depression and learning disabilities. He receives Supplemental Security Income, and AABD and Food Stamps. He was served by the Norwalk DSS office at the time this case was filed. He is not able to read or write and left school in ninth grade. He is unable to read train and bus schedules and is uncomfortable traveling because of his depression and medications. He does not have a car or know anyone who could drive him to Bridgeport. Even if DSS offered to allow him to handle all matters using the mail, he is unable to read his mail and cannot read or write well enough to fill out the forms.

35.  Plaintiff Terri Keaton resides in Willimantic. She is a single parent of two children, a teenage son and a three-year-old daughter with Kawasaki disease, a chronic health problem requiring ongoing care. At the time this action was commenced, Ms. Keaton was employed, despite disabling problems with her feet that require surgery. Her right foot is infected and requires an air cast. She often has to use crutches. She cannot remain on her feet very long or walk long distances. The family receives Medicaid, requiring visits to the DSS office two or three times per year. She was served by the Willimantic DSS office at the time this case was filed. She has a car but cannot drive long

15

distances because of the problems with her feet. Her physical disabilities preclude her

from being able to use public transportation to her newly assigned DSS office in

Norwich. Despite requests for assistance from DSS in locating a Medicaid provider who

could treat the problems with her feet, no assistance has been provided. Because the

problems with her feet cause her to ambulate abnormally, she has serious problems with

her back that may result in total disability if not resolved.   Ms. Keaton additionally feels

she should not be that far from her daughter over a long period in case her daughter

became ill, a serious risk with Kawasaki disease.

36.   Plaintiff Elmore Sweet resides in Willimantic. He  is disabled, on oxygen 24

hours a day, is diabetic, has blood clots in a leg causing severe pain, and he is obese. He

receives Social Security Disability Insurance and Food Stamps and Medicaid through

DSS. He was served by the Willimantic DSS office at the time this case was filed. His

disabilities limit his mobility and he requires a wheelchair to get around as he must be

able to rest his leg as needed. He has assistance from a homemaker and an aide to meet

his daily living needs, maintain personal hygiene, prepare food and clean his apartment

and shop.  The round trip distance between Plaintiff Sweet's residence and the DSS office

in Norwich is approximately 40 miles.  He cannot use public transportation or Dial-a-

Ride services because their vehicle cannot accommodate his wheelchair. While DSS

generally allows him to handle paperwork without having to come into the DSS office,

occasions still occur where he needs access to the office. For example, he once lost a food

stamp card and was able to arrange for his homemaker to go to the Willimantic DSS

office to obtain a replacement. However, he does not have anyone he could send to Norwich, if the need arises.

37.  Plaintiff Charles Burdine resides in Willimantic. He is disabled by renal failure requiring hemodialysis treatment three times per week, hypertension and high cholesterol requiring medication and heart problems relating to a heart attack. The dialysis treatment is exhausting and leaves him weak and tired during treatment and for a significant period following each treatment. When he is weak and tired he must rest and cannot engage in other activities.  In addition to his disability substantially limiting his mobility, his weakness, exhaustion, need to rest and ongoing need for regular treatment make it impossible to take public transportation to meet with his DSS worker in Norwich. He can complete and mail forms to DSS, but at times needs assistance and time to complete these tasks and help with mailing as he is often weak and exhausted. On the two weekdays each week when he has dialysis, in addition to one weekend day, it is impossible for him to attend appointments. Despite his disability, when he moved from Hartford to Willimantic in April 2003, he was not provided with information on his right to reasonable accommodations to allow him to maintain his life-sustaining Medicaid benefits. His DSS file is not tagged with information regarding his disabling condition and his need for reasonable accommodation to maintain benefits. He does not have a phone from which to call DSS or where he can be reached as he cannot afford one, nor does he have access to a fax or copier. His Medicaid transportation to dialysis, though reinstated since with intervention from his attorney (Connecticut Legal Services), was wrongly  terminated.   His Medicaid transportation to dialysis has been terminated in spite

of his eligibility for such services, ongoing cooperation with DSS requirements, and repeated efforts to contact DSS to resolve problems.

**B.  Statutory and Regulatory Framework of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.**

38.  Congress enacted the ADA in 1990 to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2000).   42 U.S.C. § 12101(a)(8).   Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as . . .  access to public services[.]" 42 U.S.C. § 12101(a)(3). In enacting the ADA, Congress further declared that individuals with disabilities "continually encounter various forms of discrimination, including outright intentional exclusion, . . .  failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, . . . and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

39.  Subtitle A of  Title II of the ADA extends to state and local governments and their departments and agencies, as "public entities," certain specified non-discrimination obligations against disabled individuals, thus proscribing discrimination against individuals with disabilities with respect to access to public services.  42 U.S.C. §§ 12131 - 12134.   The Act specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

18

40.  The U.S. Department of Justice ("DOJ") has promulgated regulations implementing the requirements of Subtitle A of Title II of the ADA, applicable to all services, programs, and activities provided or made available by public entities (with the exception of specified transportation activities).   28 C.F.R. §§ 35.101, 35.102.   Congress directed the DOJ regulations to be consistent with the ADA and with the coordination regulations promulgated by the former U.S. Department of Health, Education and Welfare, pursuant to  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.   42 U.S.C. § 12134(b).

41. The ADA specifies that  "the term '  discriminate'   includes .... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."   42 U.S.C. § 12112(b)(5)(A).

42.  The U.S. Department of Justice ADA regulations prohibiting "discrimination" provide in relevant part that:   "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability-- (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service[.]"  28 C.F.R. § 35.130(b)(1)(i).

