Page 1

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3
   * * * * * * * * * * * *Civil Docket
4                      *  No. 3:03CV118(MRK)
   LORI RAYMOND, ET AL,          *
5            Plaintiffs     *
                              * January 22, 2004
6         vs.            * 2:40 o'clock p.m.
                              *
7   JOHN ROWLAND, ET AL,          *
            Defendant      *
8                      *
   * * * * * * * * * * * *New Haven, Connecticut
9                ORAL ARGUMENT

10        BEFORE THE HONORABLE MARK R. KRAVITZ
             UNITED STATES DISTRICT JUDGE
11   Appearances:
     For the Plaintiffs:        GREGORY LEE BASS, ESQ.
12                    Greater Hartford Legal Aid
                      999 Asylum Avenue
13                    Hartford, CT 06105-2465
                      SHIRLEY J. BERGERT, ESQ.
14                    Connecticut Legal Services
                      872 Main Street,PO Box 258
15                    Willimantic, CT 06226

16   For the Defendants:        HUGH BARBER, ESQ.
                    Attorney General's Office
17                    Health & Human Services
                      55 Elm Street, PO Box 120
18                    Hartford, CT 06141-0120
                      PETER L. BROWN, ESQ.
19                    Attorney General's Office
                      55 Elm Street, PO Box 120
20                    Hartford, CT 06141-0120

21  Court Reporter:          Thea Finkelstein RMR, CRR
                            141 Church Street
22                           New Haven, CT 06510
                            (203) 777-3487
23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer.


Page 2


1        THE COURT:  Good afternoon.  Please be seated.

2  Okay, we are here on Raymond versus Rowland 03CV118(MRK).  We

3  have a number of motions before the Court.  Let me just get

4  organized here.

5        Could counsel identify themselves for the record?

6        MR. BASS:  Your Honor, Greg Bass arguing for

7  plaintiffs.

8        THE COURT:  Good afternoon, Mr. Bass.

9        MS. BERGERT:  Shirley Bergert with Mr. Bass.

10       THE COURT:  Good afternoon, Miss Bergert.

11       MR. BROWN:  Good afternoon, your Honor, Assistant

12  Attorney General Peter Brown for defendants.

13       THE COURT:  Good afternoon, Mr. Brown.

14       MR. BARBER:  And Hugh Barber for the defendants.

15        THE COURT:  Good afternoon, Mr. Barber.

16        MR. BARBER:  Good afternoon.

17        THE COURT:  Okay.  I have read all of your papers

18  and fundamentally, we are here to talk about the motion to

19  dismiss and the motion for class certification but there also

20  came in last week or so a motion for extension of time and

21  adjustment of scheduling order and I wanted to address that

22  first, if I could.  Is that okay?

23        MR. BASS:  Certainly, your Honor.

24        THE COURT:  And in particular, my question is --

25  you may want to not be on the record for this and if that' s


Page 3


1  so, we can discuss it in my chambers -- but I did notice that

2  in part, the request for extension of time was due to ongoing

3  active settlement negotiations and that naturally raised in

4  my own mind the question of whether I should be following

5  this argument, turning immediately to this oral argument,

6  whether they would turn immediately to the settlement or

7  letting the settlement take its own course.

8        If somebody wants to address that, I would be happy

9  to hear.

10      MR. BASS:  It is true, the plaintiffs have

11  sporadically been engaging in intensive settlement

12  negotiations.  They have not been constant but they have been

13  occurring, the latest bout of which has been written comments

14  to the attorney general's office on behalf of the defendants

15  commenting on proposed provisions to the universal manual,

16  which is a guide that the Department of Social Services uses.

17      They sent us draft revisions that would purportedly

18  take into account reasonable needs of recipients, we

19  submitted detailed comments in response and they're currently

20  reviewing them.

21      It's plaintiff's position that indeed argument

22  today on these pending motions might assist in the process of

23  settlement.  We suggested to opposing counsel possibility of

24  mediation through Magistrate Garfinkel.  We have not come to

25  terms on that as yet.

Page 4

1      THE COURT:  Mr. Brown, do you have anything to add

2  to that?

3          MR. BROWN:  No, your Honor.  In fact, we did

4   receive comments from plaintiff's counsel last week and we've

5   provided those to our client agency who's reviewing that.  I

6   don't think that we would take issue with the argument that

7   hearing the arguments on the motions today and proceeding to

8   have a decision on that, wouldn't argue that that would not

9   help to move the process along so I think we should just

10  continue and stay the course.

11         THE COURT:  Okay.  That's fine.  Then I guess my

12  question becomes:  Is this essentially shoving out of

13  everything three months, is does that contemplate a

14  three-month hiatus while settlement discussions are active or

15  simply saying that, hey, you know, we've been preoccupied

16  with not only -- with trying to settle it and therefore we

17  haven't made as much progress on these other matters that we

18  should have?

19         MR. BASS:  We are not asking for a three-month

20  hiatus.  What we've also been doing in the interim is

21  engaging in intensive discovery.  We recently completed

22  several depositions, we have a deposition pending next week

23  for Commissioner Patricia Wilson-Coker herself and regionally

24  based depositions beyond that are contemplated.  We are on a

25  settlement track and plaintiff's discovery track as well.  We

Page 5

1  don' t contemplate a hiatus.

2        THE COURT:  Certainly if you found that I keep

3  moving on my end, I think I would suggest you keep moving on

4  your end so that if you are going to go down a litigation and

5  a settlement track, it be not sequential but simultaneous,

6  okay?

7        MR. Brown:  Yes, your Honor.

8        THE COURT:  I' ll just look through these dates but

9  I expect to provide you with an extension but I would prefer

10  not to be requested for another extension, okay?

11        MR. Brown:  Certainly, your Honor.

12        THE COURT:  All right.  Then I will deal with that

13  shortly.

14        Do you want to take up the motion to dismiss first?

15        MR. Brown:  Yes, your Honor.

16        THE COURT:  I' ve read the stuff.  Basically the way

17  I would like to do these arguments is to focus on really my

18  questions more than anything.  As I understand your

19  opponent' s argument, Mr. Brown, they say that, they say a

20  number of things but they say that, one, they say that even

21  if Ms. Wilson-Coker, the department, were subject to some

22  orders, they can' t be sure that the governor wouldn' t

23  override them or not fund them properly to be implemented.

24         And in particular, I guess they point to the fact

25  that the problems that they are seeking to ameliorate in


Page 6


1  part, I gather, maybe wholly but certainly in part, were the

2  result of, in effect, directives from the governor and the

3  governor' s budget people to various department people but

4  including DSS to close offices and reduce staff.

5         Assume for the moment that that' s true, I think at

6  the motion to dismiss stage I have to assume it' s true unless

7  you correct me otherwise, why wouldn' t that then make the

8  governor a proper defendant and therefore be more than merely

9  the figurehead supreme person in charge of the law of the

10  state and therefore actually an affirmative actor in

11  connection with their claims of harm?

12         MR. BROWN:  Yes, your Honor.  Because if you take a

13  look at all of the relief that the plaintiffs are actually

14  seeking with regard to this case, these are all things that

15  the department has within its control and, in fact, we

16  believe that these are matters that the department has

17  already addressed.

18      For example, one of the issues of relief that the

19  plaintiff is seeking is to insure that there's some type of

20  grievance procedure that is put in place and put forward to

21  inform applicants and recipients of what their rights would

22  be if they feel they have been discriminated against on the

23  basis of their disability, that's something within the

24  department's control, it's not something that the governor or

25  the governor's office needs to be involved with in terms of

Page 7

1  holding him in the case for enforcement and in fact, we've

2  done that.

3      We have, in fact, the commissioner, pursuant to

4  policy that was issued in April of 2003, put information out

5  to its employees, informing them that there is a policy and

6  procedure in place and that we should make sure that our

7  clients are made well aware that if they believe that they're

8  having a problem accessing services and benefits from the

9  department and in order to do so they need a reasonable

10  accommodation, there is a mechanism and procedure for doing

11  so.

12      Holding the governor in the case to address that

13  particular avenue of relief the plaintiffs are seeking would

14  not be relevant and in fact would not be necessary.

15      Another issue that they' ve asked is with regard to

16  the issue of training, make sure that all your employees have

17  received proper training with regard to ADA and reasonable

18  accommodations.  That in fact has been done and in fact that

19  training took place over the summer.  This was something that

20  was within the power of the Department of Social Services to

21  implement and they have, in fact, done that.

22      They' ve also indicated that applicants and

23  recipients should be simply placed on notice, make sure

24  there' s some kind of notice available to these individuals to

25  insure that they know, again, if they' re having a problem


Page 8


1  accessing services and need a reasonable accommodation, that

2   they' re made aware of that.

3        There' s a brochure that' s been prepared.  A number

4   of the regional offices have received that and they' re

5   filtering that information down to their respective offices

6   within the region.  So these pamphlets have been produced and

7   they' re in the process of being made available to individuals

8   when they come into the office.

9        Similarly, if an individual were to call the

10  office, simply make a phone call, and ask for assistance and

11  indicate they have a problem accessing services or benefits,

12  it' s within the power of the department to make sure that

13  those individuals, if they' re disabled, get the information,

14  the help, that they need.

15       So the things that the plaintiff is pointing to in

16  terms of relief and how do we address them are things that

17  can, in fact, be done and we believe are, in fact, being done

18  without the need to keep the governor in the case.

