UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LORI RAYMOND, *et al.* Individually and on behalf of all other persons similarly situated, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 3:03CV0118 (MRK) |
| v. | : : : | |
| JOHN ROWLAND, in his official capacity as Governor of the State of Connecticut, and | : : : : | |
| PATRICIA WILSON-COKER, in her official capacity as Commissioner of the State of Connecticut Department of Social Services, | : : : : | (CLASS ACTION) |
| Defendants. | : : : | June 8, 2007 |

## JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT AND CLASS NOTICE, TO SET A DATE FOR A FINAL FAIRNESS HEARING AND FINAL SETTLEMENT APPROVAL

Pursuant to Fed. R. Civ. P. 23(e), the parties to this action, including the Plaintiff

class of low-income Connecticut residents with disabling conditions, and Defendants M.

Jodi Rell, Governor of Connecticut, substituted in her official capacity for former

Defendant John Rowland, and Michael Starkowski, Commissioner of Connecticut

Department of Social Services (DSS), substituted in his official capacity for former

Defendant Commissioner Patricia Wilson-Coker, hereby move this Court for an order

granting preliminary approval of the Settlement Agreement, approval of the class

settlement notice and distribution, an order establishing a date for the final fairness

hearing, and final approval of the Settlement Agreement.

In support of this motion, the parties state as follows:

1. Following arms' length negotiations, the parties have agreed to a resolution of all claims pleaded against Defendants to this action, set forth in the proposed Settlement Agreement, attached as Exhibit A.

2. The parties believe resolution of this matter through negotiation, rather than further lengthy and expensive adversarial litigation, is in the best interests of both Defendants and the Plaintiff class.

3. The parties believe the proposed settlement of this action includes terms and conditions that are fair, reasonable and adequate.

4. The Settlement Agreement was submitted by the Connecticut Attorney General, Richard Blumenthal, to the Connecticut General Assembly on April 13, 2007. The Settlement Agreement was approved by action of law.

5. The proposed form of notice to class members regarding the settlement, attached as Exhibit B, conforms with the requirements of Fed. R. Civ. P. 23(e)(1)(B). It includes a summary description and a more detailed description of the terms and provisions of the Settlement Agreement, indicates the time and place of the final fairness hearing, and advises class members how to appear and object to the Settlement Agreement. Defendant DSS Commissioner will arrange for translation of the notice into Spanish.

6. The parties propose distribution of the notice to class members as follows:

    a. By July 25, 2007, the Department of Social Services will mail a copy of the

notice to:

    i.  Pending applicants and recipients of the State Supplement to the Aged, Blind and Disabled (AABD) and State Administered General Assistance (SAGA) cash assistance programs;

   ii.  Pending applicants of the Temporary Family Assistance (TFA) program and recipients of TFA who are exempt from work requirements based on incapacity or have received at least 18 months of time-limited assistance;

  iii.  Recipients of benefits in the Food Stamp program who are exempt from work requirements based on disability;

  iv.  Pending applicants and recipients of the following Medicaid programs: Community Aged, Blind and Disabled, including persons in a spend-down period who have not met the spend-down; Long Term Care; and Medicaid/Medicare Savings programs; and

   v.  Pending applicants and recipients of the AABD, SAGA, TFA, Food Stamp and Medicaid programs with an impairment coding indicating disability.

Pending applicants will be determined as of the date DSS extracts the list of notice recipients from its computer system, approximately two weeks prior to completion of notice mailing. Persons identified in the DSS computer system as preferring Spanish will be provided with the notice in Spanish; all others will be provided with the notice in English.

b. By July 25, 2007, copies of the notice and summary in English and Spanish and a copy of the Settlement Agreement will be posted prominently on the DSS website and will remain on such website until the date of the final fairness hearing set by this Court; a request for an equivalent posting on the Connecticut Department of Labor website will be made to the Commissioner of the Connecticut Department of Labor by Defendant DSS Commissioner.

c. A proposed poster, attached as Exhibit C, will have translation arranged by Defendant DSS Commissioner, who will also arrange printing in English and Spanish. For the period of July 15, 2007 until the date of the hearing set by this Court, these bilingual posters, of at least 11" by 17" in size, will be prominently displayed in the waiting rooms of all DSS offices. Copies of the full notice in English and Spanish will be available either next to the poster or nearby. Defendant DSS Commissioner will provide copies of the bilingual posters and notice to all Community Action Agencies and Department of Labor employment service sites with a request that the posters be prominently displayed in public areas and that the notices be made readily available to the public from July 15, 2007 until the date of the final fairness hearing set by this Court.

7. The parties request the Court set a date for a final fairness hearing for a time convenient to the Court, on or after September 3, 2007 to allow sufficient time after notice is provided for objections to the Settlement Agreement, if any, to be filed with the Court.

WHEREFORE, the parties request entry of an order preliminarily approving the

settlement, utilizing the draft order attached hereto as Exhibit D, or in such other form

as the Court deems appropriate.


Plaintiffs, by Undersigned, Authorized
Counsel of Record:



Joanne Gibau
Federal Bar No. ct05730
New Haven Legal Assistance Assoc.
426 State Street
New Haven, CT 06510-2018
(203) 946-4811
(203) 498-9271 (fax)
jgibau@nhlegal.org

Michael Starkowski, Commissioner,
Department of Social Services, by
Undersigned, Authorized Counsel of
Record:



Hugh Barber, Assistant Attorney General
Federal Bar No. ct05731
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5210
(860) 808-5385 (fax)
hugh.barber@po.state.ct.us

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

· 2007 JUN -1 ₱ 2: 59

U.S. DISTRICT COURT
NEW HAVEN, CT

LORI RAYMOND, *et al.*
    Individually and on behalf of all
    other persons similarly situated,

        Plaintiffs,

        v.

JOHN ROWLAND, in his official
capacity as Governor of the State of
Connecticut, and
PATRICIA WILSON-COKER, in her
official capacity as Commissioner
of the State of Connecticut Department of
Social Services,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
3:03CV0118 (MRK) ·

SETTLEMENT AGREEMENT
(CLASS ACTION)

MAY 31, 2007

## INTRODUCTION

WHEREAS, the named plaintiffs and all others similarly situated, as low-income

Connecticut residents with disabling conditions, commenced this action against defendants,

M. JODI RELL, in her official capacity as Governor of the State of Connecticut (substituted in

her official capacity for former defendant JOHN ROWLAND) and PATRICIA WILSON-

COKER, in her official capacity as Commissioner of the State of Connecticut Department of

Social Services ("DSS"), for their alleged failure to implement policies and procedures designed

to ensure the meaningful access of plaintiffs to cash and medical subsistence benefit programs

and services administered by DSS, in alleged violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.,* and Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794 ("Section 504"), and their implementing federal regulations; and

–1–

<u>Exhibit "A"</u>

WHEREAS, the parties intend, through this Settlement Agreement, to maintain significant and substantial improvement to procedures by which individuals with disabling conditions may access the delivery of cash and medical subsistence benefits administered by DSS; and

WHEREAS, the parties desire to settle this action on terms and conditions just and fair to all parties;

NOW, THEREFORE, IT IS HEREBY AGREED by and between the parties, as represented below, as follows:

## I. General Recitals

1. The plaintiff class, as certified by order of the Court dated March 12, 2004, consists of the following:

> All disabled individuals who are or will be eligible for subsistence benefits through AABD, TFA, SAGA, Food Stamps, or Medicaid programs, who require reasonable accommodation to obtain and maintain essential services and benefits from Defendant DSS, and who have been denied reasonable accommodation through DSS's failure to implement appropriate system-wide procedures and regulations for addressing accommodations, including, inter alia, grievance, notice, and recordkeeping procedures.

2. The parties believe that resolving this matter through negotiation rather than adversarial litigation is in the best interests of both defendant Commissioner and the plaintiff class. Their agreement to settle the case, subject to the approval of the Court in accordance with Rule 23(e) of the Federal Rules of Civil Procedure, is the outcome of negotiations and bargaining by the parties.