43.  The ADA further requires public entities, including states, to make reasonable modifications to policies, practices and procedures when necessary to avoid discrimination against persons with disabilities, unless the modifications would

fundamentally alter the nature of the service, program, or activity.   28 C.F.R. §
35.130(b)(7).

44.  Section 504 of the Rehabilitation Act, enacted 17 years prior to the ADA,
similarly provides that "[n]o otherwise qualified individual with a disability in the United
States ... shall, solely by reason of her or his disability, be excluded from the participation
in, be denied the benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

45.  The Act defines the scope of "program or activity" as including "all of the
operations of - a department, agency, special purpose district, or other instrumentality of a
State or of a local government; or  the entity of such State or local government that
distributes such assistance and each such department or agency (and each other State or
local government entity) to which the assistance is extended, in the case of assistance to a
State or local government[.]"  29 U.S.C. § 794(b)(1).

46.  The U.S. Department of Justice  has been charged by Executive Order with
coordinating the implementation of Section 504.   Its implementing regulations apply to
each federal department or agency empowered to extend federal financial assistance.   28
C.F.R. §§ 41.1, 41.2.

47.  The U.S. Department of Health and Human Services  has implemented
Section 504 regulations which apply to each recipient of federal financial assistance from
HHS and to each program or activity that receives or benefits from such assistance.   45
C.F.R. §§ 84.1, 84.2.

48. Food Stamp Program  regulations promulgated by the Food and Nutrition Service (FNS) of the U.S. Department of Agriculture, pursuant to Section 504 of the Rehabilitation Act, also prohibit discrimination by state agencies "for reasons of handicap" against any applicant or participant in any aspect of program administration, including, but not limit [sic] to, the certification of households, the issuance of coupons, the conduct of fair hearings, or the conduct of any other program service[.]"  7 C.F.R. § 272.6(a).

49. The DOJ regulations implementing Section 504 of the Rehabilitation Act state that "a recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53.

50. The DOJ regulations further provide that "No qualified handicapped person, shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance," 28 C.F.R. § 41.51(a), and that a "recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:  (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 41.51(b)(1)(i).

51. The U.S. Department of Health and Human Services regulations implementing Section 504 of the Rehabilitation Act state that a recipient of funding from

21

the Department "may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons[.]" 45 C.F.R. § 84.4(b)(4).

52. A Health and Human Services federal funding recipient, "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:  (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service[.]" 45 C.F.R. § 84.4(b)(1)(i).

53. FNS Food Stamp Program regulations implementing Section 504 of the Rehabilitation Act similarly prohibit discrimination on the basis of handicap against any qualified handicapped person, in the form of exclusion  from participation in, denial of the benefits of, or otherwise being subjected to discrimination under any program or activity receiving assistance from the U.S. Department of Agriculture.  7 C.F.R. § 15b.4(a).  In providing any aid, benefit or service, FNS program recipients may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap, deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or services.  7 C.F.R. § 15b.4(b)(1)(i).  Neither may a recipient "directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the

basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons[.]"    7 C.F.R. § 15b.4(b)(4).

**C.  <u>Systemic Fact Allegations</u>**

54.  Defendants closed over one-third of the DSS offices in Connecticut on or about January 17, 2003, including Ansonia, Bristol, Meriden, Norwalk, Killingly and Willimantic, and effected transfers of residents of towns previously served by these offices to other existing DSS offices as follows:

a.  The Ansonia DSS office served the towns of Ansonia, Beacon Falls, Derby, Oxford, Seymour and Shelton. Residents of these towns were reassigned to the DSS New Haven office. The New Haven DSS office also serves Ansonia, Bethany, Branford, Derby, East Haven, Hamden, Milford, New Haven, North Branford, North Haven, Orange, Seymour, Shelton, West Haven and Woodbridge, as well as towns previously served by the closed Meriden DSS office.

b.  The Bristol DSS office served the towns of Bristol, Burlington, Plymouth, Southington, Avon, Canton, Simsbury and Farmington.  Residents of  Bristol, Burlington, Plymouth and Southington were reassigned to the New Britain DSS office; residents of Avon, Canton, Simsbury and Farmington were reassigned to the DSS Hartford office. The New Britain DSS office also serves Berlin, New Britain and Plainville; the Hartford DSS office also serves Bloomfield, East Granby, Granby, Hartford, Newington, Rocky Hill, Suffield, West Hartford, Wethersfield, Windsor and Windsor Locks.

c.  The Meriden DSS office served the towns of Meriden and Wallingford. Residents of these towns were reassigned to the DSS New Haven office. The New Haven DSS office also serves Ansonia, Bethany, Branford, Derby, East Haven, Hamden, Milford, New Haven, North Branford, North Haven, Orange, Seymour, Shelton, West Haven and Woodbridge, as well as towns previously served by the closed Ansonia DSS office.

d.  The Norwalk DSS office served the towns of New Canaan, Wilton, Norwalk, Weston and Westport.  Residents of New Canaan and Wilton have been reassigned to the DSS Stamford office; residents of Norwalk, Weston and Westport were reassigned to the DSS Bridgeport office. The DSS Stamford office also serves Darien, Greenwich and Stamford; the DSS Bridgeport office also serves Bridgeport, Easton, Fairfield, Monroe, Stratford and Trumbull.