19       THE COURT:  If they were to say, though, and I

20  think you focused on some good things that I' ll ask your

21  opponent about but if they were to say, though, that at least

22  some of the things that they' re looking for require funding,

23  money, and that Ms. Wilson-Coker is not able to demand funds

24  without the cooperation of the governor, and/or that the

25  governor has placed her agency along with other agencies

Page 9

1  under strict budget guidelines under which they have to

2  either reduce their budgeting or can increase it in certain

3  ways, why wouldn' t those circumstances and for whatever

4  aspects of those relief they' re looking for, why wouldn' t the

5  governor be an appropriate party?

6       MR. BROWN:  Your Honor, if that were the case,

7  every time a person sues a state agency because they believe

8  it' s not being provided a level of services because of

9  funding, they could always sue the governor and that would

10  appear to the defendants certainly is not what the Second

11  Circuit and other circuits have intended is a proper way of

12  looking at when a governor has been made a proper party in a

13  case.

14       Obviously, the governor is an individual pursuant

15  to the state Constitution, has supreme executive authority

16  and he obviously appoints individuals to serve as

17  commissioners and those individuals, as you know, go through

18  a budgetary process.  But to claim that in every single case,

19  when an agency is having a problem providing a service

20  because they claim it's a funding issue, that we can always

21  bring the governor in simply would fly in the face of all the

22  cases that talk about what it takes to prove that a person is

23  a proper party and in this --

24      THE COURT:  What they say, though, is a lot of the

25  cases in which, say, the governor's taken off the case, it's


Page 10


1  really an issue of is this law unconstitutional or not?  And

2  you don't think the governor can do it, yes, sure, the

3  governor is nominally in charge of enforcing all laws but

4  there's no showing that the governor, you know, adopted the

5  law in particular and it's a law adopted by the legislature

6  and that those are the kinds of cases that you've cited and

7  that really they cite to cases where it's not that, they're

8  not trying to attack a law as unconstitutional or something;

9  they're trying to challenge an ongoing program as inadequate

10  under federal law and where the governor's cabinet official

11  who reports presumably to the governor may play a role in

12  implementing policies that comply with federal law.

13          Do you have cases where that' s the situation, where

14  it' s an ongoing program of the state and whether the program

15  itself is constitutional where the court dismissed a governor

16  as a party?

17          MR. BROWN:  Your Honor, I haven' t seen any cases

18  specifically on this issue.  The cases that have addressed

19  whether it would in fact be appropriate to hold an officer

20  like a governor in a case have been the cases that we' ve

21  cited.  We have talked about the Rizzo case, your Honor,

22  which does, it' s a Supreme Court case.

23          THE COURT:  Rizzo against Goode?

24          MR. BROWN:  That' s right, your Honor, and in that

25  particular case, you had a situation where I believe it was


Page 11


1  the mayor of Philadelphia was sought to be held in this

2  particular case as a party and the issue had to do with

3  police misconduct that actually took place in the past and

4  they were seeking to impose injunctive prospective relief

5  with regard to this particular officer, in this case the

6  mayor.

7        I believe that the outcome of that case is you have

8    to find, in that particular instance, that that officer had

9    some connection -- some connection, even if it's minimal,

10   some connection -- to the alleged injury that's being

11   claimed.

12        THE COURT:  Now, let's stop you there.  Why

13   wouldn't -- recognizing that some connection seems on its

14   face at least to be a term that connotes not much maybe, why

15   wouldn't the fact, if it were true, that the governor ordered

16   the closing of these offices and staff reductions and budget

17   cuts, why wouldn't that satisfy a some connection

18   requirement?

19        MR. BROWN:  First of all, your Honor, with all due

20   respect, there's no allegation made in the amended complaint

21   that the governor did any such thing.

22        THE COURT:  I would agree with you on that.

23        MR. BROWN:  That's the first thing.

24        THE COURT:  That could be remedied though, right?

25   By an allegation?

Page 12

1          MR. BROWN:  So far, your Honor, as the complaint

2   stands, it's not an allegation that's been made.  Second of

3   all, as we argued, I think when you talk about some

4   connection, it would seem to have to be some evidence, in

5   some way, connecting that action -- say hypothetically

6   ordering closure of the offices -- with the actual injuries

7   that the plaintiff is claiming.  The plaintiffs are alleging

8   that the closure of the offices has, in fact, resulted in the

9   plaintiffs being denied meaningful access to benefits.

10         THE COURT:  Right, and for purposes of the current

11   motion, I have to assume that's true.

12         MR. BROWN:  Yes, your Honor, I understand that, but

13   I think what would have to be shown is where is the nexus?

14   In order to keep the governor in the case, you've still got

15   to try to find some nexus between the closure of the offices

16   in some way and the denial of that meaningful access to

17   benefits.  And again --

18         THE COURT:  In order to hold the governor in?

19         MR. BROWN:  Your Honor, at this point, unless

20   that's pled, how can it be found that he's a proper party?

21         THE COURT:  Let me flip the question to you.  If

22   they have to establish as opposed to simply pleading that

23   nexus, they haven't done it for Ms. Wilson-Coker either,

24  under your theory, right?

25         MR. BROWN:  Well, your Honor, what I'm arguing is


Page 13


1  at this point, the complaint, as written, does not plead that

2  the governor has played any role in --

3         THE COURT:  Closing the offices.

4         MR. BROWN:  That's correct.

5         THE COURT:  Do you deny that the governor played a

6  role in it?

7         MR. BROWN:  Your Honor, to this point, that's not

8  been established.

9         THE COURT:  We are at the pleading stage so it's

10  what can be pled consistent with Rule 11.  What if the

11  governor shut down all the offices, would that be some

12  connection?

13         MR. BROWN:  I think it would depend on the facts

14  and circumstances, your Honor, I don't know that I could

15  concede that that, in fact, would be the case.

16         THE COURT:  Some connection?

17         MR. BROWN:  I think it would depend upon exactly

18   what's pled and what the facts are, what the defendant's

19   actions, what the defendant DSS's actions, were as well at

20   that time.

21         THE COURT:  Why don't you stand down for a bit and

22   let me talk to Mr. Bass and get you back up, Mr. Brown.

23         Let's just focus for a second on the portions of

24   the prayer for relief on page 32 of the amended complaint

25   that asked for changes in grievance policies, training and


Page 14


1   notices to individuals and the adoption of appropriate

2   policies at DSS to do these things.  You don't need the

3   governor for those things, right?  That, you just need the

4   head of the department for those prayers for relief?

5         MR. BASS:  I think that's correct, your Honor, I

6   think the DSS commissioner would have statutory regulatory

7   policy to institute policy, provide adequate notice, by the

8   way we dispute has not yet happened.

9         THE COURT:  Believe me, he can say that all he

10   wants, we are at a motion to dismiss and I understand it's

11   your allegation that they're not adequate and that's all

12  that' s necessary at this stage so you don' t have to respond

13  to that.

14        MR. BASS:  Similarly a grievance procedure could be

15  instituted to take into account reasonable accommodation

16  appeals and disputes without the governor' s assistance.

17        THE COURT:  Why do you need the governor?

18        MR. BASS:  We allege a systemwide breakdown from

19  the office of policy and management, the fiscal policy making

20  arm of the governor' s office which resulted in the closure of

21  six DSS offices in 2003 and that' s demonstrated by documents

22  that we attached.

23        THE COURT:  Could I ask you this:  I thought, and I

24  could be wrong about this, but I thought that while the

25  original lawsuit was to require the offices to be reopened,


Page 15


1  in effect, and I could imagine that in those circumstances,

2  if in fact the governor was the one responsible for

3  essentially ordering that there be reductions that caused the

4  closure, you might want him in there, but my understanding

5  now is that that is not what anybody' s looking for, at least

6    there's nothing in the amended complaint in the prayer for

7    relief that says, listen, we want these offices opened up.

8    It's rather all things about, you know, these policies,

9    training, notice and -- and, it's a big and, but and --

10   providing reasonable accommodation.  I could imagine that to

11   fulfill that, that might require money but that might not

12   require, and there's nothing in the complaint that demands,

13   the reopening of offices, right?

14        MR. BASS:  That's correct although that certainly

15   could be a form of relief to the plaintiffs ultimately, try

16   to direct their energies towards in this lawsuit.  The

17   complaint does need amendment, there's no question about

18   that, to sufficiently bring in allegations to demonstrate

19   there's some connection for the governor.

20        THE COURT:  I was a little bit -- I read your brief

21   and your brief says a lot more than your complaint says.

22        MR. BASS:  That's correct.

23        THE COURT:  And I didn't know why you hadn't

24   actually amended it because he's right, if you take the

25   complaint on its face, it says he's the supreme leader of the

Page 16

1   state or in charge of the law or whatever it says, period,

2   and that' s it and that' s probably not enough given the kinds

3   of things that you are pleading here.

4        MR. BASS:  We agree.

5        THE COURT:  But on the other hand, it makes little

6   sense for me to dismiss the governor out and have you move to

7   amend and add -- I would rather would have dealt with this

8   all at once and have all the allegations and I am sympathetic

9   to Mr. Brown that it' s hard for him to respond if he doesn' t

10  know what the allegation would be.

11       MR. BASS:  I understand, your Honor, the basic

12  reason we' ve not yet amended the complaint again is we are

13  pursuing intensive discovery and we are, in fact, discovering

14  the connection factually of the governor to the initial

15  closure of the offices and we intend to depose Pat

16  Wilson-Coker herself to ascertain what in fact emanated from

17  OPM and governor' s office with respect to the further

18  continuum of events.

19       THE COURT:  Tell me this, as you stand here right

20  now, what would you allege as to satisfy the some connection

21  requirement?

22       MR. BASS:  At a bare minimum, we would allege

23  matters that we argue the Court can take judicial notice of,

24  that is the institutional powers and duties of the governor's

25  office conferred by the state Constitution and the state


Page 17


1  statutes of the state of Connecticut.