3. The parties enter into this Settlement Agreement in consideration of the mutual promises contained herein.

4. This Settlement Agreement shall become effective, final and binding upon the parties, their successors and assigns, only at such time as it is approved by the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

5. The parties herein execute this Settlement Agreement for the purposes of settlement of this case only. It should not be presumed to reflect the positions of the parties in any other judicial or administrative action or proceeding, in any forum. This Settlement Agreement may not be raised affirmatively or defensively against either party in a future proceeding, if any, provided that any party herein may use this Settlement Agreement in connection with any subsequent action or proceeding brought to enforce the Settlement Agreement.

6. This Settlement Agreement contains all the terms and conditions agreed upon by the parties. For the duration of this Settlement Agreement, defendant Commissioner shall have no additional obligations to plaintiffs with respect to the matters settled herein, and plaintiffs shall not seek to impose through any action, any additional systemic obligations upon said defendant with respect to the matters settled herein.

7. The parties intend this Settlement Agreement to be legally binding and enforceable by this Court. The parties understand and agree that until such time as the term of this Settlement Agreement expires, or this action is otherwise dismissed, the Court's jurisdiction will continue for the purpose of enforcing, as necessary, the obligations of defendant Commissioner under this Settlement Agreement.

8. This Settlement Agreement is contingent upon approval in accordance with Section 3-125a of the Connecticut General Statutes and such "fairness hearings" as may be dictated by the Federal Rules of Civil Procedure, the Local Rules of Civil Procedure of the U.S.

District Court for the District of Connecticut, and the Rulings of this Court.

9. No portion of this Settlement Agreement is severable and no portion of this Settlement Agreement is enforceable unless and until it is approved by the Connecticut General Assembly pursuant to Conn. Gen. Stat. § 3-125a and a final and complete approval by the Court.

10. As part of the settlement of this case, plaintiffs and defendant, Commissioner, stipulate that all claims against the defendant Governor shall be dismissed with prejudice. The remaining parties agree that this Settlement Agreement may be fully enforced against the defendant Commissioner.

11. In reaching this settlement, defendant Commissioner expressly does not admit liability, or violation of the law, as to any claims raised or which could have been raised by plaintiffs pertinent to events giving rise to this lawsuit.

## II. Definitions

12. The following definitions apply to this Settlement Agreement:

a. **"ADA"** refers to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq., as amended.*

b. **"Assistance Unit"** or **"AU"** is a term of art for purposes of administering public benefit programs that is used to refer to those members of a household who apply for assistance as a unit, acting by and through a head of household who applies for assistance on behalf of all members of the assistance unit.

c. **"Clients"** and **"individuals"** are terms that are used interchangeably to refer to **"applicants"** and/or **"recipients,"** as appropriate, under the AABD, TFA, SAGA, Food Stamps, or Medicaid programs.

−4−

d. [new] **"Commissioner"** means the Commissioner of the Connecticut Department of Social Services, her successors or assigns, including any Acting Commissioner.

e. **"Connecticut Works Business System" ("CTWBS")** refers to the computer system through which the Connecticut Department of Social Services and the Connecticut Department of Labor (DOL) share information regarding Temporary Family Assistance recipients participating in Jobs First Employment Services activities through DOL.

f. **"Defendants"** refers to the named defendant in this action, the Commissioner of the Connecticut Department of Social Services, his successors and assigns, including any acting Commissioner.

g. **"Persons with disabilities"** or **"disabling conditions"** or **"disability"** or **"disabilities"** refers to individuals recognized as disabled within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, *as amended*, and/or Section 504 of the Rehabilitation Act of 1973, (Section 504), 29 U.S.C. § 794, *as amended or to disabilities within the meaning of said acts.*

h. **"DSS"** or **"the Department"** means the State of Connecticut Department of Social Services, or any successor agency, its officers, administrators, staff, and employees.

i. **"Eligibility Management System" ("EMS")** refers to the automated system the Department of Social Services uses to maintain eligibility information for program participants.

j. **"Plaintiffs"** refers to the named plaintiffs in this action and the certified plaintiff class.

k. **"Section 504"** refers to Section 504 of the Rehabilitation Act of 1973, (Section 504), 29 U.S.C. § 794, *as amended.*

l. **"Service Needs Assessment" ("SNA")** refers to the instrument used by DSS to initially assess, *inter alia*, a Temporary Family Assistance participant's social service needs, including transportation, child care, child support, domestic violence, substance use disorder, learning disability, and mental and physical health, for purposes of developing an employability plan pursuant to Conn. Gen. Stat. § 17b-689c.

m. **"Temporary Family Assistance" ("TFA")," "State Administered General Assistance" ("SAGA"), "Food Stamps," "Medicaid," and "State Supplement to the Aged, Blind and Disabled" ("AABD")** each refer to public assistance programs administered by the Department of Social Services pursuant to state statute and state regulations promulgated in the Uniform Policy Manual.

n. **"Uniform Policy Manual" ("UPM")** refers to state regulations governing Department of Social Services benefits programs and services, which the Department has promulgated pursuant to Conn. Gen. Stat. § 17b-10.

### III. Uniform Policy Manual Implementations

13. Plaintiffs acknowledge that DSS has promulgated regulations in the Rights and Responsibilities section of its UPM, which, the parties agree, serve, *inter alia,* to implement the goals of allowing meaningful access to DSS benefits, programs, and services for applicants and recipients with disabling conditions, in furtherance of the ADA and Section 504:

a. Definitions have been added incorporating ADA language for the terms "disability," "major life activities," "reasonable accommodation," "record of such an impairment" and "regarded as having an impairment." UPM § 1000.01.

b. The listing of applicants' rights has been expanded to include Section 504 and

Title II of the ADA.  UPM § 1005.

    c. The regulations require DSS to afford notice to clients as follows:

    (i)  DSS informs the head of household of each  assistance unit in writing or orally of the right to an accommodation  for those with disabilities, at the time of application, redetermination, notice of adverse action and "whenever it becomes apparent to the worker or the Department that an individual with a disability may need a reasonable accommodation in order to allow the individual an equally effective and meaningful opportunity to participate in activities, services or programs provided by the Department." UPM § 1005.10 B. 5. and 6.

    (ii)  DSS informs all those requesting reasonable accommodations of the right to have the ADA coordinator review the determination of the DSS worker. UPM § 1005.10 B.16.

    (iii)  DSS informs those requesting a reasonable accommodation of what is needed to substantiate the request.  UPM § 1005.10 B. 11.

    (iv)  DSS informs participants with hearing impairments that the agency will provide interpretive services for communications on request and that a TDD machine is available for communicating with individuals who have TDD machines in their homes.  UPM § P-1005.10.

    d. The UPM section addressing "Right to Fair Treatment" has been expanded to inform all clients of the right to a reasonable accommodation and afford those with disabilities the opportunity to exercise such a right.  Such reasonable accommodation is afforded to individuals who are known to have disabilities or who are regarded as having disabilities when modification of DSS policies, practices or procedures is needed to allow an equal and meaningful

opportunity to participate in and benefit from DSS programs. This is a case by case, interactive process. UPM § 1005.10 A., B. 1. and 2.

      e. Unless there is a record of disability or the person is regarded as having a disability, the burden of demonstrating the existence of a disability is on the client. UPM § 1005.10 B. 8.

      f. An individual with a disability must demonstrate that a reasonable accommodation is needed to participate meaningfully in DSS programs. UPM §1005.10 B. 9. Such need is not shown if the resulting functional limitations do not interfere substantially with the client's ability to participate in DSS activities, services or programs, or if there is an authorized representative identified by the assistance unit to perform the required task on the individual's behalf. DSS offers assistance in obtaining existing documentation that is necessary to determine eligibility for an accommodation if it appears likely to the worker that the client cannot obtain such documentation without assistance as a result of his or her disability and there is no authorized representative or other person identified by the client willing and able to act on behalf of the client. UPM § 1005.10 B.11. and 12.

      g. A client may make a request for a reasonable accommodation orally or in writing to either his or her DSS worker, or to the agency's ADA coordinator. UPM § 1005.10 B. 10. DSS will review whether a reasonable accommodation is required whenever one is requested. UPM § 1005.10 B.7.

      h. DSS workers can, without supervisor or managerial approval, provide a reasonable accommodation when it does not require agency resources beyond the worker's control. Examples of such accommodations are: maintaining a list of visually or cognitively