e.  The Killingly DSS office served the towns of Brooklyn, Canterbury, Eastford, Killingly, Plainfield, Pomfret, Putnam, Thompson and Woodstock.  Residents of these towns were reassigned to the DSS Norwich office. The DSS Norwich office also serves Bozrah, Colchester, East Lyme, Franklin, Griswold, Groton, Lebanon, Ledyard, Lisbon, Montville, New London, North Stonington, Norwich, Preston, Salem, Sprague, Sterling, Stonington, Voluntown and Waterford, as well as towns previously served by the closed Willimantic DSS office.

f.  The Willimantic DSS office served the towns of Ashford, Chaplin, Columbia, Coventry, Hampton, Mansfield, Scotland, Union, Willington, Windham and Willimantic. Residents of these towns were reassigned to the DSS Norwich office.  The

24

DSS Norwich office also serves Bozrah, Colchester, East Lyme, Franklin, Griswold, Groton, Lebanon, Ledyard, Lisbon, Montville, New London, North Stonington, Norwich, Preston, Salem, Sprague, Sterling, Stonington, Voluntown and Waterford, as well as towns previously served by the closed Killingly DSS office.

55.  Defendant Governor Rowland, acting by and through the State of Connecticut Office of Policy and Management (OPM), made the decision to close these DSS offices, as a measure designed solely to achieve fiscal budgetary savings.  The Governor's decision to close these DSS offices included a decision to reduce DSS staff by the number of DSS staff assigned to such offices.

56.  The decisions of defendant Governor Rowland to close the DSS offices, lay off DSS staff, offer early retirement to staff, and to reduce staff through attrition were unaccompanied by any discussions or planning with the staff of defendant Commissioner Wilson-Coker, or by any other consideration, regarding any potential impact of the closures upon the abilities of DSS applicants and recipients with disabilities to be reasonably accommodated in accessing and maintaining their benefits.

57.  In carrying out the defendant Governor's decision to close the DSS offices, lay off DSS staff, offer early retirement to staff, and to reduce staff through attrition, neither  the defendant DSS Commissioner nor her staff engaged, prior to the actual closings,  in any discussions, planning or consideration, either independently or with any other entity, specifically regarding any potential impact of the closures upon the abilities of DSS applicants and recipients with disabilities to be reasonably accommodated in accessing and maintaining their benefits.

25

58. In many instances, newly assigned DSS offices are significantly farther from the homes of plaintiffs and members of the proposed plaintiff class, many of whom lack personal transportation, or the ability to travel distances under any circumstances, due to their disabilities. In many cases, the DSS offices are inaccessible by public transportation that plaintiffs and proposed plaintiff class members may use.

59. Significant numbers of plaintiffs and proposed plaintiff class members are unable to rely on telephone communication due to mental disability. Where DSS has instituted toll-free numbers to purportedly assist clients with disabilities, the numbers have frequently not been reliably answered during business hours, forcing applicants and recipients to make multiple telephone calls and utilize long-distance numbers to call workers.

60. DSS operates a voice mail system that is dysfunctional and which serves to deny opportunities for reasonable accommodations to applicants and recipients with disabilities. For example, some DSS supervisors maintain voice mail messages which explain that due to additional responsibilities from closed DSS offices and the resultant heavy calling, calls will be returned on a rotational basis and only when the worker is able. DSS operates a voice mail system that is inadequate to handle the volume of client calls to workers and will not take messages when the volume limit has been reached. DSS workers do not reliably respond to voice mail messages even when it is possible to leave them, sometimes returning calls after excessive delay or not at all, thus amplifying the access obstacles faced by applicants and recipients with disabilities. In addition, the internal telephone directory is not accurately maintained so if a DSS

applicant or recipient were to attempt to dial the letters for the name of a supervisor, the person could get the wrong telephone number, and, again, have to make multiple calls.

61. DSS has significantly reduced staff throughout the state through lay-offs, retirements and attrition. Defendant Governor Rowland, acting by and through OPM, made a decision to offer early retirement to state employees during June 2003, including employees at DSS, as a measure designed to achieve fiscal budgetary savings. Each staff position lost to DSS through lay-offs, early retirement and staff attrition may not be refilled except by permission of the Governor acting through OPM. Staff losses, when coupled with the office closures, have greatly reduced the ability of DSS to make reasonable accommodations for applicants and recipients with disabilities, including plaintiffs and members of the proposed plaintiff class, in its administration of benefits, programs and services. This situation has not been alleviated by the subsequent rehiring of approximately 50 laid-off DSS workers.

62. As a result of defendants' actions and refusals to act with respect to the office closures and staff reductions, plaintiffs and members of the proposed plaintiff class are deprived of benefits, programs and services which they need and to which they are entitled because, without reasonable accommodation, they are unable to attend scheduled appointments or provide documentation as required to maintain such benefits, programs or services, or effectively communicate by telephone or to otherwise comply with DSS eligibility requirements.

63. Total DSS staff statewide were reduced from 1287 on January 1, 2003 to 1134 on June 1, 2003.

27

64. DSS case workers have insufficient time and resources to meet and interact with plaintiffs as applicants and recipients with disabilities, either by phone, mail, or in person, explain program eligibility requirements as necessary by phone, mail, or in person, screen applicants to determine whether they have disabilities requiring reasonable accommodations to complete the application process or to qualify for a disability-based DSS service or program, or to assist applicants and recipients with disabilities in procuring needed documentation of disability.

65. In addition to the office closures and staff reductions, DSS has, since January 2003, closed its offices statewide to the public, except for emergencies, at least two half days per week, further restricting access to the agency's programs and services to plaintiffs and the proposed class, as persons with disabilities.