2       Those are matters the defendant have not disputed

3  in any way.  The state statutes speak for themselves in terms

4  of the institutional authority of the office and if you take

5  --

6       THE COURT:  That's not different than any other

7  state, right?  That's got to be true in all 50 states, that

8  the governor is in charge of the executive branch of the

9  government and in charge of the --

10      MR. BASS:  Certainly.

11      THE COURT:  Doing the same kinds of things and yet

12  as he points out, there are cases where the courts say, you

13  know, you just don't need the governor in here.

14      MR. BASS:  The cases, almost all of the cases cited

15  in defendant's briefing are the cases that deal with the

16  statute that simply vests supreme authority in the governor's

17  office and the governor is being sought to have some

18  connection to an act which is being challenged as facially

19  unconstitutional or otherwise violative of federal law.

20          As your Honor pointed out, that is not the

21  situation in the case at bar.  We are alleging a pattern and

22  practice of actions and inactions taken in tandem between the

23  governor's office as well as the Department of Social

24  Services commissioner.

25          What makes the state statutory authority that gives


Page 18


1  institutional power to the governor's office in Connecticut

2  somewhat unique is both his budget making authority in terms

3  of sending a comprehensive budget message to the legislature

4  and also having on the tail end rescission authority and line

5  item transfer authority within various circumstances to

6  budgets that come back from the legislature and are passed

7  that far surpasses any sort of budgetary authority that the

8  DSS commissioner has.

9          The DSS commissioner as an executive department

10  head serves expressly by statute at the pleasure of the

11   governor's office.  He appoints these department heads, they

12   serve at his pleasure, he has programmatic authority over

13   their actions.

14          So the case of Rowland versus Cellucci from the

15   district court of Massachusetts is actually a more analogous

16   case.  The court there disputed and discounted ultimately the

17   defendant's obligations, the defendant governor of

18   Massachusetts's contentions, that he was not a proper party

19   to that action.  That was a class of developmentally disabled

20   plaintiffs who sought placement under Medicare statute and

21   also under the ADA.

22          The court discounted the governor's argument that

23   he should not be included as a proper party by citing some of

24   the very same things that we have cited in our briefing here,

25   namely the statutory authority of the governor to appoint


                              Page 19


1   department heads of executive state agencies, the fact that

2   they serve at his pleasure and his programmatic control.

3   Those factors were at least persuasive to the district court

4   of Massachusetts in allowing the governor to remain in that

5   action.

6        That's actually a more analogous ruling than the

7   plethora of cases the defendant cites where a supreme

8   executive power is cited as the only authority keeping the

9   governor in and he is being attacked as a defendant who is

10  theoretically charged with enforcing unconstitutional state

11  statute.  Very different scenarios.

12       THE COURT:  Why do you need him though?

13       MR. BASS:  It's a practical issue.  Under Rule

14  65(d) as your Honor knows, the acting in concert with

15  extension of the rule does not flow upstream, it flows

16  downstream.  You have to view DSS Commissioner Wilson-Coker

17  as the agent in this case, in terms of actions or inactions

18  leading to violations and leading to subsequent injury under

19  the ADA and the Rehabilitation Act and the governor's office

20  has to be viewed as the principal.

21       Any injunctive order under Rule 65 against the

22  agent will not bind the principal.  If there are programmatic

23  changes within the department, and we've alleged systemic

24  series of violations where the reasonable accommodation

25  rights of disabled applicants and recipients are not met on a

Page 20

1    routine uniform basis, they' re not identified, screened,

2    tracked or reasonably accommodated, to secure full and

3    adequate relief requires programmatic changes or funding,

4    only the governor can do that.

5         It is easy to envision a scenario where the DSS

6    commissioner seeks in good faith and reasonably to comply

7    with a court injunctive order but ultimately comes before the

8    court in saying I submitted my recommendations of

9    programmatic changes and policy shifts, whether it' s staff

10   reductions, office closures, or funding realignment to the

11   governor' s office and was told no.

12        THE COURT:  Okay.  So at that point, we can bring

13   the governor in because then the governor is affirmatively

14   preventing the implementation of policies that at that point,

15   the Court has concluded are essential to compliance with

16   federal law.

17        MR. BASS:  It' s unclear.

18        THE COURT:  What you are really saying is, you

19   know, the governor may very well veto what you, Judge, order

20   Ms. Wilson-Coker to do and because he might do that, even

21   though we don' t know that he will do that and we would think

22  that, hope that he would comply with the Court's orders, we

23  need to keep him in and make sure that your order, Judge,

24  runs to him because we -- I don't mean it like we can't trust

25  him but it's almost like that and that seems like an odd

Page 21

1  thing and it also seems like an inappropriate assumption for

2  me to make as a federal judge dealing with a head of a

3  sovereign state.

4        MR. BASS:  That's understandable certainly, your

5  Honor, and we are not asking the Court to make any sort of

6  inference that the governor's office would be acting out of

7  anything but good faith.

8        It's unclear, under Rule 65, whether or not an

9  injunctive order emanating from this court would, in fact,

10  reach an entity or state official, in his official capacity,

11  who has otherwise not been party to the underlying

12  proceedings, who's not been able to present defenses,

13  affirmatively, or to present disputed facts in any way as to

14  his involvement in the case.

15        If you secure an injunctive order under Rule 65

16   that binds the agent, the DSS commissioner in this instance,

17   it's clear that that does not in and of itself bind the

18   principal.

19        THE COURT: So we have to name all the legislators,

20   too, because the legislators might pass a law ordering Ms.

21   Wilson-Coker not to comply with the things that I order

22   because they have the power of the purse and they might say,

23   we are going to withhold your whole budget because we don't

24   want you to comply with Judge Kravitz's order so we really

25   need to get Moira Lyons in here and everybody -- you can take


Page 22


1   that analogy forever, really, and it would be infinite, it

2   seems to me.

3        And unless and until there were some indication

4   that in the past, when federal courts have entered orders

5   against department heads, the governor has taken steps to

6   override them in a budgetary or programmatic way or that

7   there has been -- you know, that there's a substantial risk

8   that we are going to find ourselves in the same kind of

9   conduct, then I would say, well, you know, maybe -- or I

10   think if the exact act that is being attacked here is one in

11   which the governor said to his agent, listen, this is what I

12   want you to do from now on.

13         I want you, and this is my order, in effect,

14   executive order characterize that or otherwise, but I want

15   you to whatever, whatever the thing is.  And his agent says,

16   sure, fine, governor, I'm doing it.  So we know really the

17   mover here isn't the department head, the mover really here

18   is the governor, again that would be appropriate

19   circumstance.

20         But here, where the governor's simply exercising an

21   overall budgetary control for his department and Ms.

22   Wilson-Coker is implementing that as best she can, given the

23   constraints she has, and there is no indication that the

24   governor will thumb his nose at an order that I may issue,

25   it's hard for me to understand why it's essential that he be

Page 23

1   here from the outset.

2         MR. BASS:  Because the facts that we are pursuing

3   in discovery and the facts that we've been able to divulge so

4    far, in which we have brought to the Court by way of

5    attachment to our briefing, do indicate that the prime mover

6    behind the closure of the offices, which in turn precipitated

7    a virtually systemic chaotic disorder within the department

8    which, in turn, is leading to the reasonable accommodation

9    needs of our clients, disabled applicants and recipients,

10   being unmet, began with the governor, fiscal budgetary

11   decision without any apparent forethought or planning as to

12   how this would impact disabled clients of services, programs

13   and benefits of the Department of Social Services.

14        THE COURT:  Maybe then the solution would be to

15   drop the governor for the moment but without prejudice to you

16   coming back at some later point after you' ve taken all your

17   discovery and seek to add him back in on the ground that now

18   we can demonstrate the some connection and here it all is and

19   then I deal with it at that point rather than keeping him in

20   on the basis that you may find something in discovery and

21   then throwing him out on summary judgment.

22        The reason I ask this is I did notice that one case

23   before Judge Thompson that I think you all cited to me on

24   class action status, I didn' t see the governor in that case

25   and actually I went back to the docket sheets and looked at

Page 24

1  the complaint and he's not there.

2       MR. BASS:  That's correct.

3       THE COURT:  Why is it you think in that case, which

4  deals with programmatic problems, that it's not important to

5  keep the governor, you think an order in that case ordering

6  Miss Wilson-Coker to change her programs and spend money, you

7  could do that and you don't need the governor but here you

8  need the governor.  I couldn't understand that.

9       MR. BASS:  Carr has some distinguishing

10  characteristics peculiar to the Medicaid system.  In Carr, it

11  runs downward by contracts that emanate from department to

12  managed care agencies, which run virtually all of the state

13  of Connecticut's Medicaid program.

14       So to deal with the issues of systemic lack of

15  access for Medicaid recipients to dental care in that

16  litigation, we've had to deal with managed care corporations

17  who have contracted upwards with the department, in turn

18  those MCOs contract downwards to dental care subcontractors.

19       So we've got three layers emanating down from the

20  department, and the compartment has clear authority under

21  federal law to issue these contracts and to seek waivers of

22  federal law to run a Medicaid managed care system in the

23  first place.

24          So the governor would have added yet a fourth layer

25  and for tactical reasons, logistical reasons and legal


Page 25


1  reasons he isn' t a necessary party in that case to secure

2  adequate relief.

3          THE COURT:  He didn' t have any connection with the

4  implementation of the policies that are being challenged in

5  that case?

6          MR. BASS:  Not directly, the waiver sought to

7  implement a Medicaid managed care system was sought by the

8  Department of Social Services with some modicum of oversight

9  by committees of cognizance within the state legislature.