–8–

impaired persons requesting to be called prior to the mailing of notices; waiving office interviews

or conducting interviews via phone; extending deadlines for providing documentation of

eligibility factors; requesting the assistance of a specialized worker to help complete forms,

gather necessary documentation, assist with making medical appointments, and assist with

collecting medical documentation in order to establish disability where disability is a factor of

eligibility; providing forms or material in Braille, tape or large print and requesting the

assignment of a social worker to conduct home visits to explain notices, help complete forms,

and review and receive documentation; and providing access to communication services for

applicants or recipients with hearing impairments. A DSS worker's determination that an

accommodation cannot be provided without resources beyond the worker's control is entitled to

deference. Accommodations requiring more significant agency resources require approval from

a supervisor or manager or from the agency's ADA coordinator. UPM §§ 1005.10 B. 4. and 13.,

and P-1005.10.

      i. Home visits may be provided by agency social workers as a reasonable

accommodation if a face to face interview is required as part of the eligibility process and cannot

be waived, the assistance unit cannot come to the Regional Office or sub-office because of a

disability and there is no authorized representative available to attend the interview. UPM §

1005.10 B.14. The determination of whether to conduct home visits as a reasonable

accommodation is made by an agency supervisor or manager.

      j. Requests for accommodation, and the granting or denial of such requests, will

be recorded in the client's case file. If a request is granted, the nature of the reasonable

accommodation will be recorded for future utilization. If a request is denied, the reason will be

recorded. UPM § 1005.10 B.15. The Procedures pages in the UPM specify that the disability and the needed reasonable accommodation will be noted on a "green tag" affixed to the file and also in the EMS address screen for the client. UPM § P-1005.10.

k. Before taking action on a case, DSS workers must review the case file to ensure that DSS has afforded any necessary reasonable accommodation to the client. UPM § 1005.10 B.17.

l. Requests for reasonable accommodation may be made directly to the ADA coordinator, who must acknowledge such requests within 10 days, and approve or deny them within 20 days. Determinations by the ADA coordinator are reviewable by a written request within 15 days to DSS Deputy Commissioner for Administration. Determinations made by the Deputy Commissioner for Administration are final agency decisions. UPM § 1005.10 B.18., 19. and 20.

m. The discrimination complaint procedure has been expanded to program participants or applicants who allege discrimination on the basis of mental disorder, mental retardation, physical disability or learning disability. UPM § 1005.15.A.

n. The parties agree that it will be necessary for defendant Commissioner to amend the regulations of DSS in certain limited respects in order to be consistent with this Settlement Agreement. The proposed amendments are attached as Exhibit 1. Defendant Commissioner agrees to promulgate the amendments as quickly as possible, subject to the approval of the Legislative Regulations Review Committee and the Attorney General. Plaintiffs agree to support the approval of the proposed amendments indicated in Exhibit 1.

o. The parties acknowledge that it may also be necessary for DSS to further

–10–

amend its regulations during the term of this Settlement Agreement as a result of any change in state or federal law, or as a result of any requirements imposed upon DSS by the Office of Civil Rights of the U.S. Department of Health and Human Services. The parties further acknowledge that it may be appropriate for DSS to amend its regulations during the term of the Settlement Agreement to improve the operation or efficiency of the programs; however, except as noted in subparagraph n., *supra,* DSS will not amend its regulations in a manner that will substantially change the rights of clients as outlined in this Settlement Agreement during the term of the Settlement Agreement, except as may be required by state or federal law. Prior to implementation of any changes in regulations which may impact the rights of clients provided in the current regulations described above and under the Settlement Agreement, including any proposed regulations which relate to state law changes or modifications of a joint state and federal program, or improvements to the operation or efficiency of a DSS program, sought and initiated by defendant Commissioner, such proposed regulations will be subject to notice, comment and legislative approval as required by the Uniform Administrative Procedure Act.

## IV. Staff Training

14. Plaintiffs acknowledge that DSS has conducted mandatory training for staff on client issues regarding ADA compliance and related subjects, including:

a. A computer-based training course administered in 2003 regarding "Provision of Services to Individuals with Disabilities."

b. A training by the DSS Office of Organizational and Skill Development on the new "Rights and Responsibilities" provisions in the UPM.

c. Training of supervisory staff on the use of the ADA Policy Review Guide and

–11–

the ADA Supervisory Review Form.

      d. Training of staff administering TFA and social work staff on identification of client barriers to employment, such as substance abuse and addiction issues, building relationships with clients to better facilitate communication regarding potential barriers, and in recognizing the indicators that can help uncover physical, psychological, social, or emotional barriers.

      e. DSS will conduct trainings with similar content regarding ADA rights and responsibilities for all new staff within three months of beginning work, to ensure compliance with ADA requirements. DSS will also conduct training in targeted interviewing for staff that perform eligibility functions.

      15. ADA training has also been provided to fair hearing staff. DSS agrees to provide similar training to new DSS staff including new fair hearing officers and fair hearing support staff. In addition, DSS agrees to provide ongoing training to DSS workers through the Supervisory Review process outlined *infra* in Paragraph 25 of this Settlement Agreement.

**V.  Notice of the Availability of Reasonable Accommodations and Complaint Procedures**

      16. Defendant Commissioner has taken measures to ensure that program applicants and recipients are informed of the right to reasonable accommodation in the eligibility process as follows:

      a. A 2003 mailing to all program participants of a brochure regarding the rights of participants with disabilities. The same brochure is available in all DSS waiting rooms.

      b. A poster informing applicants and recipients with disabilities of their right to reasonable accommodations and help in the eligibility process  has been placed in all DSS

waiting rooms

      c. The DSS application and redetermination forms, and the form entitled "Application Requirements List," which lists verification needed to establish eligibility, have each been changed to include language informing clients that DSS will provide help if they have a disability and need an accommodation as a result. The language includes examples of help to be offered by DSS, such as assistance in completing the forms, in gathering needed information, or in giving the participant extra time to complete the forms. The application and redetermination forms also specifically ask whether the applicant or recipient has a disability that requires extra help, and they inform applicants of the right to file a discrimination complaint on the basis of disability, among other factors. Notices of granting, discontinuance, suspension of, or change in benefits, generated by the automated system, also inform the applicant or recipient of the availability of reasonable accommodations for disability and the right to file a complaint.

      d. The checklist for recipient/agency responsibilities has an added check box for the explanation of the right to accommodation for a disability.

      e. DSS has modified its medical documentation forms to include language informing participants that DSS workers will assist in making medical appointments for those who need such assistance because of disability.

      f. DSS agrees to modify its medical documentation forms that are used in determining eligibility for its benefit programs, currently forms W-301 and W-1463, to include language informing participants that DSS workers will assist in obtaining needed medical verification and getting forms and other medical documentation returned to DSS, for those who need such assistance because of disability.

g. DSS has issued a new form entitled "Now That You're Getting Help from the Department of Social Services," which informs participants of the right to have an office interview waived and to receive extra help from DSS in the redetermination process, if needed due to disability.

17. Defendant Commissioner issued an "Americans with Disabilities Act Policy Statement for Applicants and Recipients" in April 2003. The policy statement makes assurances that DSS will comply with the Americans with Disabilities Act and Section 504 of Rehabilitation Act of 1973. The policy specifies that identical treatment can be discriminatory treatment for those with disabilities, and affirms that the Department will "ensure that qualified individuals with disabilities . . . have access to all programs, services or activities."

## VI. Mechanisms to Minimize Disability as a Barrier in the Eligibility Process

18. Defendant Commissioner implemented a transition plan following the closure of DSS offices in January 2003, to allow alternative methods of access to DSS services for program applicants and recipients with disabilities, in the towns served by the closed offices. These alternatives continue to include use of local Community Action Agencies as liaisons to copy and transmit forms and documentation on behalf of individuals with disabilities, and to take applications for emergency food stamps and medical assistance for transmittal to DSS. Defendant Commissioner also implemented a toll-free Disability Assistance Help Line staffed by the DSS central office, for clients formerly served by the closed offices to call when there were issues accessing DSS at the local level. Defendant Commissioner further reminded DSS workers of provisions allowing the waiver of office visits, or the possibility of home visits for those clients with disabilities.