66. A significant number of individuals seeking to apply for benefits at various DSS offices are unable to do so on the day they come in and are provided with a short application form to preserve the date of benefits eligibility, and are told by DSS staff to return on a subsequent day to complete the application. Individuals who are unable to return to the DSS office to complete this application within the processing time for that particular program have benefits which only begin to accrue after the full application is completed and received by DSS. The need to appear at the office twice in order to apply for benefits is a particular hardship for applicants with disabilities who have mobility or cognitive limitations. Further, the process does not allow applicants to be informed of their ADA rights or to request reasonable accommodations.

67.  As partial resolution of an individual complaint of disability discrimination filed against DSS with the Office of Civil Rights of the U.S. Department of Health and Human Services, the defendant DSS Commissioner directed that staff receive  a brief, one-time, generic  training on the ADA.  The training did not provide guidance for the application of ADA reasonable accommodation standards for persons with disabilities in the administration of DSS benefits, programs, or services, nor did it identify what accommodations are available through DSS, and it has not been accompanied by any follow-up statewide staff  trainings on ADA issues.  DSS staff do not have adequate training or supervision to ensure they recognize disabling conditions and understand appropriate available accommodations to be made for persons with disabilities.

68.  On or about January 20, 2003,  following the office closings,  the defendant DSS Commissioner adopted  a short-term transition plan under a memorandum of understanding with the Connecticut Association for Community Action to purportedly assist  persons with disabilities through community action agencies serving areas where DSS offices had closed, with respect to meeting documentation and verification eligibility requirements for DSS benefits.  That plan has not met  the reasonable accommodation requirements of the ADA and Section 504.

69.  DSS staff reductions, occurring at the time of the office closings and continuing  thereafter, have caused a 15% increase in  caseloads for the remaining workers, in numbers up to approximately 1300 cases for some workers.

70.  Staff reductions, occurring at the time of DSS office closings and thereafter, have resulted in caseloads maintained by DSS case workers that are too high to

consistently and timely provide reasonable accommodations, as appropriate, to plaintiffs

and members of the proposed plaintiff class, resulting in delays in processing benefits and

denials of benefits to plaintiffs and members of the proposed plaintiff class.

71.   The office closings and staff reductions have contributed to significant delays

in processing applications and changes in benefits.  According to DSS Intake Reports,

34% of pending applications were overdue, as of  December, 2003.  This is a 16%

increase from November, 2002, when 18% of applications were overdue. A significant

number of these applications are for AABD state supplement benefits for the aged, blind

and disabled, as well as Medicaid benefits for persons with disabilities.

72.   The DSS staff reductions  and increases in individual worker caseloads have

also contributed to significant delays in taking benefit applications, and to a failure to

fully  inform applicants of relevant eligibility criteria, thereby restricting the opportunities

for  applicants with disabilities to receive necessary reasonable accommodations  in

accessing  benefits, programs and services.   This disproportionally impacts proposed

plaintiff class members, because disability itself is a relevant eligibility criteria for cash

assistance.  Most individuals  must have a medical basis for not being able to work to

qualify for SAGA  cash assistance. An employable  person with children can qualify for

Temporary Family Assistance (TFA) for only a limited time period of 21 months plus two

possible extensions of six months each,  if the person is deemed to have been in good

faith compliance with program requirements. Other extensions are only available if there

are two or more barriers to work, domestic violence is present which impedes the ability

to work, the individual is medically determined to be incapacitated and unable to work, or the individual qualifies under several other limited exemptions.

73. DSS workers routinely fail to inform those individuals potentially eligible for SAGA cash, those reaching time limits, or those reapplying after losing TFA eligibility, of these alternate ways to qualify based on "barriers" or disability. As a result, plaintiffs and proposed class members are given the incorrect impression that they are ineligible and do not have the right to apply for benefits.

74. As a result of the office closings and staff reductions, DSS workers have even less time than prior to these events to provide appropriate, reasonable accommodations to plaintiffs and members of the proposed plaintiff class, as persons with disabilities. DSS workers routinely fail or refuse to inform applicants that they have the right to request reasonable accommodations such as assistance with completing forms, or obtaining needed proof, if they are disabled.

75. While staff in various DSS offices have periodically employed a "service needs assessment" purportedly designed to initially screen for disabling conditions or barriers to work possessed by TFA program recipients, the defendant Commissioner has failed or refused to act to ensure that this tool is routinely and uniformly used statewide on an ongoing basis, and its use has identified far fewer DSS clients with disabilities than exist in the agency's client population.

76. DSS staff in various offices periodically use a manual file tagging or computer identification system to purportedly track applicants or recipients previously screened or identified as disabled and requiring reasonable accommodations, but the

31

defendant Commissioner has failed or refused to act to ensure that these methods are routinely and uniformly used statewide on an ongoing basis,  and their  use has identified far fewer DSS clients with disabilities requiring reasonable accommodations than exist in the agency's client population.

77.   Defendants have failed to adopt, implement, maintain, or monitor  policies and procedures to reasonably accommodate, if necessary and appropriate,  program-eligible persons with disabilities, in a manner that reasonably ensures they have an opportunity to meaningfully access DSS-administered benefits, programs and services.