10          THE COURT:  Your view, though, is what' s different

11  about this case is that the harm really flows from the

12  closing of the offices and that the governor, through OPM,

13  either directly or through OPM, you believe, had an

14  affirmative role in precipitating this?

15          MR. BASS:  Absolutely.  That's what precipitated

16   this lawsuit, that's what has precipitated a situation

17   existing today where DSS frontline case workers have case

18   loads of upwards of 1300 cases.

19          Their ability to meet as a frontline threshold

20   proposition the needs, to reasonably accommodate disabled

21   applicants and recipients are directly thwarted by the

22   closing of offices, the resulting reduction of physical

23   facilities, the resulting concentration of staff resources,

24   added to staff layoffs, this is all combined to perpetuate a

25   system which, we allege, is in virtual chaos at this point.


Page 26


1          Similar to the Henrietta D versus Bloomberg case

2   last year out of the Second Circuit where HIV positive

3   plaintiffs had a system that had been placed into being by

4   state statute in New York to assist them in an ombudsman sort

5   of context to access existing public benefit programs and to

6   make it easier for HIV positive individuals who were

7   thwarted, by virtue of their disability, from acting on their

8   own to access these programs, to serve as a go between, to

9  assist them, that system was in perpetual chaos, as alleged

10  by the plaintiffs, and ultimately found by the district court

11  in that case, and that led to the lack -- denial of

12  meaningful access based upon lack of reasonable

13  accommodation.

14        We have a very analogous situation in the instant

15  case, your Honor.

16        THE COURT:  Although everything you've just said to

17  me, I know you've said this in your brief, I don't see that

18  in the complaint.  I really don't.  This allegation of

19  completely dysfunctional system that's broken down entirely

20  and, you know, I just don't see that in the complaint.

21        I see you've got individuals there, and you do

22  argue that they didn't adequately prepare for the transition,

23  they don't have adequate policies, there's a generalized

24  allegation that therefore, they're not reasonably

25  accommodating but it's extremely general and it is not of the

Page 27

1  level and depth of that you've described in your brief or you

2  are describing now.

3          MR. BASS:  It is illustrated in a series of

4    illustrative circumstances of the named plaintiffs.  Time and

5    time again the recurring scenario pled and alleged in the

6    complaint for plaintiffs such as Kimberly Dade, Carmen

7    Gonzalez, Darryl Paulding is that by virtue of their

8    disabilities, they are being denied access to the system, not

9    just because their local office closed but because they can' t

10   get their worker on the hotline, they can' t get telephone

11   access on a recurring basis.

12         Their ability to use the mail system in the way

13   that comports with their disabling conditions is also

14   troublesome.  There' s an individual who is blind who is one

15   of the named plaintiffs, there' s no indication that she' s

16   been provided Braille messages at any time.  The department

17   simply sits back and says that we never received a reasonable

18   accommodation message from any of these named plaintiffs and

19   so they don' t present conditions that allege violations of

20   the ADA or the Rehabilitation Act.

21         Well, there' s no indication that they received

22   notice of their right to request reasonable accommodation,

23   there' s no indication that they received any assistance

24   through way of an interactive process mandated by the ADA to

25   facilitate the accommodation.  So it' s disingenuous for the

Page 28

1   department to say we didn' t receive magic words from these

2   named individuals so we can' t act on their reasonable

3   accommodations.  These are individuals whose disabilities

4   have long time been known to the department.

5        THE COURT:  Hang on for a second.  That' s true but,

6   you know, again, as I read your amended complaint, and while

7   there are a few examples where you talk about actual

8   problems, in most instances, what you say is this person' s

9   disabled, they have no way of getting to Norwich or wherever

10  they have to go, and they don' t know how they' ll get there.

11       That' s a little bit different than saying they' ve

12  tried seven times, their benefits have been denied, they' re

13  constantly calling and can never get through, nobody has ever

14  contacted them to offer them a ride, they think they have to

15  actually physically go there when in fact the state said they

16  don' t have to.  There are not those kinds of allegations

17  there by and large.

18       In most instances, in the individual cases in your

19  amended complaint, it' s this person was being serviced out of

20  this office, that person does not have a car, does not have

21  means of going on public transportation and therefore can' t

22  get to Norwich or wherever the place is.

23      That' s qualitatively different than the kind of

24  thing that you are talking about right now and that you are

25  urging me to use as a basis for ruling on this motion.


Page 29


1      MR. BASS:  There are at least several --

2      THE COURT:  There are a couple where there are

3  individual things but I have in mind your statistics in the

4  motion to dismiss that we are talking about vast numbers,

5  thousands upon thousands of disabled people in the state who

6  are seeking assistance and need accommodation and yet, you

7  know, not even all the people who you plead here have had

8  problems and there are some problems but, you know, there' s a

9  disconnect between systemic dysfunctional broken down agency

10  that can' t operate and allegations about three or four people

11  out of tens of thousands.

12      MR. BASS:  We would certainly point to Mr. Burdine

13  who your Honor has by court order allowed intervention as

14  presenting a serious virtually life and death emergent

15  situation due to his being on renal failure requiring three

16  times a week kidney dialysis treatments and his inability to

17  get through -- this was just a few months ago -- to his

18  worker to explain why he should not be terminated from life

19  subsisting Medicaid benefits resulted almost in his death.

20  That's a dramatic scenario that would demonstrate an ongoing

21  breakdown of reasonable accommodations.

22      THE COURT:  Systemwide.

23      MR. BASS:  Systemwide.  Proof that we are divulging

24  in discovery and would be happy to include an amended

25  complaint indicates that there are no systemic policies,


Page 30


1  protocols, regulations or guidelines in place that adequately

2  identify individuals, even individuals known to the

3  department, to ascertain their disabling conditions, what

4  reasonable accommodations they will need on an ongoing basis

5  so they don't have to perpetually reinvent the wheel and how

6  their meaningful acts as to benefits programs will be

7  facilitated on an ongoing basis.  Those systems are not in

8  place and that's the crux of our complaint.

9        THE COURT:  We'll get to that more in the class

10  action thing but I appreciate your comments and your

11  arguments.

12        Unless you have something more to say, I'm going to

13  go back to Mr. Brown and have him respond to some of the

14  things.

15        MR. BASS:  Thank you, your Honor.

16        THE COURT:  Mr. Brown.

17        MR. Brown:  Yes, your Honor?

18        THE COURT:  Assume for the moment that I were to

19  allow Mr. Bass to amend his complaint and assume for the

20  moment that he were to allege that the difficulties that the

21  department is now facing, complying with the ADA and

22  rehabilitation act began when the closings occurred and some

23  staff reductions occurred and that those, the governor and

24  OPM directed or played a large role in directing those

25  closings and staff reductions, period, just that, would you


Page 31


1  agree at that point that he has pled enough -- again, this is

2  a motion to dismiss not a motion for summary judgment -- pled

3  enough to keep the governor in at least for the moment until

4  we find out what the full facts are at the end?  Based on the

5  case law you've cited me, Rizzo against Goode and these other

6  cases.

7      MR. BROWN:  Again, your Honor, I think the problem

8  is that the class as it's defined right now really has no

9  relation to the office closure whatsoever.  The injunction

10  action clearly did speak to the problem concerning office

11  closures.

12      THE COURT:  What I'm saying to you is that he is

13  going to be alleging -- I'm making this up, I realize right

14  now, under my hypothetical he's going to be alleging yes,

15  there are systemic problems in the state and in large part,

16  those were caused by and/or exacerbated by the closings of

17  offices which made it much more difficult to accommodate

18  clients and that difficulty has meant increased case loads

19  for existing offices, et cetera, et cetera, longer distances

20  people have to travel, increase the needs for accommodation

21  and that all began when those offices were required to be

22  closed and the governor and OPM staff played at least a

23  significant if not major role in that.  Assume he were to

24  have allegations along those lines, would you agree that that

25  probably would be enough, at least for the motion to dismiss

Page 32

1   stage, to satisfy the some connection rule?

2       MR. BROWN:  I think that would, yes, your Honor.

3       THE COURT:  Kind of where I am on the thing, to

4   tell you the truth.

5       MR. BROWN:  Of course, that' s not occurred yet.

6       THE COURT:  I know that has not occurred yet.  I

7   guess the real question is -- Mr. Bass, I really, when you

8   see a motion like this and you think you can plead to solve

9   the problem, you got to plead, okay?  You don' t put it in

10  your brief.  You really have to say, listen, I can solve this

11  problem, I' ll give him the allegations that he wants and here

12  are the allegations and that' s enough.

13      Are you prepared to make allegations along the

14  lines that I' ve just described?

15      MR. BASS:  Yes, absolutely, your Honor, and again,

16  you are absolutely right, the normal course of events we

17  would have presented an amended complaint before these

18  matters but due to the fact that we are in discovery and

19  doing a string of depositions including the commissioner

20  herself --

21        THE COURT:  But that' s not the way things work.

22  You don' t sue somebody hoping you will find something on it;

23  you sue somebody based on what you know you have and if you

24  have to amend it later on to add additional things, you can

25  do that.


Page 33


1        Mr. Brown is absolutely right that the allegations

2  on the face of that amended complaint really aren' t enough

3  but it seems to me silly to dismiss the governor out and have

4  you make a motion to amend the complaint to add him back in

5  with new allegations.

6        We ought to see what the allegations are.  You

7  shouldn' t have to guess but we ought to see what they can do

8  and if you plead things consistent with your obligations

9  under Rule 11 and the facts that are akin to the kinds of

10  things we are talking about, you are probably going to sneak

11  within the some connection rule.  That may not be that he

12  stays in the case forever but it probably would be enough.