19. Unless obstacles unanticipated by defendant Commissioner occur, defendant Commissioner shall have at least substantially completed the following modifications to DSS' EMS, within eighteen months after this Settlement Agreement has been approved by this Court:

a. The field indicating the presence of a disability requiring reasonable accommodation will be made more prominent by a flashing color, to alert a worker entering the file that an accommodation may be needed.

b. A field will be added to delineate the nature of the accommodation to be provided.

c. When the needed accommodation is oral notice for clients with disabilities, an alert will be sent to the DSS worker whenever a written notice is issued, prompting the worker to call the client.

d. A method to track reasonable accommodations that have been provided.

e. The EMS will generate an alert to the DSS worker when a client who requires an accommodation is scheduled to be discontinued for not returning eligibility forms or needed verification on time. The alert will issue before the discontinuance is triggered, so the worker can contact the client to ascertain whether an accommodation is needed to complete the eligibility process.

20. Defendant Commissioner agrees to amend UPM § 8530.50, regarding the mandatory conciliation process designed to review a TFA recipient's circumstances prior to a proposed sanction, to require the following:

a. That all notices regarding conciliation will include notice of the right to receive a reasonable accommodation, should the recipient have a disabling condition that contributes to

–15–

the alleged noncompliance with TFA program requirements;

   b. That the conciliation process will require the DSS worker, prior to imposition of a proposed sanction, to review the client file, including the SNA and the CTWBS, to determine whether a disability reasonably indicated by documentation in the client file may have contributed to the alleged noncompliance with TFA program requirements; and

   c. During the conciliation meeting, and prior to the imposition of a sanction, the DSS worker will offer the client the opportunity to be screened for mental health conditions, substance use disorders, or learning disabilities. DSS workers will not conduct actual drug testing. Sanctions for non-compliance with program requirements will not be imposed as long as the client is cooperating with the screening process. If the screening indicates that the client likely has a disability, the DSS worker will determine whether the imposition of the sanction is appropriate, including whether good cause exists, taking into account the disability. The worker will inform the Department of Labor's ("DOL") Jobs First Employment Services case manager of his or her findings. DSS may also make a referral for future evaluation to the Bureau of Rehabilitation Services ("BRS") and/or to a participating provider in the Department's medical assistance program.  If the client is found to have a disability, DSS will engage the client in a conversation regarding the need for accommodations.

  21. Defendant Commissioner agrees to insert a provision into § P-1005.10 of the Procedures pages of the UPM to instruct DSS workers to record the existence of any identified disability and needed reasonable accommodation on the CTWBS system for all TFA applicants and recipients subject to employment services requirements. DOL, which is not a party to this Settlement Agreement, has agreed to modify the CTWBS system to allow recording of such

information in a prominent location.

22. DSS will maintain the Employment Success Program, or a comparable program, to refer TFA recipients having difficulty complying with program rules for screening, assessment and case management, as needed, to remove barriers or to document eligibility for an exemption from program requirements for at least the next three years following approval of this Settlement Agreement.

23. The SNA is a tool that is used pursuant to the requirements of Conn. Gen. Stat. § 17b-689c to assess the strengths and weaknesses of TFA applicants for purposes of developing an employment plan. Within six months of final approval of this Settlement Agreement, the defendant Commissioner of DSS will ensure that a revised SNA is fully implemented by DSS, acting in coordination with DOL. Defendant Commissioner's obligation under this paragraph is conditioned upon the cooperation of DOL. The revised SNA is attached hereto as Exhibit 2.

24. DSS will assign up to a maximum of four employees, who will not supplant existing staff, with the responsibility of conducting the screens referenced in Paragraph 20c of TFA clients who are subject to sanction for failure to comply with Employment Services requirements. The assigned employees will be qualified by background, experience or training to screen for disabilities, including for learning and mental health disabilities. The employees may be assigned other duties appropriate to their job classifications that assist individuals with disabilities in obtaining employment and/or in establishing or maintaining eligibility for governmental assistance programs. DSS will initially assign three employees with these responsibilities, and may adjust the number of employees so assigned downwards or upwards (up to a maximum of four) depending upon the demonstrated need for such services.

## VII.  Agency Operational Improvements

25.  Defendant Commissioner has adopted a system of supervisory reviews whereby DSS
supervisors periodically review DSS workers' knowledge of, and implementation of, the
agency's ADA policies and practices.  DSS currently conducts these reviews in accordance with
a document entitled "W-1567 ADA Policy Review Guide," which requires the supervisor to
complete the "W-1567 ADA Supervisory Form" attesting that the agency's ADA policies and
practices were reviewed, and that the DSS worker is knowledgeable about the policies.
Defendant Commissioner will ensure that such reviews, or similar reviews,  are conducted at
least annually for all DSS workers and supervisors performing eligibility determination functions
during the term of this Settlement Agreement.

26.  Unless obstacles unanticipated by defendant Commissioner occur, within eighteen
months of the Court approving this Settlement Agreement, the defendant Commissioner will
have at least substantially completed the necessary modifications to EMS to ensure that the
existence of a client's disability, and the need for and the provision of reasonable
accommodations for the client, are recorded as data fields in addition to text format.  Once the
necessary EMS modifications are made,  defendant Commissioner will provide counsel for
plaintiffs with quarterly reports during the term of this Settlement Agreement which indicate, by
DSS office, DSS program, type of disability and type of reasonable accommodation, the number
of cases identified as requiring a reasonable accommodation in that quarter, the number of cases
afforded a reasonable accommodation in that quarter, the number of alerts issued in that quarter
regarding batch closings for clients identified as requiring a reasonable accommodation, and the
total number of cases in that quarter in which a disability requiring a reasonable accommodation

–18–

is noted.

## VIII. Agency Environmental Improvements

27. In order to facilitate equal and meaningful access for all applicants and recipients, including those with disabling conditions, to the TFA, SAGA, Food Stamps, Medicaid, and State Supplement programs it administers, defendant Commissioner agrees to implement certain improvements in the methods by which DSS administers its programs. To the extent feasible, as determined by the Commissioner, the agreed improvements are based upon principles that are intended to make the Department's programs more usable by all persons, whether or not such person are disabled. The Commissioner is only required by this Settlement Agreement to make the improvements that are provided for in paragraphs 28-33 of this Agreement.

28. The Department agrees to make physical improvements to the Waiting Rooms and Client Interview Areas of its twelve Regional Offices, as necessary. The schedule for physical improvements in each office will be based upon the lease renewal date for each office building, with the obligation to make the improvements being contractually imposed upon the landlord as leases are entered or renewed. Where reasonable and necessary based upon the physical configuration of the Regional Office and the cost of making the desired improvements at each office, the defendant agrees, in cooperation with the Department of Public Works ("DPW"), to make improvements to interior and exterior signage, entrances and exits, floor surfaces, triage areas, reception areas, waiting areas, rest rooms, interview rooms, and hearing rooms. The principles that will guide the Commissioner and DPW in determining what improvements to make are summarized in the attached document, Exhibit 3, entitled "Physical Improvements." The determination of what specific improvements are reasonable, necessary, and cost-effective, based upon the configuration of each

–19–

Regional Office, shall be made by the Commissioner using the principles elucidated in Exhibit 3, acting in conjunction with DPW. This determination shall not be subject to review as long as it is made in good faith and does not constitute an abuse of discretion.

29. It is understood and acknowledged that, under state law, another state agency, which is not a defendant in this case, DPW, is exclusively responsible for securing detailed architectural plans and for negotiating the terms of lease agreements with the private landlords. DPW has agreed to work cooperatively with DSS on implementing the physical improvements specified in this Settlement Agreement; however, DPW is not a party to this Agreement. It is further understood that any lease or amended lease agreement with private landlords that may be negotiated by DPW, on behalf of DSS, is subject to approval by other independent entities in accordance with state law, namely, the State Property Review Board ("SPRB"), the Office of Policy and Management ("OPM"), and the Office of the Attorney General, or their successor agencies. Notwithstanding Paragraph 28, defendant Commissioner's obligations shall be limited to taking diligent efforts, within the control of said defendant, to implement such improvements as defendant Commissioner determines are reasonable, necessary, cost effective, and consistent with the principles stated in Exhibit 3. Defendant Commissioner will notify counsel for plaintiffs, in quarterly reports, whenever it becomes apparent that improvements will not be implemented, or will not be implemented timely. Such reports will also include the best estimate of when the improvement will be made. Defendant Commissioner will be excused from failing to implement any physical improvement within the purview of DPW if such failure is due to circumstances beyond the control of said defendant.