78.   The defendant Commissioner has failed or refused to ensure that DSS has implemented, adopted, maintained, or enforced any effective or adequate statewide policy, protocol, guidance, regulation, process, or procedure designed to ensure:

a.   Routine, timely and effective screening or identification of  applicants or recipients with disabling conditions who might require reasonable accommodations to access and maintain eligibility for DSS benefits, programs and services;

b.   Routine, uniform, statewide notification to applicants or recipients with disabilities of:  the availability of waivers of mandatory face-to-face appointment interviews for applications and redeterminations of eligibility for the TFA, SAGA and Food Stamp programs;  how to request such waivers; or the standards under which they are granted or denied;

c.   Routine tracking of  applicants or recipients screened or identified as disabled and requiring reasonable accommodations, so as to continue to affirmatively

offer and provide such accommodations to these individuals on an ongoing basis, as
needed;

       d.  Evaluation or assessment of the adequacy of the performance of DSS
staff in performing their obligations under the ADA and the Section 504 Rehabilitation
Act to reasonably accommodate applicants and recipients with disabilities in accessing
and maintaining eligibility for benefits, programs and services;

       e. Coordination with other entities, such as community action agencies and
other DSS contractors, as appropriate, to ensure that these entities:   reasonably
accommodate DSS applicants and recipients with disabilities; maintain standards that
ensure workers in such agencies and organizations are adequately trained and supervised
to recognize disabling conditions and understand appropriate reasonable accommodations
to be made for persons with disabilities; and receive  information  regarding which DSS
recipients are disabled and what reasonable accommodations are needed to ensure access
to DSS benefits, programs and services.

       f.  Instruction of DSS staff regarding the variety and types of reasonable
accommodations they may provide to applicants or recipients with disabling conditions,
how to identify requests or needs of such individuals for reasonable accommodations,  or
how to assess the appropriateness of a  reasonable accommodation for any particular
program client in any particular circumstance.

     79. The defendant DSS Commissioner does  not provide, on an ongoing basis,
adequate, timely or effective written or oral notice of, or information regarding the

nondiscrimination requirements of the ADA, including the right to request reasonable

accommodations,  to plaintiffs or members of the proposed plaintiff class.

80.  The defendant DSS Commissioner has failed or refused to reasonably notify,

on an ongoing basis,  applicants or recipients with disabilities of the agency's ADA

grievance policy, adopted on or about April 1, 2003, and  purportedly designed to allow

applicants and recipients with disabilities the opportunity  to appeal denials of reasonable

accommodation requests.

81.  The defendant DSS Commissioner has failed or refused to ensure that staff

routinely obtain information regarding the potential existence of disabling conditions of

applicants or  recipients for DSS-administered benefits, programs or services which might

require reasonable accommodations, prior to taking adverse actions or sanctions against

those individuals, including denials or terminations of eligibility, exemptions, or

extensions, where  those disabling conditions might militate against the adverse actions or

sanctions as mitigating or defensive factors.

82.  The defendant DSS Commissioner has  not adopted appropriate or adequate

written grievance procedures that would allow plaintiffs and members of the proposed

plaintiff class reasonable opportunities to be notified of their right to file grievances to

redress violations of their reasonable accommodation rights under the ADA or Section

504 of the Rehabilitation Act, and to file such  grievances and obtain relief when their

rights to reasonable accommodations under the ADA and Section 504 are so violated.

83.  Defendants must meet their  ADA and Section 504 obligations  in

conjunction with mandatory federal standards of equitable administration of subsistence

benefit programs.  In its  operation of the TFA, Food Stamp and Medicaid programs, the

State of Connecticut is required to conduct a program in all political subdivisions of the

state. (TFA - 42 U.S.C. § 602(a)(1);  45 C.F.R.  § 205.120; Food Stamp program - 7

U.S.C. § 2020(d); Medicaid - 42 U.S.C.  § 1396a(a)(1), 42 C.F.R. § 431.50(b)(1)). There

must be equitable standards of assistance and administration throughout the state, and

specifically with cash assistance programs, there must be equitable treatment of

individuals in similar circumstances throughout the state. (TFA - 45 C.F.R. §§ 205.120

and 205.130(b); Medicaid - 42 C.F.R. 431.50(b)(1)).

84.  Defendants' ADA and Section 504 obligations must additionally be met in

conjunction with the obligations of the defendant DSS Commissioner, together  with the

Secretary of the Office of Policy and Management, an agent of the defendant Governor, to

ensure: the development of DSS regions for service delivery that consider the "location of

department facilities", "the accessibility of transportation for clients to service delivery

offices and for workers to clients" and "federal requirements"; "coordinated control and

direction for programs to ensure consistency and uniformity among the regions in the

development and provision of services"; and the encouragement of collaborations that

"maintain the client-focused structure of the health and human services system".  Conn.

Gen. Stat.  § 17b-6(b).

85.  Plaintiffs and the proposed class they represent have no adequate remedy at

law and are being  irreparably injured by the defendants' actions of closing DSS offices

and reducing staff, which exacerbated and perpetuated the continuing statewide, systemic

failure or refusal of defendants to identify, screen, track  and reasonably  accommodate

plaintiffs and the proposed class, as persons with disabilities, to ensure their ability to meaningfully access DSS-administered benefits, programs and services, and to adopt, implement and maintain policies and procedures designed to afford opportunities for such access.

**FIRST CAUSE OF ACTION:**
**AMERICANS WITH DISABILITIES ACT - REASONABLE**
**ACCOMMODATION**

86. Paragraphs 1 through 85 are incorporated by reference as if fully stated herein.

87. DSS is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1)(A), (B), and U.S. Department of Justice implementing regulations, at 28 C.F.R. § 35.104.

88. Each named plaintiff and each absent member of the plaintiff class has at least one "disability," as that term incorporates having a physical or mental impairment that substantially limits one or more of the major life activities of such individual, as defined under the ADA at 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104.