13   This complaint doesn' t have enough for me to keep him in.

14        MR. BASS:  I agree, your Honor.

15        THE COURT:  Mr. Brown?

16        MR. BROWN:  Yes, your Honor, the only point I would

17   make is obviously at this point, keeping the governor in the

18   complaint would obviously subject the governor presumably to

19   depositions himself in discovery.  Until the plaintiffs have

20   properly pled an action against the governor, it would really

21   seem, frankly, unfair.

22        THE COURT:  I can solve your problem on that.  You

23   are not taking the governor' s deposition or his office' s

24   deposition until I see a pleading that gives allegations that

25   meets the some connection test.  Once you do that, and if you


Page 34


1   withdraw your motion or we deny it without prejudice to renew

2   on summary judgment, then they' re fair game.

3        Mr. Brown' s right and I don' t anticipate that you

4   are going to be seeking that but we are going to put him on a

5   short leash, he' s going to have to come up with some

6   allegations along the lines we' ve talked about.  I frankly

7   would like you to rethink whether you even need the governor

8   in this case.

9        I asked this when we met several months ago and I

10  see this case, this other Wilson-Coker case doesn' t have the

11  governor in, I' ve looked at a few other cases the governor' s

12  not in, I don' t think the governor' s likely to be ignoring my

13  orders but if he did that, certainly there' s no history that

14  he' s done that but if he did do that, I think there are ways

15  of solving the problem.

16        I just don' t think it' s necessary but if you still

17  think it' s necessary, you got to come up with the allegations

18  to meet it.  You haven' t done so now, I' m going to put you on

19  a short leash to do it, there' s no discovery of the governor

20  or the governor' s personnel until I see that.

21        Mr. Brown, you will have a chance to take a look at

22  it, if you still don' t think it' s adequate you can let me

23  know that and I' ll decide the matter at that point but based

24  on the representations of Mr. Bass, it sounds like he' s going

25  to plead something that' s probably going to at least for the

1   motion to dismiss stage probably get us over the hurdle.

2        How much time do you need, Mr. Bass?

3        MR. BASS:  I would estimate three weeks, your

4   Honor.

5        THE COURT:  Three weeks to make the allegations?

6        MR. BASS:  We'll be deposing Commissioner

7   Wilson-Coker next week and that may have to be adjourned.

8        MR. BROWN:  We'll do the best we can to make the

9   commissioner as available as possible, we are scheduled to go

10  next Thursday the 29th, I believe that she's setting aside a

11  number of hours on the 30th as well.

12       THE COURT:  Maybe you can concentrate on the

13  governor's role first, in the first deposition, and then you

14  won't have to wait until the end, okay?

15       MR. BASS:  Certainly.

16       MR. BROWN:  If I'm allowed to indicate, I do want

17  to make it clear that I think continuing to keep the governor

18  in the case could cause some issues with regard to potential

19  settlement.

20       Obviously, we would like to see if we could

21  continue with our settlement discussions and I think we would

22  find it sort of an olive branch, if you will, if the

23  plaintiff could come to the conclusion that the governor's

24   presence in the case is not necessary, so I would like to put

25   that on the record.


Page 36


1        THE COURT:  Let me say this, Mr. Bass, that's

2   another alternative which may be a useful one, which is:  I

3   could grant the motion on the basis of the current amended

4   complaint without prejudice to your seeking to amend the

5   complaint to add any defendant, including the governor, at

6   some subsequent time as long as you do it within, and we set

7   some period of time, whether it's a month or some period of

8   time, and you are free at that point to do that, make the

9   allegations, assuming that you make the kinds of allegations

10   we are talking about, that's going to meet his -- he can't

11   argue that the amendment is inappropriate because it's futile

12   because you haven't made the allegations necessary and maybe

13   in the meantime, you all conclude that you are getting along

14   enough that you can resolve this case without me.  That's

15   another option.

16        MR. BASS:  Respectfully, your Honor, we would

17   prefer the first option of allowing us to amend the complaint

18  to withstand the motion to dismiss, obviously it can be

19  renewed without prejudice or they can certainly file a

20  summary judgment motion.

21      As to whether or not it will facilitate settlement

22  discussions, we certainly hope that it would.  We lack any

23  clear vision or guarantee on that at this point but we would

24  prefer, your Honor, to be allowed, within your Honor's

25  discretion, to amend the complaint to reflect the


Page 37


1  allegations.

2      THE COURT:  I'm going to let you amend the

3  complaint, there's no question about that.  Whatever I do

4  today with this motion to dismiss, I'm going to let you amend

5  it, okay?  And I'm going to let you amend it to seek to add

6  more allegations regarding the governor.

7      The only question really was:  Would I, today,

8  grant the motion to dismiss without prejudice to your right

9  to seek to add him back in with additional allegations or

10  would I simply hold the motion to dismiss in abeyance pending

11  some amendment you are going to file three weeks from now.

12  That' s really the two choices.

13      MR. BASS:  We would ask, your Honor respectfully,

14  that the motion be held in abeyance and see what we can

15  produce with an amended complaint.  Perhaps the parties can

16  resolve the matter at that point between themselves, as to

17  whether the defendant feels that the allegations are

18  sufficient to meet the "some connection test."

19      MR. BROWN:  We prefer that the motion to dismiss be

20  granted, your Honor, and that would certainly provide the

21  plaintiffs with the time and the impetus and the opportunity

22  to file the amended complaint and we take it up at that time.

23      THE COURT:  You guys get along famously.

24      MR. BASS:  We would submit that in the interests of

25  judicial economy, the former might serve the interests of the


Page 38


1  court more efficiently if the motion is held in abeyance.  If

2  the motion is held without prejudice, we may be here on semi

3  dispositive motion, we would ask that it be held in abeyance,

4  let us submit an amended complaint.  If it doesn' t satisfy

5  your Honor' s requirements, that would speak for itself.

6        THE COURT:  Hang on for a second.

7        What other discovery are you likely to be taking in

8    the next month or so, Mr. Bass?

9        MR. BASS:  We will further our regional and local

10    base of officials to see how scenarios are playing out at a

11    local level apart from the central office, we' ll be deposing

12    Wilson-Coker, maybe Marc Ryan if necessary, whether those

13    will all be done within the next month, I' m not sure, that

14    depends on some fairly logistical scheduling.  We only have a

15    three-month window obviously if your Honor grants the

16    extension.

17        THE COURT:  Although you are going to have about

18    six months more discovery or five months, I guess, right?

19        MR. BASS:  We also may be sending out an additional

20    round of written discovery, your Honor, production requests.

21        THE COURT:  How about you, Mr. Brown, are you

22    taking discovery?

23        MR. BROWN:  Mr. Barber and I have to discuss that

24    but we intend to, your Honor, yes.

25        THE COURT:  None on the horizon right now?

1         MR. BROWN:  We will, at the very least, be deposing

2   the named plaintiffs, your Honor.  Your Honor, Mr. Barber,

3   counsel's reminded me, that Mr. Ryan, secretary of OPM, is

4   direct arm of the governor's office.  I don't know what

5   issues that would present if, in fact, the motion is simply

6   held in abeyance as opposed to simply being granted at this

7   point.

8         MR. BASS:  We would submit no effect, your Honor.

9         THE COURT:  At some point, there may be all sorts

10  of people in the government who they have reason to believe

11  has knowledge of relevant facts and I just didn't want him

12  deposing the governor or anything like that at the moment.

13        This is what I'm going to do, whether it's the

14  right thing or not, I don't know, but it's what I'm going to

15  do:

16        I'm a little bit disappointed, I guess, Mr. Bass,

17  and have to say that this motion has been out here for a long

18  time and you did amend the complaint, you could have amended

19  the complaint before now, I believe, to make some of the

20  allegations that you really haven't.

21        My inclination, therefore, is to grant the motion

22  to dismiss the governor without prejudice to the plaintiffs'

23   right to seek to amend the complaint.  I'm going to give you

24   a month from now to in any way you want to amend the

25   complaint, including amending it to bring the governor back


Page 40


1   in the case with appropriate allegations regarding his

2   connection to the events that are causing the -- that are

3   connected to the events that underlie the complaint and

4   that's my ruling on the -- hang on for a second.  I don't

5   have a number on it.  The pleadings I have -- I have the file

6   here, defendant Governor John Rowland's motion to dismiss is

7   docket No. 54, that will be granted without prejudice to the

8   plaintiffs having the right to amend their complaint within

9   one month from today, that is to say February 23rd, 2004, to

10   add the governor back in with appropriate allegations or add

11   any other defendant or to add additional allegations to the

12   complaint, okay?

13        MR. BASS:  Your Honor, if I may.

14        THE COURT:  Yes, you may.

15        MR. BASS:  If we do amend the complaint to once

16   again add the governor as a party defendant, will the

17  defendant then be allowed leave to proceed once again with a

18  motion to dismiss?

19        THE COURT:  I can' t stop them from filing a motion

20  to dismiss.  I would say to you, Mr. Brown, that we went

21  through this colloquy and if they make the allegations that

22  the governor was, and his staff through OPM played a

23  significant role in the closings and that the closings were a

24  major part of the cause of the problem that we currently

25  face, or they' ve contributed in large measure, whatever

Page 41

1  adjective you want, I think we all agree that they meet the

2  some connection.  I wouldn' t expect to see a motion to

3  dismiss in the case.  Do we understand?

4        MR. BROWN:  I understand.

5        THE COURT:  If you don' t have those allegations or

6  there' s a problem in some way -- the thing about it is this:

7  The way I see the law is that I think if there' s an

8  allegation where the governor is not just the titular head

9  and included as the titular head but is included as somehow

10  playing a role of some nature in connection with the policies

11  or procedures or actions that form the basis of the lawsuit,

12  I think he's a proper defendant and he should be there. And

13  that's the way I read Rizzo against Goode and I take it from

14  Mr. Bass that you intend to make those allegations, do you

15  not?