30. It is understood that the defendant Commissioner plans on implementing the identified physical improvements by negotiating (through DPW, subject to the approval of the SPRB, OPM, and the Attorney General) lease terms that require private landlords to make the specified improvements, with the cost of the improvements being considered in the lease negotiations as each lease is up for renewal. If a private landlord refuses to make requested improvements, or if the landlord will only make the improvements at a cost that defendant Commissioner, in conjunction with DPW, determines to be unreasonable, defendant Commissioner has the discretion to determine the appropriate steps, and timeline, in order to address the impasse, provided such steps may not include any action that is inconsistent with the best interests of the State as a tenant, as determined by the Commissioner of Public Works. The appropriate steps may include cancelling or not renewing the lease and making arrangements for the lease of alternative space, or determining that the refusal to make the improvements is not of sufficient severity, balancing all pertinent factors, to warrant defendant Commissioner making arrangements for alternative space. Defendant Commissioner's determination as to what step to take shall only be reviewable for abuse of discretion. Nothing in this agreement restricts the defendant Commissioner's discretion with respect to the number or location of its regional offices, or its discretion (through DPW) to enter into lease agreements with different landlords for office space in different locations, except that any regional office leased or purchased in the future will substantially comply with the principles outlined in attached Exhibit 3.

31. DSS will review its program application and redetermination forms, client notices and standardized client letters and implement revisions to improve their comprehension by clients. Recognizing that a significant portion of the DSS client population faces barriers to comprehension of these materials caused by disability, low literacy or language challenges, DSS will employ

–21–

approaches that focus on best practices for clear and plain language, format, fonts, use of white space, and appropriate reading level. Notices will be revised to include the key messages with only the most important messages stated up-front. The Department will develop informational materials to provide important but less critical program information to clients and a method to distribute this information. The most commonly used application and redetermination forms and notices will be revised first, followed by the less frequently used client forms, notices and letters. As part of the improvement in client forms and notices, DSS will develop a style guide that is intended to be used as a model for the revision of other forms and notices. The style guide will be subject to comment by plaintiffs. Within three months of the approval of this Settlement Agreement, DSS will assign an employee whose primary job responsibility will be to oversee the revision of client forms and notices.

32. DSS will implement an improved telephone system in all of its regional offices that is capable of providing automated answers to commonly asked questions, with protections afforded that ensure client confidentiality.

33. DSS will implement a document management solution, which may include, at the Commissioner's discretion, document imaging, scanning, or other technologies whereby documents that are required to be produced in order to determine eligibility will be electronically available in the Department's eligibility computer system, instead of being physically copied with a hard copy retained in the client's paper file. DSS may implement the document management obligation under this Paragraph either by the purchase or lease of appropriate equipment plus the use of state employees and/or by a contractual purchase of services from a private vendor. DSS will meet its obligation under this Paragraph if the use of appropriate equipment is obtained and the services of

to up sixteen additional document managing staff are obtained (on an employment or purchase of service basis).

34. Within six months of the approval of this Settlement Agreement, DSS will assign up to ten employees to be located in the Regional Offices located throughout the State. DSS will initially assign at least six employees with these responsibilities, and may adjust the number of employees so assigned downwards or upwards (to a maximum of ten positions) depending upon the demonstrated usefulness of such staff in facilitating equal and meaningful access for persons with disabilities to DSS programs and services. The assignment of these employees to these responsibilities shall not cause a reduction in the number of staff, state-wide, who are performing eligibility functions on a full-time basis. The duties of the employees may include greeting newly arriving clients upon their arrival at a Regional Office, ascertaining the nature of their business with the Department, assisting them in obtaining and understanding necessary forms and seeing the appropriate person, providing assistance in completing forms, providing assistance in scheduling appointments with medical providers, explaining the eligibility requirements, answering client questions, referring clients to other service providers as needed, and/or providing additional assistance to clients with disabilities who need additional help. The employees shall be knowledgeable and experienced in determining eligibility for the various programs administered by the Department. The other duties of the assigned employee shall reflect the fact that the employee is assigned the foregoing responsibilities.

**IX Miscellaneous**

35. Within ninety days of the approval of this Settlement Agreement, defendant Commissioner shall develop a plan of implementation, setting goals, objectives and timeframes for

the accomplishment of the requirements of this Settlement Agreement. A copy of the detailed plan shall be provided to counsel for the plaintiffs, but shall not be subject to judicial review or approval.

36. Within twelve months from the date of approval of this Settlement Agreement, defendant Commissioner will assign an individual whose duties shall include, but not necessarily be limited to, determining whether clients with disabilities who require additional assistance to access services receive such assistance in accordance with the requirements of this Settlement Agreement. Such individual may be assigned additional job responsibilities as determined by DSS in its discretion, including coordinating ADA compliance issues with respect to the Department's employees.

37. DSS shall report quarterly to counsel for plaintiffs on its progress implementing the terms of this Settlement Agreement. In addition, if DSS becomes aware of a substantial impediment to achieving compliance, it shall report said impediment promptly to counsel for plaintiffs instead of waiting for the next quarterly report. DSS is not required by this Settlement Agreement to make any periodic reports to the Court.

38. It is understood and agreed that another state agency, the Department of Information Technology ("DoIT") is responsible for procuring the equipment and/or the contractual services related to the telephone and document management improvements identified in Paragraphs 32 and 33. Defendant Commissioner's responsibility under this Agreement is to take diligent, good faith efforts to comply with this Agreement. DSS and DoIT have agreed to work cooperatively on implementing these provisions; however, DoIT is not a party to this agreement and shall not be bound thereby.

## X. Term of Settlement Agreement

39. Unless otherwise terminated, this Settlement Agreement shall remain in effect for six

--24--

(6) years following the Court's ruling approving this Settlement Agreement. Thereafter, the case shall be automatically dismissed with prejudice, without any requirement that a party move for dismissal.

40. If defendant Commissioner fails to substantially comply with the terms of this Settlement Agreement, plaintiffs may bring a motion seeking enforcement or contempt. Enforcement action with respect to any failure of defendant Commissioner to comply with her obligations to make physical improvements to the Regional Offices may be brought within a six year period commencing on the date of the Court's approval of this Settlement Agreement. Any enforcement action with respect to any of the Commissioner's other obligations under this Settlement Agreement may only be brought within a forty-eight month period commencing on the date of Court approval of the Settlement Agreement. Substantial compliance will be determined by reference to the extent of defendant Commissioner's compliance with the obligations of this Settlement Agreement as applied to the plaintiff class as a whole, and not solely by reference to the individual circumstances of any one applicant or recipient.

41. Plaintiffs shall not bring any motion seeking enforcement or contempt with respect to whether defendant Commissioner has substantially complied with his or her obligations under this Settlement Agreement unless plaintiffs have first provided sixty days advance notice specifically detailing the factual basis for the claimed substantial noncompliance, except in emergency circumstances when plaintiffs will provide notice that is practicable under the circumstances. The parties agree to discuss and to attempt to resolve in good faith any claimed substantial noncompliance.

42. To the extent that any part of this Settlement Agreement, including Paragraphs 13n and 20, require defendant Commissioner to adopt amended regulations, defendant Commissioner's obligation shall be limited to taking good faith efforts at adopting the amended regulation. The Commissioner may not be found to be in violation of this Settlement Agreement if DSS fails to adopt amended regulations as a result of the action of a third party disapproving the proposed amended regulations, including  the Attorney General and the legislative Regulations Review Committee.

### XI.  Attorneys' Fees and Costs

43.  The parties herein agree that defendant Commissioner shall pay plaintiffs' counsel the amount of Thirty-Five Thousand and No/100 Dollars ($35,000.00), which represents the sum total of attorney's fees and costs that plaintiffs seek in this action.  Plaintiffs shall not be entitled to any additional compensation for attorneys' fees or costs as a result of routine monitoring of the sufficiency of defendant Commissioner's implementation of this Settlement Agreement. The Court, in its discretion, may award plaintiffs additional attorneys' fees and costs only if a motion for enforcement or contempt is filed, the Court adjudicates the claim, and the Court grants relief as a result of defendant Commissioner's failure to substantially comply.