89. Each named plaintiff and each absent member of the plaintiff class is a "qualified individual with a disability" as defined under the ADA at 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104, as an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by DSS.

36

90.  By closing offices and reducing staff, defendants have  exacerbated and perpetuated an ongoing, statewide, systemic breakdown of delivery of DSS benefits, services and programs, insofar as they have failed or refused to implement, maintain or monitor a reliable, statewide system of ensuring that the  reasonable accommodation needs of applicants and recipients with disabilities are met, with respect to accessing and maintaining eligibility for those benefits, programs and services, in violation of Title II of the ADA and its implementing regulations.   42 U.S.C. § 12112(b)(5)(A); 28 C.F.R. § 35.130(b)(7).

### SECOND CAUSE OF ACTION: AMERICANS WITH DISABILITIES ACT - DISCRIMINATORY EXCLUSION AND DENIAL OF BENEFITS

91.  Paragraphs 1 through 90 are incorporated by reference as if fully stated herein.

92.  Defendant Commissioner,  pursuant to the ongoing funding and policy authority and directives of defendant Governor, continues to administer  DSS public assistance programs in a manner that excludes plaintiffs and proposed plaintiff class members from participation in,  or denies them the benefits of DSS-administered public assistance programs and services to which they are otherwise entitled, and subjects them to unlawful discrimination, in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations.   28 C.F.R. § 35.130(b)(1)(i).

### THIRD CAUSE OF ACTION:
### LACK OF INFORMATION REGARDING ADA RIGHTS

93.  Paragraphs 1  through 92 are incorporated by reference as if fully stated herein.

94.  Under regulations promulgated by the U.S. Department of Justice which implement the ADA, DSS, as a public entity, is required to make available to plaintiffs and the proposed class they represent information regarding Title II of the ADA and its applicability to the services and programs of  DSS, and the protections against discrimination which are assured them by the ADA.  28 C.F.R. § 35.106.

95.  In violation of 28 C.F.R. § 35.106, defendant Commissioner has continued to fail or refuse  to make information regarding Title II of the ADA and its applicability to DSS-administered public assistance programs available to plaintiffs and members of the proposed  plaintiff class, thereby preventing them from effectively exercising their rights as disabled persons to meaningful access to DSS-administered benefits, programs and services.

### FOURTH CAUSE OF ACTION:  LACK OF ADA GRIEVANCE PROCEDURE

96.  Paragraphs 1  through 95 are  incorporated by reference as if fully stated herein.

97.  DSS is a public entity that employs 50 or more persons.

98.  U.S. Department of Justice regulations implementing the ADA require DSS, as a public entity employing 50 or more persons,  to adopt and publish a grievance

procedure providing for prompt and equitable resolution of complaints of ADA Title II

violations. 28 C.F.R. § 35.107(b).

99.  In violation of these ADA regulations, defendant Commissioner has failed or

refused to adopt and publish, or otherwise inform or notify plaintiffs of appropriate and

adequate ADA grievance procedures that would reasonably allow the named plaintiffs

and members of the proposed plaintiff class to file grievances and obtain relief when their

rights under the ADA are violated, thereby preventing them from effectively having the

opportunity to uphold their rights as  persons with disabilities to meaningful access, with

or without reasonable accommodations,  to DSS- administered benefits, programs and

services.

**FIFTH CAUSE OF ACTION: SECTION 504 OF THE REHABILITATION ACT - REASONABLE ACCOMMODATION**

100.  Paragraphs 1 through 99 are incorporated by reference as if fully stated

herein.

101.  DSS is a "recipient" of "federal financial assistance," as defined by Section

504 of the Rehabilitation Act of 1973 and by implementing regulations promulgated by

the U.S. Department of Justice, the U.S. Department of Health and Human Services, and

the U.S. Department of Agriculture, thereby rendering it  subject to Section 504.   29

U.S.C. § 794(b)(1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 7 C.F.R. § 15b.3(f),

(g).

102.  The administration by DSS of the TFA, Food Stamp and Medicaid

programs, which  are funded in part with federal financial assistance, constitutes

"programs or activities" subject to Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794(b)(1).

103. Each named plaintiff and each absent member of the proposed plaintiff class has at least one "disability," as that term incorporates having a physical or mental impairment that substantially limits one or more of the major life activities of such individual, as defined under Section 504 of the Rehabilitation Act of 1973, at 29 U.S.C. § 705(9)(B), (20)(B).

104. Each named plaintiff and each absent member of the proposed plaintiff class is a "handicapped person," as that term incorporates having a physical or mental impairment that substantially limits one or more of the major life activities of such individual, pursuant to the Section 504 implementing regulations of the U.S. Departments of Justice, Health and Human Services, and Agriculture. 28 C.F.R. § 41.31; 45 C.F.R. § 84.3(j), (l); 7 C.F. R. § 15b.3(i), (j), (k).

105. Each named plaintiff and each absent member of the proposed plaintiff class is a "qualified handicapped person," as that term incorporates a handicapped person who meets the essential eligibility requirements for the receipt of services, pursuant to the Section 504 implementing regulations of the U.S. Departments of Justice, Health and Human Services, and Agriculture. 28 C.F.R. § 41.32; 45 C.F.R. § 84.3(k)(4); 7 C.F.R. § 15b.3(n).