16        MR. BASS: Yes, we do, your Honor.

17        THE COURT: If he does and I see no reason why he

18  won't, I wouldn't expect to see a motion to dismiss from you,

19  Mr. Brown, understood?

20        MR. BROWN: Understood.

21        MR. BASS: Thank you, your Honor.

22        THE COURT: Class certification. Mr. Bass, why

23  don't we start with you on this. Here's my concern, and then

24  you tell me why I shouldn't be concerned about it or what

25  your answer is to it:


Page 42


1        It seems to me that your complaints about the

2  policies and procedures and transition plans and grievance

3  plans, that seems systemic. In other words, it's

4  programmatic, it goes across the board, it affects everybody

5   who avails themselves of those programs and I'll be asking

6   Mr. Brown why shouldn't that be a class action honestly, but

7   his point is that at least some of what you are claiming here

8   is that the people haven't been reasonably accommodated and

9   they should be reasonably accommodated.

10      As to that portion of your case, I think even you,

11   in your reply brief, conceded -- I'll find it in a second --

12   that, you know, that's really based on individualized factual

13   determinations as to what each person needs, someone who's

14   blind needs different services than someone who's depressed

15   and can't leave the house and different services than someone

16   who is confined to a wheelchair and everybody has to be

17   accommodated in a different way and trying to determine

18   whether or not they have been accommodated reasonably

19   involves sort of numerous individual factual determinations.

20      So where I come out is or where I'm thinking is,

21   there are a lot of this that you are challenging which is

22   programmatic and affects everybody equally, it seems to me,

23   the grievance and the like, the policies, the training and

24   all those things.

25      But it wasn't clear to me whether there's some

Page 43

1  other thing in your lawsuit which is saying, wanting an

2  order, for example, that the department shall reasonably

3  accommodate all the disabled people in the system.  That' s

4  what the statute says, for goodness sakes.  I don' t know

5  whether that' s what you are seeking or if you want an

6  individual determination that the department hasn' t been

7  reasonably accommodating, you know, that may develop into

8  individual factual determinations.  That' s what I want you to

9  address.

10      MR. BASS:  Well, your Honor, we maintain that the

11  crux of the case at bar is, in fact, a challenge to the

12  systemic lack of any process, any sequential system in place

13  that identifies, screens, accommodates and tracks on an

14  ongoing basis the reasonable accommodations of disabled

15  applicants and recipients who try to meaningfully access DSS

16  programs, services and benefits.

17      The crux of the litigation has its focus on the

18  defendants'  actions or inactions, not on any varying factual

19  patterns of the individual clients who need and who may seek

20  an interactive process which is a reasonable accommodation.

21      THE COURT:  When you say defendants'  actions, you

22  are saying on a system wide basis and program basis, not on

23  an individual basis?

24      MR. BASS:  The closest analogy is the Carr case,

25  where Judge Thompson granted class certification in a very


Page 44


1  analogous situation where plaintiffs were seeking on a system

2  wide statewide basis meaningful access to Medicaid

3  reimbursable dental services.

4      They were being denied due to a series of systemic

5  deficiencies, lack of adequate provider reimbursements to

6  dentists to enable them to participate in the program and to

7  provide sufficient numbers of dentists in the state who

8  would, in turn, serve recipients.  Lack of outreach.  Lack of

9  supportive services such as scheduling assistance, case

10  management, transportation to both children and adults, all

11  systemic problems and Judge Thompson granted class

12  certification.

13      THE COURT:  How do I ensure, were I to certify a

14  class, though, that the case wouldn' t evolve into

15  individualized factual determinations as to whether this

16  particular person was accommodated or that particular person

17  wasn' t accommodated and it would stay at that system wide --

18  not 30,000 feet but systemwide applicable to all and how do I

19  ensure that that' s what the case remains once it gets

20  certified?

21        MR. BASS:  Because we sought a Rule 23(b)(2) and

22  declaratory relief based upon a unitary course of conduct

23  from the defendants resulted in their actions or inactions

24  affecting all class members statewide and systemwide and

25  thereby making appropriate declaratory injunctive relief for


Page 45


1  the class as a whole.

2        We submit that we absolutely meet that standard as

3  well as the four prerequisites of Rule 23(a).  There' s

4  absolute commonality under 23(a)(2), we are not bringing

5  damages actions, so litigating individual circumstances of

6  individual clients who may seek reasonable accommodations is

7  not part of the lawsuit.

8        What is part of the lawsuit is a systemic challenge

9  to lack of policy and procedures in place to afford people

10  with so-called hidden disabilities such as learning

11  disabilities, cognitive disorders, behavioral disorders as

12  well as the more readily apparent disorders of individuals

13  such as those who are mobility impaired and confined to

14  wheelchairs.

15       THE COURT:  Ms. McMahon and Ms. Morin?

16       MR. BASS:  Do not present disabling conditions and

17  we propose to drop them from the lawsuit, your Honor.

18       THE COURT:  When you do your amendment.

19       I'  ll talk to Mr. Brown then.  When you first got

20  up, one of the first things you said that struck me was,

21  geez, your Honor, all the relief they'  re looking for, you

22  know, doesn'  t really affect the governor after all what

23  they'  re looking for is changes in grievance policies, they'  re

24  looking for changes in training, looking for changes in

25  notification and notices and we'  ve done all these things and


Page 46


1  DSS has done all those and implemented all those things.

2       If I take you at your word and that'  s what this

3  case is about, recognize for a moment that they disagree that

4    you've done it adequately, aren't we really talking about

5    things that really are systemwide and programmatic wide and

6    class wide and therefore, the appropriate kinds of things to

7    be dealt with in a class action?

8         MR. BROWN:  Respectfully no, your Honor, because at

9    the heart of their case, at the heart of their case, is an

10   issue concerning whether disabled individuals, the proposed

11   class here, disabled individuals, have, in fact, been denied

12   reasonable accommodations.  That's really the heart of what

13   this case is all about.  When you take a look at the

14   allegations as they plead them, and you look individually at

15   what they're alleging, none of these individuals has

16   indicated that they've requested a reasonable accommodation

17   that's ever been denied by the Department of Social Services.

18        THE COURT:  Certainly, again, at this stage -- let

19   me ask you this:  For purposes of the motion for class

20   certification, can I go outside the complaint and -- you go

21   through each individual and you explain how many times,

22   exactly what was done with these individuals and detailed

23   information about how you believe you've accommodated them,

24   none of which is in the complaint, all of which may be true

25   but can I consider that information at this stage?

Page 47

1        MR. BROWN:  I believe you can, your Honor, with

2   regard to a motion for class certification.

3        THE COURT:  So let' s say that they had allegations

4   that certain individuals had been never given notice and

5   there' s not notice but you had absolute proof that that

6   individual had notice, for purposes of class certification, I

7   could consider your proof, proffer, that this person had

8   notice?

9        MR. BROWN:  Your Honor, it' s my understanding that

10  if the plaintiff, as they did in this case, submits

11  affidavits to corroborate their position that these

12  individuals are fair representatives of the class, they have

13  a particular proof element under the rubric for class

14  certification that they have to meet and that we would

15  therefore be able to come back with subsequent affidavits,

16  which we' ve done in this instance.

17        THE COURT:  Hang on for a second.

18        MR. BROWN:  For example, they have to prove

19  numerosity and to do that they' ve obviously attached a number

20  of documents, including studies and things of that like to

21  their pleadings and that' s a factual element of proof, burden

22  for them.

23          THE COURT:  Let' s talk about numerosity for just a

24  second.  There' s no question that there' s a lot of people

25  served by DSS and I assume that there' s no question that

Page 48

1  there' s a lot of the people served in these particular

2  programs are disabled, right?  The real question that you put

3  is, yeah, but how many of them haven' t been reasonably

4  accommodated?

5          MR. BROWN:  That' s true, your Honor, yes.

6          THE COURT:  But we agree that the universe is

7  large, right?  The universe of potential people who haven' t

8  been reasonably accommodated could be quite large, right?

9          MR. BROWN:  It' s speculation.  Would he don' t know

10  that, your Honor.

11          THE COURT:  You don' t know how many disabled people

12  you serve at DSS in these programs?

13          MR. BROWN:  Who have not been reasonably

14  accommodated?

15          THE COURT:  No, I said the potential universe of

16   people who haven' t been, which is to say all people who are

17   disabled who are served in this program, you don' t know that

18   that' s a large number?

19          MR. BROWN:  I just want to make sure I' m

20   understanding your question.  Is your question is the

21   potential universe of disabled individuals who have not been

22   reasonably accommodated large?  Arguably yes.

23          THE COURT: Sure.  Yes.  Okay.

24          MR. BROWN:  Arguably.

25          THE COURT:  So if they then say, as they do say in


Page 49


1   the complaint, that as to this large potential universe, they

2   haven' t gotten adequate notice, the grievance policies that

3   you have in place aren' t adequate to deal with this potential

4   universe, and they didn' t get proper notice and your staff

5   hasn' t been trained properly to deal with this potential

6   universe and/or accommodate them adequately and that' s their

7   allegations and they say that this is across the board, why

8   isn' t that a proper class allegation?

9          MR. BROWN:  I think partly, your Honor, when you

10   actually take a look at the individual cases that they' re

11   putting forward, in terms of this proposed class and you look

12   at the allegations that they' re raising in terms of lack of

13   notice and lack of training and lack of policy, they don' t

14   match up.  I think that' s the problem.  When you take a look

15   at --

16          THE COURT:  Is that a motion for summary judgment

17   or is that a motion not to certify the class?