Plaintiffs, by Undersigned, Authorized
Counsel of Record:

*Shirley Bergert*

Shirley Bergert
Public Benefits Task Force Director
Federal Bar No. ct09328
Connecticut Legal Services, Inc.
872 Main St., PO Box 258
Willimantic, CT 06226
(860) 456-1761 x.115
(860) 456-7420 (fax)
sbergert@connlegalservices.org


Greg Bass, Litigation Director
Federal Bar No. ct18114
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
(860) 541-5018
(860) 541-5050 (fax)
gbass@ghla.org


*Maria Morelli-Wolfe*

Maria Morelli-Wolfe
Federal Bar No. 2317
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
(860) 541-5042
(860) 541-5050 (fax)
mmorelliwolfe@ghla.org

Michael Starkowski, Commissioner,
Department of Social Services, by
Undersigned, Authorized Counsel of
Record:


Hugh Barber, Assistant Attorney General
Federal Bar No. ct05731
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5210
(860) 808-5385 (fax)
hugh.barber@po.state.ct.us


Richard Lynch, Assistant Attorney General
Federal Bar No. ct05764
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5210
(860) 808-5385 (fax)
richard.lynch@po.state.ct.us


Michael Starkowski, Commissioner
Department of Social Services
25 Sigourney Street
Hartford, CT 06106
(860) 424-5008
(860) 541-5050 (fax)
michael.starkowski@po.state.ct.us

–27–

Lucy Potter
Federal Bar No. ct23449
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
(860) 541-5002
(860)541-5050 (fax)
lpotter@ghla.org


Joanne Gibau
Federal Bar No. ct05730
New Haven Legal Assistance Assoc.
426 State Street
New Haven, CT 06510-2018
(203) 946-4811
(203) 498-9271 (fax)
jgibau@nhlegal.org


DATED: _May 31, 2007_____

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 2-1-06 | Transmittal: UP-06-04 | 1005.10 |
|---|---|---|

| Section: | Type: | |
| Rights and Responsibilities | | POLICY |

| Chapter: | Program: | ALL |
| Rights of Applicants and Recipients | | PROGRAMS |

Subject:
Right to Fair Treatment

1005.10  A.  General Principle

1. The assistance unit has the right to be treated fairly by the Department regardless of the unit's race, color, religious creed, sex, marital status, age, national origin, ancestry, criminal record, political beliefs, sexual orientation, mental retardation, mental disability, physical disability or learning disability.

2. The Department shall notify the assistance unit of its right to non-discrimination, of the availability of accommodations for individuals with a disability, and the complaint procedure on its application and redetermination of eligibility forms and on each notice of action affecting eligibility for, or the amount of, benefits. The Department shall also provide oral notice at face-to-face intake and redetermination interviews.

B  Right to Reasonable Accommodation for Assistance Units

1. An individual with a disability has a right to receive a reasonable accommodation from the Department when a reasonable accommodation is necessary to allow the individual to have an equally effective and meaningful opportunity to participate in, and benefit from, programs administered by the Department, if the individual is has a disability, or is regarded by the worker or the Department as having a disability, and a modification in the Department's policies, practices or procedures is required in order to allow the individual to participate. Accommodations may be appropriate at any point of interaction between the individual and the Department. Any accommodation must be reasonable and not cause a fundamental alteration in the program or cause undue administrative or fiscal burden on the Department. Reasonable accommodations do not include waivers of essential factors of eligibility.

2. When an accommodation is required, the accommodation that is provided is determined by the Department through an interactive process on a case by case basis that involves both the client and the Department. The Department takes into account both the wishes of the client and the availability of any less burdensome, alternative accommodations that would allow the client to participate in activities, program or services.

Exhibit 1

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 2-1-06 | Transmittal: UP-06-04 | 1005.10 page 2 |
|---|---|---|

| Section: | Type: |
|---|---|
| Rights and Responsibilities | POLICY |

| Chapter: | Program:    ALL |
|---|---|
| Rights of Applicants and Recipients | PROGRAMS |

Subject:
   Right to Fair Treatment

1005.10   B.    Right to a Reasonable Accommodation for Assistance Units (continued)

   3.    The following are not considered a reasonable accommodation as they
         constitute a fundamental alteration to the Department's programs:

         a.    Waiving the requirement that an applicant for benefits based on
               disability provide medical documentation to substantiate that he or she
               meets a program's disability criteria.

         b.    Waiving the requirement that verification of income or assets be
               provided in order to qualify for programs that require such verification.

   4.    If the Department determines that an individual who is applying for
         assistance has a disability that requires that the Department provide an
         accommodation of assistance in obtaining the required medical
         verifications, the Department shall offer to provide such assistance as a
         reasonable accommodation that includes, but is not limited to, writing to the
         medical provider to obtain existing documentation of the disability,
         provided:

         a.    the client cannot obtain the required verification himself or herself as a
               result of his or her disability and;

         b.    there is no authorized representative or other person identified by the
               client willing and able to act on behalf of the client.

   5.    The Department shall inform the assistance unit in writing or orally that
         reasonable accommodations are available if a member of the assistance unit
         has a disability and an accommodation is required in order to allow the
         individual an equally effective and meaningful opportunity to participate in
         activities, services or programs provided by the Department

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 8-1-06 | Transmittal: UP-06- | 1005.10 page 3 |
|---|---|---|

| Section: Rights and Responsibilities | Type: POLICY |
|---|---|

| Chapter: Rights of Applicants and Recipients | Program: ALL PROGRAMS |
|---|---|

Subject:
    Right to Fair Treatment

1005.10   B.   Right to a Reasonable Accommodation for Assistance Units (continued)

6.   In addition to providing notice of availability of accommodations at the time of application, redetermination and notice of action, the Department shall inform assistance units of the availability of reasonable accommodations whenever it becomes apparent to the worker or the Department that an individual with a disability may need a reasonable accommodation in order to allow the individual an equally effective and meaningful opportunity to participate in activities, services or programs provided by the Department.

7.   The Department shall review whether an accommodation is required in every case where an individual requests an accommodation, including when a client requests an accommodation after being informed of the availability of accommodations because it became apparent to the Department that the client may need an accommodation in order to participate meaningfully in Department programs, activities or services.

8.   If there is no record of the individual's disability and the individual is not regarded as having a disability, then the individual has the burden of demonstrating the existence of a disability.

9.   An individual with a disability must demonstrate that an accommodation is needed in order to enable the client to participate meaningfully in the Department's programs, activities or services.

10.  Individuals or their representative have the option to request an accommodation, either in writing or orally, from their eligibility worker or from the agency's ADA coordinator [Department's Affirmative Action Division, ADA Coordinator].

11.  Upon receipt of a request for an accommodation:

     a.   the Department's eligibility worker or ADA c[C]oordinator shall inform the client of any information that the eligibility worker or ADA c[C]oordinator needs in order to make a determination on the request for an accommodation, and specify a date for the documentation to be provided and;

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 8-1-06 | Transmittal: UP-06- | 1005.10 page 4 |
|---|---|---|

| Section: | Type: |
|---|---|
| Rights and Responsibilities | POLICY |

| Chapter: | Program:    ALL |
|---|---|
| Rights of Applicants and Recipients | PROGRAMS |

Subject:
Right to Fair Treatment

1005.10    B.    11.    Right to a Reasonable Accommodation for Assistance Units (continued)

b.  the Department's eligibility worker shall offer assistance in obtaining existing documentation that is necessary to determine eligibility for an accommodation, if it appears likely to the worker that the client cannot obtain such documentation without assistance as a result of his or her disability and there is no authorized representative or other person identified by the client willing and able to act on behalf of the client.