106. By closing offices and reducing staff, defendants have exacerbated and perpetuated an ongoing, statewide, systemic breakdown of delivery of DSS benefits, services and programs, insofar as they have failed or refused to implement, maintain or

monitor a reliable, statewide system of ensuring that the reasonable accommodation

needs of applicants and recipients with disabilities are met, with respect to accessing and

maintaining eligibility for those benefits, programs and services, in violation of Section

504 of the Rehabilitation Act and its implementing regulations.    29 U.S.C. § 794(a);

28 C.F.R. § 41.53.

**SIXTH CAUSE OF ACTION: SECTION 504 OF THE REHABILITATION ACT - DISCRIMINATORY EXCLUSION AND DENIAL OF BENEFITS**

107.  Paragraphs 1 through 106 are incorporated by reference as if fully stated

herein.

108.  Defendant Commissioner, pursuant to the ongoing funding and policy

authority and directives of defendant Governor, continues to administer DSS public

assistance programs in a manner that excludes plaintiffs and proposed class members

from participation in, or denies them the benefits of DSS-administered public assistance

programs and services to which they are otherwise entitled, and subjects them to

discrimination, in violation of Section 504 and its implementing regulations.  29 U.S.C. §

794(a); 28 C.F.R. §§ 41.51(a), 41.51(b)(1)(i);  45 C.F.R. §§ 84.4(b)(1)(i);  84.4(b)(4).

**SEVENTH CAUSE OF ACTION: LACK OF REHABILITATION ACT SECTION 504 GRIEVANCE PROCEDURE**

109.  Paragraphs 1 through 108  are incorporated by reference as if fully stated

herein.

110.  DSS is a recipient under Section 504 that employs 15 or more persons.

41

111.  Federal regulations implementing Section 504 for recipients of federal funding from the U.S. Department of Health and Human Services and the U.S. Department of Agriculture require the defendant DSS Commissioner, as administrator of a  recipient that employs 15 or more persons, to adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by the Act.  45 C.F.R. § 84.7(b); 7 C.F.R. § 15b.6(b).

112.  Defendant Commissioner has violated these Section 504 regulations by failing or refusing to establish an adequate grievance procedure for the named plaintiffs and members of the proposed plaintiff class to file grievances and obtain relief when their rights under Section 504 are violated, thereby preventing them from having the opportunity to effectively exercise their rights as persons with disabilities to meaningful access, with or without reasonable accommodations,  to DSS administered benefits, programs and services.

## EIGHTH CAUSE OF ACTION: DUE PROCESS

113.  Paragraphs 1 through 112 are incorporated by reference as if fully stated herein.

114.  At all times relevant herein, defendants were acting under color of statutes, ordinances, regulations, custom, or usage of the State of Connecticut.

115.  Defendant Commissioner's  actions in failing or refusing to ensure that DSS staff inform program applicants that DSS rules allow individuals  with certain limitations in their ability to work to qualify for TFA or SAGA cash benefits, notwithstanding

sanctions or time limits, unlawfully hinders or prevents proposed plaintiff class members who would otherwise qualify for benefits from applying.  This violates proposed plaintiff class members' rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

A.    Assume jurisdiction of this matter;

B.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) with respect to the proposed class identified herein;

C.    Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring  that the defendants' actions and failures or refusals to act violate the federal statutory and regulatory provisions, and Constitutional standards cited in the Causes of Action in the Complaint, as follows:

(1) By continuing to fail or refuse to implement, maintain or monitor a reliable, statewide system of ensuring that the reasonable accommodation needs of DSS applicants and recipients with disabilities are met, with respect to accessing and maintaining eligibility for those benefits, programs and services, in violation of Title II of the ADA and its

implementing regulations, as recited in plaintiffs' FIRST CAUSE OF ACTION;

(2)   By the defendant Commissioner,  pursuant to the ongoing funding and policy authority and directives of defendant Governor, continuing to administer  DSS public assistance programs in a manner that excludes plaintiffs and proposed plaintiff class members from participation in,  or denies them the benefits of DSS-administered public assistance programs and services to which they are otherwise entitled, and subjects them to unlawful discrimination, in violation of Title II of the ADA, and its implementing regulations,  as recited in plaintiffs' SECOND CAUSE OF ACTION;

(3) By the continuing failure or refusal of defendant Commissioner to make information regarding Title II of the ADA and its applicability to DSS-administered public assistance programs available to plaintiffs and members of the proposed plaintiff class, thereby preventing them from effectively exercising their rights as persons with disabilities to meaningful access to DSS-administered benefits, programs and services, in violation of federal regulations implementing Title II of the ADA, as recited in plaintiffs' THIRD CAUSE OF ACTION;

(4) By the continuing failure or refusal of defendant Commissioner to adopt and publish, or otherwise inform or notify plaintiffs and members of the proposed plaintiff class of appropriate and adequate ADA grievance

44

procedures that reasonably would allow them to file grievances and obtain relief when their rights under the ADA are violated, thereby preventing them from effectively having the opportunity to uphold their rights as persons with disabilities to meaningful access, with or without reasonable accommodations, to DSS- administered benefits, programs and services, in violation of federal regulations implementing Title II of the ADA, as recited in plaintiffs' FOURTH CAUSE OF ACTION;

(5) By the continuing failure or refusal of defendants to implement, maintain or monitor a reliable, statewide system of ensuring that the reasonable accommodation needs of DSS applicants and recipients with disabilities are met, with respect to accessing and maintaining eligibility for those benefits, programs and services, in violation of Section 504 of the Rehabilitation Act and its implementing federal regulations, as recited in plaintiffs' FIFTH CAUSE OF ACTION;