18          MR. BROWN:  Your Honor, I think in order to look at

19   things such as numerosity, if we are going to make a

20   determination as to whether the class is, in fact, so

21   numerous that the only way to properly deal with it is to

22   have a class as opposed to individuals bringing matters

23   separately, we are going to have to find that they all share

24   something in common and --

25          THE COURT:  Don' t they all share something in




Page 50




1   common that they' re disabled and they' re seeking and need

2   services from this agency, that they have in common, and they

3  also are all -- Mr. Brown, listen to me, wait a minute --

4  they also may potentially avail themselves of a statewide

5  grievance procedure, right?

6      MR. BROWN:  Potentially, yes, your Honor, that's

7  true.

8      THE COURT:  They all have an interest in having an

9  adequate grievance procedure, right?

10      MR. BROWN:  True.

11      THE COURT:  Whether they've needed it to date or

12  will need it in the future, they have an interest in making

13  sure that the grievance procedure that's in place satisfies

14  federal law, don't they have that interest?

15      MR. BROWN:  Your Honor, I think the problem that I

16  have with agreeing with that last part is that though it's

17  true that all of the proposed plaintiffs are disabled

18  individuals who might potentially at some point want to seek

19  the services of the department and seek grievance procedures,

20  again, that the heart or the crux of this is that these are

21  all individuals who have been denied meaningful access to

22  services and benefits and at this point, as you go through

23  each and every one of those allegations, with regard to each

24  of the named plaintiffs, there actually is no allegation that

25  those individuals have been denied a request for reasonable

Page 51

1  accommodation on the basis of their disability which has

2  stopped them from being able to take advantage of services.

3  In fact, all of these individuals have been able to access

4  services from the department far from the fact that they've

5  been denied services, they have had access to the services.

6  So it's because of that.

7      THE COURT:  How about Mr. Burdine?

8      MR. BROWN:  Obviously the affidavit speaks for

9  itself as far as the problems Mr. Burdine had run into.  In

10  fact the department to my knowledge is providing him with

11  services at this point.  To say there aren't some

12  circumstances where there have been problems, obviously, I

13  couldn't stand up here and say that.

14      THE COURT:  But assuming we've got at least one

15  person who has not been accommodated adequately, as the

16  person alleges, again the purpose of the motion to dismiss,

17  and the relief they're seeking is the implementation of

18  adequate procedures to identify, screen, and follow people

19  who need accommodation, doesn't that sound class wide to me?

20  To you?

21      MR. BROWN:  One or two persons, no, your Honor,

22  it's not.

23      THE COURT:  And you are of the view that -- again,

24  we have to focus on the one or two, who are the one or two.

25  We know the potential universe of people who may have been


Page 52


1  denied accommodation is large, okay?  Now, you say, though,

2  that, listen, we are accommodating all of them so therefore,

3  the potential universe of people who haven't been

4  accommodated must be small and therefore no need for a class

5  action.  That's essentially what you are arguing.

6      MR. BROWN:  Yes, your Honor.

7      THE COURT:  I think what they're saying is we all

8  agree that the potential universe is large, we think your

9  procedures aren't complying with federal law, therefore that

10  whole large universe is affected by what we believe to be

11  illegal and unlawful and inadequate procedures and policies

12  and all of them have an interest in lawful, legal and

13  adequate policies and therefore, this is a proper class

14  action and if you want to show ultimately that the way you

15  are operating complies with federal law, that's terrific but

16  that's the merits of the dispute, it's not whether or not we

17  have a potentially large enough group who are affected by

18  inadequate, illegal and unlawful policies.  I think that's

19  kind of where they are.

20      Mr. Bass, is that kind of -- seemed to me what you

21  are saying in this case.

22      MR. BASS:  Absolutely is, your Honor.  Again, the

23  Carr case from two years ago is the closest analogy from this

24  court per Judge Thompson that could be instructive to the

25  Court today in the instant case.


Page 53


1      The defendants --

2      THE COURT:  I noticed in that case the state moved

3  for summary judgment on the ground that they complied with

4  federal law.

5      MR. BASS:  The plaintiffs moved for summary

6  judgment on the grounds they have not.

7      THE COURT:  Someone will figure that out.  If they

8  decide that the policies and procedures comply with federal

9  law, the case is at an end and if they don' t comply, all

10  those people who are members of the class are going to get

11  the benefit of the new policies and procedures, right?

12       MR. BASS:  That' s correct, your Honor.  We

13  respectfully submit that the defendants wish to litigate the

14  merits of the instant action at the class certification

15  juncture and that simply is inappropriate.  Motion to

16  dismiss, motion for summary judgment, trial.  Those are the

17  junctures that are appropriate to litigate the merits of the

18  case.

19       THE COURT:  Can I, though, at this stage consider

20  information regarding individual circumstances, am I on the

21  class certification really bound by the complaint in terms of

22  the allegations regarding these individuals?

23       MR. BASS:  Particularly the Caridad case from the

24  Second Circuit allows the Court to inquire behind the four

25  corners of the complaint for purposes of determining whether

Page 54

1  the strictures of Rule 23 are, in fact, met, not to litigate

2    the merits of the case.

3        In the Carr case, for example, Judge Thompson did

4    not rule that class certification must be denied because X,

5    Y, Z named individuals out there in the system sought dental

6    access under the Medicaid program and were denied.

7        You don't have to litigate those individual cases

8    ad infinitum.  There's no indication from the defendants as

9    to how many of those individual cases out there we would have

10   to litigate and present to the Court as factually disputable

11   before class certification could be denied.

12       What we have done instead is complied with Rule 3,

13   presented named plaintiffs who present commonality, typical

14   of the unnamed members of the peer class they seek to

15   represent and are themselves adequate representatives and

16   they feature a class that is definitely complying with the

17   numerosity requirement of 23(a)(1), which also implicates

18   impracticality of joinder.

19       There's no dispute this is a statewide class that

20   is geographically dispersed.  As Judge Thompson noted in

21   Carr, Judge Arterton noted in Ladd, these individuals are

22   destitute financially, unsophisticated in being able to mount

23   independent litigation on their own, their health is frail.

24   That's the definition of the class, they are health-impaired,

25  they' re disabled.


Page 55


1         THE COURT:  Let me focus on the definition of

2  class, this is what Mr. Brown was trying to focus on, on page

3  2 you state all disabled individuals in the state of

4  Connecticut who are or will be eligible for subsistence

5  benefits through these various state programmings who require

6  reasonable accommodation to obtain and maintain essential

7  services and benefits from the defendant and then this is the

8  key, and whose meaningful access to such subsistence benefits

9  has been or is being denied or effectively limited by DSS.

10        And he would say to that, two things, I think,

11  first, he would say, there' s no way you can figure out

12  whether they have been denied adequate access, meaningful

13  access, to subsistence benefits unless you get in and try

14  each individual case and that' s a fact-dependent thing.

15        Or, he would say, alternatively, he would say, I

16  think, you haven' t shown by just the people, the plaintiffs

17  you put in here that you' ve got a large number who actually

18  are being denied meaningful access.

19          In other words, he's saying two things, one is on

20    numerosity, you know, you aren't showing a large number who

21    have been denied access, and that's your definition of the

22    class; and, alternatively, I think he's saying, if that's

23    your definition of the class, necessarily, we are going to

24    devolve into individualized determinations about who's been

25    denied meaningful access and who hasn't and that's not


Page 56


1    appropriate.

2          MR. BASS:  All that these plaintiffs seek is that

3    there be systems, protocols, guidelines, regulations, what

4    have you, in place to reasonably assure in the future that

5    individuals who are disabled, who come before the department

6    to seek benefits that of themselves may have a criterion that

7    requires disability to be demonstrated or are otherwise

8    disabled and seek services or benefits, that they have

9    adequate assurances that these policies are in place to

10    assist them, to gain meaningful access and accommodate their

11    disabling conditions as otherwise qualified individuals under

12    the ADA.

13        THE COURT:  But can I just stop you there?  If

14    that, if we are basically talking about, as you said before,

15    the systemwide policies and procedures that affect everybody

16    who's essentially disabled and needs accommodation, whether

17    or not they have been denied it in the past or not, they're

18    going to be affected by it, why wouldn't the class be, in

19    effect, all disabled individuals who require reasonable

20    accommodation, period, and then we would figure out whether

21    or not the policies and procedures and everything else

22    satisfy federal law?

23        MR. BASS:  We've referenced the basic eligibility

24    programs that these individuals are likely to encounter as

25    part of the class definition and that comports with the ADA

Page 57

1    requirement that they be otherwise qualified individuals who

2    otherwise are eligible under basic eligibility criteria to

3    access these benefits.

4        All that we are asking for is that they be

5    reasonably accommodated in doing so, not that any new

6    programs be carved out to make them eligible for a new

7   benefit but simply to have access to existing benefit

8   programs.

9        Your Honor, the core group that remains in the

10  welfare based population in the state of Connecticut is

11  virtually the same as every other state in the country and

12  we've attached excerpts from several national studies in our

13  reply brief that demonstrate that this is a disability based

14  population now.

15       THE COURT:  I don't think Mr. Brown disagrees, and

16  I heard him say basically that there is a large number of

17  people who are disabled and who are availing themselves of

18  these programs.

19       Where he is debating you is whether there's a large

20  number of people who are disabled availing themselves of this

21  program and are being denied meaningful access and I was just

22  wondering whether we even need that in the definition of the

23  class right now and instead, it's anybody who is disabled and

24  needs accommodation and therefore needs adequate procedures.