12.  The existence of a disability is not sufficient to demonstrate the need for an accommodation when:

a.  the resulting functional limitations do not substantially interfere with the client's ability to participate in the activities, services and programs administered by the Department without an accommodation, or;

b.  the resulting functional limitations do not substantially interfere with the client's ability to participate in the activities, services and programs administered by the Department without an accommodation, or;

13.  The need for an accommodation and the availability of an accommodation is determined by the eligibility worker. Approval of the eligibility worker's immediate supervisor or regional manager is secured when the accommodation requires agency resources beyond the eligibility worker's control, but within the control of the regional office. Accommodations that involve significantly greater administrative or fiscal burden may only be granted after consultation with the Department's ADA coordinator [Affirmative Action Director]. The following are examples of accommodations that are presumed to be reasonable and may be offered by the eligibility worker:

a.  maintaining a list of visually or cognitively impaired persons requesting to be called prior to the mailing of notices;

b.  waiving office interviews or conducting interviews via the telephone;

c.  extending deadlines for providing documentation related to factors of eligibility

d.  requesting the assistance of [assigning] a specialized worker to help complete necessary forms, gather necessary documentation. Assist with making medical appointments, or assist with collecting medical documentation in order to establish disability where disability is a factor of eligibility;

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 8-1-06 | Transmittal: UP-06- | 1005.10 page 5 |
|---|---|---|

| Section: Rights and Responsibilities | Type:     POLICY |
|---|---|

| Chapter: Rights of Applicants and Recipients | Program:   ALL PROGRAMS |
|---|---|

Subject:
  Right to Fair Treatment

1005.10    B.    13.   Right to a Reasonable Accommodation for Assistance Units (continued)

  e. providing <u>forms or material</u> [informational] material in Braille, tape or large print;

  f. <u>requesting the assignment of a social worker to conduct</u> [conducting] a home visit to explain notices or explain or help complete forms and review and receive documentation.

 14. Home visits are necessary if a face-to-face interview is required as part of the eligibility process and cannot be waived, the assistance unit cannot come to the Regional Office or sub-office because of a disability, and there is no authorized representative available to attend the interview.

 15. The eligibility worker shall document each request for an accommodation in the client's case file, and shall indicate the result thereof in the file (including when the accommodation is granted or denied by the ADA c[C]oordinator).  If the accommodation is granted, the worker shall record the nature of the accommodation in the assistance unit's case record in a manner that Department staff will easily recognize and utilize when contacting the assistance unit. The worker shall also record the reason for denial in the client's file, if the request for accommodation is not granted.

 16. When an accommodation is requested, whether it is granted or not, the eligibility worker shall inform the individual that he or she may request that the ADA c[C]oordinator review the determination of the eligibility worker.

 17. Before taking any action on a case, the worker shall review whether a need for accommodation is recorded and whether the Department provided the necessary resources required to accommodate the individual.

 18. All requests for accommodation directed to the Department's ADA c[C]oordinator shall be acted upon in accordance with the Department's ADA Policy Statement for Applicants/Recipients.     The ADA c[C]oordinator shall:

  a. acknowledge all requests for accommodation in writing within ten (10) working days of receipt of the request by the ADA c[C]oordinator, and shall;

  b. approve or deny all requests not later than twenty working days after the date of receipt, unless additional medical or technical information ~~an evaluation is necessary~~ or evaluation is necessary.

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 8-1-06 | Transmittal: UP-06- | 1005.10 page 6 |
|---|---|---|

| Section:  Rights and Responsibilities | Type:  **POLICY** |
|---|---|

| Chapter:  Rights of Applicants and Recipients | Program:  **ALL PROGRAMS** |
|---|---|

Subject:
    Right to Fair Treatment

1005.10    B.    Right to a Reasonable Accommodation for Assistance Units (continued)

19. An individual may request that the Department's Deputy Commissioner for Administration review the determination of the Department's ADA c[C]oordinator. All requests for review by the Deputy Commissioner for Administration shall be:

   a.    in writing, and;

   b.    received by the Department's Deputy Commissioner for Administration not later than fifteen days after the date of issuance of the ADA c[C]oordinator's decision.

20. The determination by the Deputy Commissioner for Administration constitutes the Department's final administrative determination and is only subject to whatever external review may be available to the applicant or recipient by operation of law.

C.    Spanish Speaking, Other Non-English Speaking, or Limited-English Proficiency (LEP) Assistance Units

1. If the head of an assistance unit or unit's representative is Spanish speaking, non-English speaking, or has limited-English proficiency and requests that the eligibility process be conducted in his or her primary language, the Department explains to the assistance unit that the unit has the right to an interpreter provided by the Department instead of using a family member, friend or client advocate as an interpreter.

2. The Department shall conduct the initial and periodic eligibility interviews and interim interviews in the language normally used by the assistance unit or assistance unit's representative, as follows:

   a.    The Department shall use a bilingual eligibility worker or any other interpreter provided by the Department;

   b.    the Department shall obtain an interpreter; or

   c.    the Department may use a family member or friend age 16 or older as an interpreter, if the assistance unit expressly requests such an arrangement.

CONNECTICUT DEPARTMENT OF SOCIAL SERVICES
UNIFORM POLICY MANUAL

| Date: 2-1-06 | Transmittal: UP-06-04 | 1005.10 page 7 |
|---|---|---|

| Section: Rights and Responsibilities | Type: POLICY |
|---|---|

| Chapter: Rights of Applicants and Recipients | Program: ALL PROGRAMS |
|---|---|

**Subject:**
Right to Fair Treatment

1005.10    C.    Spanish Speaking, Other Non-English Speaking, or Limited-English Proficiency (LEP) Assistance Units  (continued)

3.  For Spanish speaking assistance units, the Department shall use applications, redeterminations, and interim activity forms and notices written in Spanish during the eligibility process or at time of interim contact.

4.  The Department shall require that the interpreter sign all forms which the head of the assistance unit or the assistance unit's representative signs to acknowledge that he or she has informed the unit in the unit's primary language.

5.  Upon request, the Department shall provide an interpreter for any Spanish speaking, non-English speaking, or limited-English proficiency assistance unit when such services are necessary for communicating with the unit.

6.  An assistance unit speaking Spanish has the right to receive application forms and notices in Spanish.

7.  The services of the interpreter are used at the time of each contact with the assistance unit during the eligibility determination process and during any interim case actions.

8.  The Department uses any employee of the Department or an interpreter from outside the Department to the extent that such services are available.

9.  The Department uses family members, friends or client advocates of Spanish speaking, non-English speaking, or limited-English proficiency (LEP) assistance units as interpreters only when assistance unit expressly requests such an arrangement.

10. Department reserves the right to provide its own interpreter to assist with communication, if the Department determines that the interpreter provided by the assistance unit is not accurately transmitting information between the Department and the assistance unit.

11. Children under age 16 are not permitted to act as interpreters for the assistance unit.

12. The Department does not require a Spanish speaking, non-English speaking, or limited-English proficiency (LEP) assistance unit to pay for the services of any interpreter used by the Department

## Exhibit 2
## Revised Jobs First Employment Services
## Service Needs Assessment
### (Revised Section in Bold)

What circumstances or issues in your life cause you to need help from DSS?                Value

**(For Jobs First Employment Services Only)**
What kind of help (programs, services and other support) do you want from DSS?

Is anyone in your family currently working with any other agencies (DMR, DMHAS,DCF,DPH)?

How many adults in this family?

How many children in this family?

Birth date of Youngest Child

Do you share your household with others who can help while you participate in employment activities?

If yes, who?

Do you have childcare arranged for your children?

Do you need help arranging childcare?

Do you have a back up in the event that your provider is not available?

Do you have a valid driver's license?

Do you have access to transportation?

### Employment History One

Information                                                                              Value

List the jobs that you have had, begin with the most recent. Include any volunteer experience that you have had

Company Name

Company Address

Job Title

Date Start

Date End

Months Experience

Salary (hour)

Reason for Separation

If Other, Please Specify

Describe your job duties in detail, including any tools or equipment used, as well as skills you have acquired

Exhibit 2

## Employment History Two

| Information | Value |
|---|---|
| Company Name | |
| Company Address | |
| Job Title | |
| Date Start | |
| Date End | |
| Months Experience | |
| Salary (hour) | |
| Reason for Separation | |
| If Other, Please Specify | |
| Describe your job duties in detail, including any tools or equipment used, as well as skills you have acquired | |

## Employment History Three

| Information | Value |
|---|---|
| Company Name | |
| Company Address | |
| Job Title | |
| Date Start | |
| Date End | |
| Months Experience | |
| Salary (hour) | |
| Reason for Separation | |
| If Other, Please Specify | |
| Describe your job duties in detail, including any tools or equipment used, as well as skills you have acquired | |

## Education

| Information | Value |
|---|---|
| Highest Grade Completed | |
| High School/Equivalent School or Program | |
| High School/Equivalent Start Date | |
| High School/Equivalent End Date | |
| High School/Equivalent Area of Study | |
| High School/Equivalent Degree Type | *** Select *** |
| College School or Program | |

College Start Date
College End Date
College Area of Study
College Degree Type                          *** Select ***
Other Training School or Program
Other Training Start Date
Other Training End Date
Other Training Area of Study
Other Training Degree Type                   *** Select ***
Other Training School or Program
Other Training Start Date
Other Training End Date
Other Training Area of Study
Other Training Degree Type                   *** Select ***

## Languages

| Information | Value |
|---|---|
| Speak English | Yes |
| Read English | Yes |
| Write English | Yes |
| Other Language | *** Select *** |
| Speak Other Language | No |
| Read Other Language | No |
| Write Other Language | No |

## Learning Disabilities

| Information | Value |
|---|---|
| Do any family members have learning problems? | |
| Did you have any problems learning in elementary or middle school? | |
| Do you have difficulty filling out forms? | |
| Were you ever in a special program or given extra help in school? | |
| Have you ever been diagnosed with or told you had a learning disability? | |
| If so, who told you and when were you told? | |
| Comments | |

## Substance Use Disorders

| Information | Value |
|---|---|
| Have you ever spent more time drinking or using drugs than you intended? | |

Have you ever neglected some of your usual responsibilities because of using alcohol or drugs?