(6) By the defendant Commissioner, pursuant to the ongoing funding and policy authority and directives of defendant Governor, continuing to administer DSS public assistance programs in a manner that excludes plaintiffs and proposed plaintiff class members from participation in, or denies them the benefits of DSS-administered public assistance programs and services to which they are otherwise entitled, and subjects them to discrimination, in violation of Section 504 and its implementing federal regulations, as recited in plaintiffs' SIXTH CAUSE OF ACTION;

45

(7) By the failure or refusal of the defendant Commissioner to establish an appropriate and adequate grievance procedure for the named plaintiffs and members of the proposed plaintiff class to file grievances and obtain relief when their rights under Section 504 are violated, thereby preventing them from having the opportunity to effectively exercise their rights as persons with disabilities to meaningful access, with or without reasonable accommodations, to DSS-administered benefits, programs and services, in violation of federal regulations implementing Section 504 of the Rehabilitation Act, as recited in plaintiffs' SEVENTH CAUSE OF ACTION;

(8) By the failure or refusal of defendant Commissioner to ensure that DSS staff inform DSS program applicants of the eligibility criterion that individuals with certain limitations in their ability to work might qualify for TFA or SAGA cash benefits, notwithstanding sanctions or time limits, thereby unlawfully hindering or preventing proposed plaintiff class members who would otherwise qualify for benefits from applying, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as recited in plaintiffs' EIGHTH CAUSE OF ACTION.

D.    Enter temporary, preliminary and permanent injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, requiring defendants to comply with the Americans with Disabilities Act and Section 504 of the

Rehabilitation Act of 1973 and the implementing federal regulations of both Acts, as follows:

(1)  Adopt, implement,  and monitor, on an ongoing basis, statewide, systemic policies and procedures designed to ensure that DSS applicants and recipients with disabilities are routinely provided with appropriate identification or screening as individuals with disabilities requiring reasonable accommodations to meaningfully access DSS administered benefits, programs and services, and are consequently provided with such reasonable accommodations, as needed and as appropriate;

(2)  Adopt, implement and monitor, on an ongoing basis, policies and procedures designed  to notify applicants for and recipients of DSS administered benefits, programs and services of the nondiscrimination requirements of Title II of the ADA and their applicability to DSS-administered public assistance programs;

(3)  Adopt, implement and monitor, on an ongoing basis,  an appropriate and adequate  grievance procedure providing for prompt and equitable resolution of complaints of ADA Title II violations and Section 504 violations and provide adequate, reasonable notice to applicants for and recipients of DSS-administered benefits, programs and services of their right to file grievances;

E.    Enter temporary, preliminary and permanent injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, requiring defendant DSS

47

Commissioner to comply with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by ensuring that DSS staff refrain from hindering or preventing otherwise eligible proposed plaintiff class members from applying from benefits, by instead informing DSS program applicants of the eligibility criterion that individuals with certain limitations in their ability to work might qualify for TFA or SAGA cash benefits, notwithstanding sanctions or time limits;

F.     Award plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 12205 (ADA); 29 U.S.C. § 794a(b) (Section 504); and 42 U.S.C. § 1988 (enforcement of due process under 42 U.S.C. § 1983); and

G.     Order such other, further, or different relief as the Court deems equitable and just.

PLAINTIFFS


BY:     /s/Maria Morelli-Wolfe
        Maria Morelli-Wolfe (ct23174)
        Greater Hartford Legal Aid
        99 Asylum Ave., 3rd Floor
        Hartford, CT 06105-2465
        Phone: 860.541.5042
        Fax: 860.541.5050
        E-Mail: mmorelliwolfe@ghla.org
        Their Attorney

48

Shirley Bergert (ct09328)
Connecticut Legal Services, Inc.
872 Main St., PO Box 258
Willimantic, CT 06226
Phone: 860.456.1761 x.115
Fax: 860.456.7420
E-Mail: sbergert@connlegalservices.org
Their Attorney

Priya Cloutier (ct20598)
Connecticut Legal Services, Inc.
153 Williams Street
New London, CT 06320
Phone: 860.447.0323 x.112
Fax: 860.443.0109
E-Mail: pcloutier@connlegalservices.org
Their Attorney

Lucy Potter (ct23449)
Greater Hartford Legal Aid
99 Asylum Ave., 3rd Floor
Hartford, CT 06105-2465
Phone: 860.541.5002
Fax: 860.541.5050
E-Mail: lpotter@ghla.org
Their Attorney

Greg Bass (ct18114)
Greater Hartford Legal Aid
999 Asylum Ave., 3rd Floor
Hartford, CT 06105-2465
Phone: 860.541.5018
Fax: 860.541.5050
E-Mail: gbass@ghla.org
Their Attorney

Joanne Gibau (ct05730)
New Haven Legal Assistance Assoc.
426 State Street
New Haven, CT 06510-2018
Phone: 203.946.4811
Fax: 203.498-9271

49

E-Mail: jgibau@nhlegal.org
Their Attorney


CERTIFICATE OF SERVICE


I hereby certify that on the 23rd of February 2004, a copy of foregoing Plaintiffs'

Second Amended Complaint was filed electronically [and served by mail on anyone

unable to accept electronic filing.] Notice of this filing will be sent by e-mail to all parties

by operation of the Court's electronic filing system [or by mail to anyone unable to accept

electronic filing]. Parties may access this filing through the Court's system.


Hugh Barber, Esq.
Peter Brown, Esq.
Richard J. Lynch, Esq.
Assistant Attorneys General
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120


_____
/s/ Maria Morelli-Wolfe (ct23174)
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
Phone: (860) 541-5042
Fax: (860) 541-5050
E-mail: mmorelliwolfe@ghla.org

50