25  I'm just thinking out loud right now, I was just looking at

Page 58

1    the Carr class and how it was defined.

2        I will confess to not having a whole lot of

3    experience with this so I don' t know whether you need to

4    define the class as people who have all these things and who

5    had their federal rights violated when some people who -- I

6    assume the people who have been adequately served by the

7    department in the past may still have an interest in having

8    policies and procedures that comply with federal law into the

9    future.

10        MR. BASS:  I think that' s correct, your Honor, I

11    agree.

12        THE COURT:  And they all have common questions

13    because they all have the common interest in policies and

14    procedures that comply with federal law because they' re all

15    disabled and all availing themselves of these programs.

16        What do you say to that, Mr. Brown?

17        MR. BROWN:  Well, your Honor, I still think that

18    there being an injury requirement that would have to be

19    shown, these individuals would have to somehow demonstrate

20    that not having these policies or procedures in place has led

21    to some injury, has in some way resulted in their being

22    denied meaningful access to services.

23        THE COURT:  Do they have to show that to get an

24    injunction to get you enjoined to have adequate policies and

25    procedures that comply with federal law because these

Page 59

1    individuals are the recipients or beneficiaries of those

2    policies?

3        MR. BROWN:  I believe as a threshold.

4        THE COURT:  Damages, I agree with you they would

5    have to show they were actually damaged and injured by the

6    conduct of the state but I'm thinking out loud here really,

7    just trying to get your reactions.

8        MR. BROWN:  I just think because they are actually

9    seeking declaratory relief in this case, that as a part of

10   that, and that's a part of what the class would be seeking,

11   that there would be a requirement to show some injury.

12       THE COURT:  Well, they don't have to show that

13   they've actually been injured; they can show that they may be

14   injured in the future, right?  I'm assuming, let's just say

15   that somebody has never had to call the department before.

16   They've always been able to drive there.

17       Yet the department has lousy policies on telephone

18  calls and if anybody ever tried to call them, it would take

19  them six hours to get through or something and these people

20  need help faster than that.  That person might still have an

21  interest in having a better system of answering the phones

22  and be able to complain that the current system doesn' t

23  violate because they in the future might have to avail

24  themselves of that assistance.

25        MR. BROWN:  It would seem rather speculative in


Page 60


1  terms of an interest, your Honor, I' m not sure that that

2  would in and of itself be sufficient.  You would need

3  individuals as a part of the class who, in fact, can

4  indicate, again like you have in this case, by way of

5  affidavit, that they have, in fact, suffered.

6        THE COURT:  We got some of those.  Mr. Burdine is

7  at least one of them, okay?

8        MR. BROWN:  Yes, your Honor, I understand that and

9  again, one does not necessarily make up an entire

10  representative class.  I think, as your Honor was pointing

11  out earlier, the biggest problem in this case seems to be

12    that there is no proof that these particular individuals

13    really meet the class definition, that they are ones who

14    require, first of all, reasonable accommodation to obtain and

15    maintain the essential services and that their meaningful

16    access to these benefits has been or is being denied.

17         THE COURT:  Let me review what the class was

18    certified in Carr.  Class in Carr is this:  Plaintiff class

19    consisting of all individuals in Connecticut who are or will

20    be eligible for Medicaid managed care husky A benefits and

21    are or will be seeking dental services is hereby certified.

22         Doesn' t say who are eligible for these services and

23    been denied them in the past.  It just says, listen, the

24    people who have an interest in having a properly run Medicaid

25    dental program are the people who are or have been eligible

Page 61

1    for such a program.  And now we' ll go litigate whether or not

2    the program meets federal law or not and by any stretch of

3    the imagination, the number of people who are disabled and

4    who are served by DSS under these programs is large, right?

5    It would meet the numerosity requirement.

6          MR. BROWN:  Your Honor, I was not involved in the

7    Carr case, but it's my understanding that one of the ways

8    that numerosity was met is that you had a specific program

9    that individuals were a part of and you had a specific finite

10   number of dentists that you were working with and I believe

11   that the court found that looking at the number of dentists

12   and the number of the population, you can much more easily

13   address the numerosity issue.  You have a lot more of a

14   narrow defined class in that instance.

15          In this particular case, again, we are still at the

16   major stumbling block because of the issue of any lack of

17   proof regarding individuals who actually require reasonable

18   accommodation.

19          Again, I agree that the potential class of disabled

20   individuals who could need services is large but we have no

21   idea what the class is of individuals who require reasonable

22   accommodation or have been denied or may be denied or might

23   be effectively being denied access to services, we have no

24   idea as to that.

25          THE COURT:  Well, in Carr, Judge Thompson noted

Page 62

1   that the defendant -- maybe it was you, Mr. Brown, -- argued

2   that they couldn' t satisfy the numerosity requirement because

3   the plaintiffs have not documented the existence of

4   individuals who have actually suffered injuries as a result

5   of inadequate programs.

6          MR. BROWN:  That was not me, your Honor.

7          THE COURT:  He rejected that argument and the court

8   found there are tens of thousands of potential class members

9   who have an interest in a program that complies with federal

10  law and that satisfies the numerosity requirement.

11          All right.  I understand your positions on both, I

12  don' t know what I' m going to do on this but it wasn' t clear

13  to me that you needed that last bit on your class definition

14  and whether it created more problems because it really walks

15  into Mr. Brown' s argument that now we are talking about

16  factual things and you don' t have a large number of people

17  that you can show -- show -- have been denied meaningful

18  access but if you are really talking about making sure all of

19  the people who are disabled and participating in these

20  particular benefit programs have available to them policies

21  and procedures and training processes that, you know, allows

22  the state to comply with federal law, then maybe that is the

23  appropriate way to define the class.

24      MR. BASS:  We would submit, your Honor, the

25  defendants are putting the cart before the horse.  If they


Page 63


1  wish to contend that there's no way to determine the

2  reasonable accommodation needs of this universe of

3  potentially eligible clients out there, that's because, as we

4  allege, they lack the systems in place to identify, screen,

5  assess and track.

6      THE COURT:  Let me ask you this, Mr. Brown, I did

7  see the memo in there, the deposition of an individual who

8  said that you don't keep track of requests for accommodation.

9  How in the world do you expect them to document all of the

10  requests for accommodation have been denied or not adequately

11  responded to when the department itself doesn't keep track of

12  requests for accommodation?

13      MR. BROWN:  Well, your Honor, certainly, in

14  individual cases there are narratives in the file with regard

15  to the clients or applicants, when they call in and ask for

16  assistance, and when there's a file open, the narrative would

17  contain information as to whether that person has, in fact,

18  requested some kind of an accommodation and what action was

19  taken.

20        But it's our position that there's no obligation

21  under law to track such requests.

22        THE COURT:  So the files on all the individual

23  recipients would indicate whether they sought assistance and

24  what the result was of their seeking assistance?

25        MR. BROWN:  That would be the proper way to notate


Page 64


1  the file, yes, your Honor.

2        MR. BASS:  To the extent we get into factual

3  disputes, your Honor, we dispute that.  The fact that a case

4  worker narrative in a case file might contain the nature of

5  the disability, of the reasonable accommodation, the process

6  that may or may not have occurred between client and case

7  worker, we dispute that occurs randomly let alone on a

8  systemwide basis.

9        The Kevin Loveland deposition transcript excerpt

10  also describes they attempted to put a green tag system in

11   place, they're attempting to put in a computer screen prompt

12   none of this exists, for them to say there's a lack of

13   numerosity, you know, in light of the fact that their own

14   procedures are deficient in tracking numbers of disabled

15   people out there who may need accommodation, let alone the

16   fact that there's no system in place yet to ensure the people

17   on a day-to-day basis get notice of their rights to request

18   accommodations and their right to dispute and file a

19   grievance should that accommodation be denied, we would

20   submit that it's not appropriate for the defendant to control

21   that equation.

22       THE COURT:  Can I ask you this question, just

23   trying to understand how these cases work, assuming you are

24   attacking the adequacies of their overall policies and

25   procedures and things, you could have one person do that, if


Page 65


1   I make a declaratory judgment that they violate federal law,

2   and that those policies have to be improved in some way, and

3   enjoin them from -- I just don't know what the class gives

4   you that an individual declaratory injunctive relief case

5    wouldn' t, maybe it' s mootness.

6        MR. BASS:  Exactly, we would face a mootness issue

7    if there was only a single individual.  Robidoux in the

8    Second Circuit shows these classes are fluid and they include

9    future members who may enter in.  There are people applying

10   for benefits before the department on a daily basis, many of

11   whom are disabled and their needs need to be protected as

12   well.

13        THE COURT:  Anything either of you want to add?

14   You both have been great, I appreciate your help and

15   assistance, your briefing and oral argument.  It' s been very

16   helpful.

17        The motion for class certification, I' m going to

18   take under advisement and I will rule on that, I' ll get to it

19   in a meaningful time period.  I will grant this motion for

20   extension of time.  The only thing is I' m going to add in

21   there you' ve got a month to amend your complaint and add

22   additional parties or allegations, Mr. Bass.

23        Anything else I need to deal with today on this

24   case?

25        MR. BASS:  I don' t believe so, your Honor.

Page 66

1          MR. BROWN:  No, your Honor.

2          THE COURT:  Okay.  Thank you both.

3

4          (4:20 o'  clock p.m.)

5

6

7

8

9

10

11

12

13

14

15          COURT REPORTER'  S TRANSCRIPT CERTIFICATE

16             I hereby certify that the within

17     and foregoing is a true and correct transcript

18     taken from the proceedings in the above-entitled

19     matter.

20

21

22

23                    Official Court Reporter

24   Dated:

25