Have you ever wanted to cut down on your drinking or drug use?

Has anyone ever objected to your drinking or drug use?

Have you ever found yourself thinking a lot about drinking or using drugs?

Have you ever used alcohol or drugs to relieve emotional discomfort, such as sadness, anger, or boredom?

Comments

## Mental and Physical Health

Value

Information

Have you ever received treatment or medications for a mental health or emotional condition, such as depression, anxiety, or stress?

Have you ever had a two-week period where you felt sad or depressed so that it was difficult to function?

Have you ever been so anxious that you had difficulty doing things you wanted to do?

Have you ever been so confused that you were not able to work or meet your other responsibilities?

Do you have any emotional problems or special needs that would prevent or limit you from participating in employment plan activities?

Has anything happened to you that bothered you so much that you could not get it out of your mind even if you wanted to forget it?

Do you have any health issues or special needs that would prevent or limit you from participating in employment plan activities?

***Select ***

Physical Health problems:

Comments

## Domestic Violence

Value

Information

Do you ever feel unsafe at home because of someone in your life?

In the last year, has anyone tried to control what you do, where you go, your money, telephone, health care, or your relationships with your family and friends?

Comments

## Other

Value

Information

Is anyone in your family having problems at school (discipline, attendance)?

If yes, please explain

Is anyone in your family having any problems with the legal system? (frequent police contact, courts, gang-related issues, serious discipline problems with your children)

If yes, please explain

Do you have any family or friends that can help you in an emergency?

Are you having problems with any of the following

Paying your bills (food, rent utilities)?

Housing problems/eviction proceedings (Are you being evicted?)

Running out of food?

If yes, please explain

Are there any other problems that would limit or prevent you from participating in your employment plan activities?

If yes, please explain

Are there any other problems that you would like to discuss?

Referred to Ct. Works

DSS Referral to Employment Success Program (ESP)

### Physical Improvements

The Connecticut Department of Social Services (DSS) requested the assistance of Adaptive Environments (AE) in collaboration with Maximum Corporation (Maximum) to evaluate and recommend changes to the physical environment of its offices.

Site visits were conducted by DSS staff and DSS' consultants AE and Maximum, to DSS sites on June 5 (Stamford, Bridgeport), June 6 (Torrington, New Britain, Hartford), and June 14 (Middletown, Willimantic, Manchester), 2006. After these visits, the team concluded that the major cost estimating issues had been defined and it was not necessary to visit and revisit the remaining offices. Prior to June, 2006, Adaptive Environments (AE) had already visited one office (Norwich), and DSS had surveyed two more offices (Waterbury, Danbury). The last office (New Haven), will be a new space built to suit.

Recommendations for improvements fall into the following general categories:

**Separate Functional Areas:** Waiting, reception and interview areas should be readily identifiable and separated to protect the privacy of persons seeking services.

**Reception Stations:** Often the first point of contact between clients and workers, the reception stations, vary from office to office. The goal in the design of reception stations is to give workers and clients both a sense of security and dignity, to facilitate communication and to protect privacy. When renovating, the goal will be to provide a welcoming environment with a higher level of both visual and auditory privacy. Ideally, reception stations should protect the private information of clients, allow everyone to speak in normal voices and confer with one another when necessary and also accommodate a variety of heights. It is recommended that prototypes be modeled at one or two offices and evaluated after some number of months. Only after the design is refined and introduced to staff should any program of phasing in be undertaken at additional sites. It must be recognized, however, that any one particular prototype design may not be suitable at every DSS office given the design limitations that vary from office to office.

**Interview Booths:** One on one conversations between workers and clients take place in interviewing cubicles arranged in an open office plan layout. Interview cubicles are shared space furnished with a work table, chairs and a computer. Work spaces are typically all the same size. To accommodate larger groups or people with wheelchairs and strollers, one or two larger interview areas should be available.

Because personal information is discussed, there is a need for privacy as well as visibility and openness to avoid claustrophobia and give a sense of safety and comfort. Creating a suitable auditory environment in an open plan is a challenge. Not only is it important to protect people's privacy, some people can be distracted or disturbed by adjacent audible conversations or constant changes in noise around them. Others are simply unable to hear the person in front of them if the background is too loud or changeable. At DSS, the use of speaker phones for interpretive services has proven to be a pervasive acoustical problem since amplification of sound from them can disturb the entire room. Multiple headsets, handsets or other accommodations should be used to provide auditory privacy to the normal speech privacy level. In an open plan arrangement, appropriate privacy can be achieved with the acoustical standard known as "normal speech privacy." Sound from booth to booth will be audible to most people, but a person would

1
<u>Exhibit 3</u>

have to pay careful attention to overhear the content of the conversation. Ideally, the elements of the interview booth area will be arranged to reach that level and may include partitions, absorptive ceiling tiles and introduced electronic background sound.

**Signage:** To reduce anxiety, confusion and frustration, environments should be easy for first time users to understand and navigate through. Clear spatial organization, good lines of sight and effective signage are all tools that make places easy to use. The department will examine these layouts and signs in a comprehensive manner and make substantial changes. A system of signs that has hierarchy and a consistent use of words, pictograms and colors and is well placed so that they can be seen and understood from entrances and across rooms will be installed.

**Entrance Doors:** Wherever possible, power assisted doors should be used. While sliding automatic doors are sometimes more convenient and efficient, the location of the sensor in relation to adjacent activities needs to be carefully considered.

**Hearing Rooms:** Hearing room will be large enough to accommodate a wheelchair.

**Rest Rooms:** These need to have a better level of maintenance, and fit and finish, and be easily accessible to the public. In recognition of the fact that some men come with young children, baby changing areas that are unisex, accessible toilets or even in the men's rooms will be added where feasible. There will be a minimum of two restrooms in each office.

**Drop Boxes:** Some clients are unwilling to leave their papers in drop boxes and therefore stand in line to bring them to the reception window. For some clients, the security in knowing their documents have been checked over by another human being is worth the wait. For others, it simply may be that the location of the drop box seems too remote or too vulnerable to surrender such important papers. Standard locations and arrangements for after hours and during hours drop boxes will be reviewed, and changes will be made as necessary to increase the use of drop boxes. This will free up time for reception workers as well as clients.

**Security:** Safety in all parts of the office is, and will continue to be, a major consideration. Security measures include a clear office layout, electronic security devices and on-site security personnel, including Police Officers, where necessary.

**Photocopiers:** One of the tasks that reception workers perform for clients is photocopying of their application documents, including vital records. While it may give some clients reassurance and a sense of confidence to have a worker doing this, for others, it is waiting time and a forfeiture of control. It also takes up the time of the reception worker and others waiting in line. The department will explore the use of a self-service photocopier in the waiting area for client use with the goal of piloting self-service in at least one of the larger offices (i.e., Bridgeport, Hartford or New Haven). Once additional triage staff are in place, it should be possible for those workers to take the responsibility for overseeing copier use. This would be coordinated with any document management system.

**These are some of the design issues that deserve a coherent look across the system. Each site has different experiences, variations in clients and workers and physical environments. While there is no one single uniform solution for these conditions, each of them will benefit from study and experimentation of implementation.**