UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LORI RAYMOND, *et al.* Individually and on behalf of all other persons similarly situated, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 3:03CV0118 (MRK) |
| v. | : : : | |
| JOHN ROWLAND, in his official capacity as Governor of the State of Connecticut, and PATRICIA WILSON-COKER, in her official capacity as Commissioner of the State of Connecticut Department of Social Services, | : : : : : : : : : | (CLASS ACTION) |
| Defendants. | : : | June 8, 2007 |

**JOINT BRIEF IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT AND CLASS NOTICE, TO SET A DATE FOR A FINAL FAIRNESS HEARING AND FINAL SETTLEMENT APPROVAL**

**I. Introduction**

**A. Background**

Plaintiffs filed this action on January 16, 2003, on behalf of themselves and others similarly situated, when the Connecticut Department of Social Services (DSS) was in the process of closing over a third of its client access offices and laying off staff deployed in those offices. The offices being closed included: Ansonia, Bristol, Meriden, Norwalk, Killingly and Willimantic. DSS reassigned benefit recipients served by these offices to other DSS offices more remote from their residences.

1

DSS administers subsistence programs statewide. Many beneficiaries of these programs are disabled. In some programs or subprograms, disability is an eligibility criteria; applicants and recipients may also have disabilities that do not rise to the level that allow them to receive benefits based on disability, but otherwise entitle them to legal protections on which this litigation was based. DSS administered programs include: State Supplement to the Aged, Blind and Disabled (AABD; cash assistance for impoverished elderly and disabled persons), Temporary Family Assistance (TFA; cash assistance for impoverished families with children or pregnant women), State Administered General Assistance (SAGA; cash and medical assistance), Food Stamps (food assistance for impoverished persons) and Medicaid (medical assistance for impoverished recipients of cash assistance programs, children and disabled persons).[1]

### B. Plaintiffs' claims and relief sought

In their original complaint, Plaintiffs challenged the DSS office closures as allegedly being violative of their rights to nondiscrimination based upon disability, pursuant to Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12132, and its implementing regulations,[2] and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 701, *et seq.*, and its implementing regulations.[3] In their amended complaint, filed March 25, 2004, Plaintiffs additionally challenged the alleged lack of DSS planning, policy, notice and

---

[1] Conn. Gen. Stat. §§ 17b-2 and 17b-3 (general application), 17b-104 (AABD), 17b-105a-105c (Food Stamps), 17b-112 and 17b-112c (TFA), 17b-191, 17b-192 and 17b-257b (SAGA), 17b-257a, 17b-260 and 17b-261 (Medicaid).

[2] In particular, 28 C.F.R. §§ 35.130(b)(1)(ii), (iii), (iv), (vii), (b)(3) and (b)(7), 35.149-151, and 35.160-164(b)(4).

[3] In particular, 45 C.F.R. §§ 84.4(b)(1)(ii), (iii) and (b)(4).

2

availability of reasonable accommodations regarding nondiscriminatory access to DSS administered programs by qualified disabled persons, which Plaintiffs claimed resulted in discriminatory exclusion of many eligible disabled individuals from receipt of benefits and services to which they are otherwise entitled. Plaintiffs also asserted Defendants violated the right of the Plaintiff class to Due Process under the Fourteenth Amendment of the United States Constitution by failing to ensure DSS employees informed class members of rules exempting individuals with certain limitations from work requirements, thereby discouraging applications.

Plaintiffs sought declaratory and injunctive relief requiring Defendants to:

1. Adopt policies to ensure persons with disabilities are identified and afforded reasonable accommodations in the course of the eligibility processes.
2. Afford notice of the right to nondiscrimination on the basis of disability.
3. Implement a grievance procedure for resolving issues arising under the ADA and Section 504.
4. Properly inform class members of DSS rules allowing individuals with limitations in their ability to work to qualify for TFA and SAGA benefits, so class members are not hindered from applying for and maintaining benefits under these programs.

### C. Plaintiff class certification

On March 12, 2004, the Court certified the Plaintiff class pursuant to Fed. R. Civ. P. 23(a) and (b)(2), as follows:

> All disabled individuals who are or will be eligible for subsistence benefits through AABD, TFA, SAGA, Food Stamps, or Medicaid programs, who require reasonable accommodation to obtain and maintain essential services and benefits from Defendant DSS, and who have been denied reasonable accommodation through DSS's failure to implement appropriate system-wide procedures and regulations for addressing accommodations, including, inter alia, grievance, notice, and recordkeeping procedures.

Raymond v. Rowland, 220 F.R.D. 173, 181 (D. Conn. 2004).

### D. Discovery and expert involvement

Throughout the course of this litigation, Plaintiffs engaged in extensive discovery to ascertain details of the operation of DSS and policy and program implementation pertaining to disability-based discrimination and reasonable accommodation. This involved extensive written discovery, including two extensive sets of interrogatories and four requests for production. Discovery further included depositions of numerous individuals with related document requests including: Marc Ryan, Secretary, Office of Policy and Management; Patricia Wilson-Coker, then Commissioner of DSS; Kevin Loveland, DSS Director of Family Services; Irene Mason, DSS Director, Affirmative Action Division; Silvana Flattery, Ronald Roberts and Frances Freer, DSS Regional Directors; John Souchuns and Michael Kiselica, DSS office managers; Laura DiGalbo, DSS Bureau of Rehabilitation Services; and Judy Mentz, Donna Velardi, Belinda May and Jacqueline Greenfield, DSS staff members.

Plaintiffs retained and disclosed, pursuant to Fed. R. Civ. P. 26(a)(2)(A), four national level experts to testify at trial regarding DSS program administration, barriers to persons with disabilities allegedly posed by DSS program administration, as well as issues concerning screening for disabilities and development of appropriate remedial measures. These experts were: Peter Blanck, Ph.D., J.D., Director, Law, Health Policy &

Disability Center, University of Iowa College of Law, an expert in systems serving persons with a range of disabilities; Michael Rowe, Ph.D., Associate Clinical Professor, Yale School of Medicine Department of Psychiatry and Institution for Social and Policy Studies, an expert in systems serving welfare populations; Nancie Payne, M.S., President, Payne & Associates of the Northwest, Inc., Olympia, Washington, an expert in learning disabilities and attention disorders; and Norman Hoffman, Ph.D., President, Evince Clinical Assessments, Waynesville, North Carolina, an expert in mental health disorders and clinical assessment instruments. Defendants deposed all of Plaintiffs' experts except Dr. Blanck.

Defendants disclosed, pursuant to Fed. R. Civ. P. 26(a)(2)(A), Laura DiGalbo, from the DSS Bureau of Rehabilitation Services, as their disability expert, and Kevin Loveland, DSS Director of Family Services, an expert on DSS programs, both of whom Plaintiffs deposed. During subsequent extensive negotiations between the parties regarding possible settlement, Defendants retained the consulting services of Valerie Fletcher, Executive Director of Adaptive Environments in Boston, Massachusetts, which focuses on design issues that confront people with disabilities, and Maximus, Inc., to conduct focus groups of DSS clientele, evaluate DSS offices, and make recommendations regarding modifications of policy, practice and physical plant to allow DSS to more effectively serve persons with disabilities under a universal design approach. Plaintiffs participated extensively in discussions with Defendants, Ms. Fletcher and Maximus, Inc., regarding these issues, including the construction of the client focus groups.

### E. History of negotiations

Arm's length negotiations, which took place over a two-plus year period between experienced counsel for the parties, initially began with several sessions with Magistrate Judge William Garfinkel in 2004. Thereafter, in early 2005, the parties, on their own, engaged in more intensive negotiations. Through the use of discovery, expert consultation and research, the parties explored a range of approaches that could be employed to improve access to DSS programs, benefits and services by persons with disabilities. With the assistance of the experts retained by the parties, the parties ultimately reached the Settlement Agreement now before the Court for approval. The Settlement Agreement affords in significant measure the relief sought on behalf of the Plaintiff class, and is wholly consistent with the merits of the legal claims and range of potential resolutions that could have followed full litigation.

### F. Improvements in access to DSS programs and services by persons with disabilities

During the course of this litigation, Defendants have taken steps to address the issues raised in this case. DSS adopted a policy statement regarding its compliance with the ADA and Section 504 and revised its regulations governing administration of its programs, creating a protocol to affirmatively assist applicants and recipients who need such assistance due to disabilities in the course of the benefits eligibility processes. DSS amended agency regulations to allow for reasonable accommodations, specifying modifications to program administration which workers may take on their own, and more substantial accommodations requiring supervisor approval. The amended regulations also implement a grievance procedure for challenging a denial of such accommodations. DSS revised an array of written forms and notices to help ensure class members are

aware of protections afforded in the regulations regarding nondiscrimination based on disability. DSS implemented training for staff on an ongoing basis regarding the ADA, recognition of disabilities, identification of barriers to employment that individuals might face, and provision of accommodations and targeted interviewing techniques. DSS also began conducting annual reviews of staff regarding compliance with disability-related policy.

DSS will implement additional measures incorporated in the Settlement Agreement, upon approval by the Court. These include: improved screening of TFA recipients subject to work requirements to identify disabilities that may impede cooperation; modification of procedures to include screening for potential disabilities for TFA households facing potential sanctions, including benefit reductions and loss of eligibility, for noncompliance with program work related requirements, to help ensure that individuals with limited ability to work do not suffer improper sanctions; computer enhancements to notify workers when an identified disabled recipient may need accommodations at all stages of engagement with such recipients; review and improvement of DSS forms to enhance readability and comprehension; implementation of an automated telephone response system and improved document handling systems; and increased staffing to allow DSS to meet its obligations under the Settlement Agreement.

Defendants have also agreed to make physical plant improvements in the DSS field offices to help ensure clear and more private communication between workers and applicants and recipients. By reducing noise, addressing client flow

in reception, interview and waiting areas and improving signage, the ability of class members to negotiate the eligibility processes will be enhanced.

The Settlement Agreement provides for reporting by Defendant DSS to Plaintiffs' counsel regarding progress with compliance of the Settlement Agreement, to facilitate monitoring and enforcement. The Agreement ends, by its terms, six years following Court approval, allowing sufficient time for DSS to make the improvements included in the Agreement.

### G. Approval of the Settlement Agreement by the Connecticut General Assembly

Conn. Gen. Stat. § 3-125a prohibits the Attorney General from entering into any agreement resolving litigation which requires an expenditure from the General Fund in an amount in excess of two million five hundred thousand dollars,[4] unless the Connecticut General Assembly accepts the terms of the agreement. Accordingly, the Connecticut Attorney General, Richard Blumenthal, submitted the Settlement Agreement to the Connecticut General Assembly on April 13, 2007 pursuant to Conn. Gen. Stat. § 3-125a and the Connecticut General Assembly Joint Rules § 32. The Settlement Agreement was referred to the committees of cognizance: Judiciary, Human Services and Appropriations. These committees held a joint hearing on April 30, 2007. On May 8, 2007, the House of Representatives and Senate Judiciary Committees submitted resolutions supporting the Settlement Agreement to each respective body of the legislature. House Resolution No.

---

[4] This settlement is expected to cost the Department of Social Services $7,715,740 in FY08 and $4,202,080 in FY09. These funds are included in HB 7077 (the Appropriations Act, as reported by the Appropriations Committee). Additionally, Plaintiffs' attorney's fees of $35,000, incorporated in the Settlement Agreement, are expected to be made from the Adjudicated Claims Account within the Comptroller's budget for administrative purposes. The Adjudicated Claims Account draws from the resources of the General Fund, but is not appropriated. *See* footnote 5, *infra,* for links to the legislative fiscal notes.

60, File 804 and Senate Resolution No. 58, January Session, 2007.[5] No vote was held within 30 days of submission of the Settlement Agreement to the General Assembly, so the Settlement Agreement is deemed to have been approved. Conn. Gen. Stat. § 3-125a(a).[6]

## II. Legal Standards

### A. General principles

Class litigation lends itself to settlement because of difficulties of proof, uncertainty of outcome and length of litigation. Bourlas v. Davis Law Associates, 237 F.R.D. 345, 355 (E.D.N.Y. 2006). There is a strong judicial policy favoring settlements, particularly in a complex class litigation context. Wal-Mart Stores, Inc. v. VISA U.S.A., 396 F.3d 96, 116 (2d Cir. 2005); In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); Bourlas, 237 F.R.D. at 354. There is a range of reasonableness in settlements which recognizes the uncertainties of law and fact and the risks and costs inherent in litigation. Wal-Mart Stores, Inc., 396 F.3d at 119. The possibility that the class may achieve more at trial is not dispositive, so long as the result of settlement is within the range of reasonableness. In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 316. Where settlement of a class action results from arm's length negotiations between experienced counsel after significant discovery, the

---

[5] The following is a link to the House and Senate Judiciary Committee resolutions which include the fiscal note covering the next two fiscal years:
http://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=File+Copy&bill_num=804&which_year=2007 (House of Representatives)
http://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=File+Copy&bill_num=800&which_year=2007 (Senate)

[6] If modification of the Settlement Agreement were necessary for final approval of this Court, the earliest it again could be submitted to the General Assembly for consideration and approval is the beginning date of the next regular session of the General Assembly: February 6, 2008. Conn. Gen. Assembly Joint Rules § 32.

9

court may presume the settlement is fair, adequate and reasonable. Wal-Mart Stores, Inc., 396 F.3d at 116; In re IPO Securities Litigation, 226 F.R.D. 186, 190 (S.D.N.Y. 2005).

### B. Steps for approval of a settlement in class action litigation

Courts must ultimately approve all settlements reached in class action litigation. Fed. R. Civ. P. 23(e). There are several steps in this approval process.

The Court preliminarily approves the fairness of the settlement, prior to notice. In re NASDAQ Antitrust Litigation, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). A grant of preliminary approval involves a determination that "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representative or segments of the class and falls within the reasonable range of approval." Bourlas, 237 F.R.D. at 355 (citing In re IPO Litigation, 226 F.R.D. at 191; In re NASDAQ Antitrust Litigation, 176 F.R.D. at 102). At this stage, the Court need only find that the proposed settlement fits within the range of possible approvable outcomes. In re Prudential Securities Inc. Limited Partnerships Litigation, 163 F.R.D. 200, 210 (S.D.N.Y. 1995). *See also* Manual for Complex Litigation, Fourth § 21.632 (2007).

Once the preliminary approval is granted, the Court orders appropriate notice of the proposed settlement and the date of the final fairness hearing in a reasonable manner to all class members who will be bound by the settlement. Bourlas, 237 F.R.D. at 355 (citing In re IPO Litigation, 226 F.R.D. at 191); In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 309. The notice must fairly apprise class members of the terms of the proposed settlement and their options in connection with the proceedings. Wal-

Mart Stores, Inc., 396 F.3d at 113. *See also* Manual for Complex Litigation, Fourth § 21.633 (2007).

Finally, the Court conducts the fairness hearing required by Fed. R. Civ. P. 23(e) to provide class members an opportunity to present their views of the proposed settlement and argument and evidence regarding the terms, before making a final determination as to whether the proposed settlement is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(1)(C). *See also* Manual for Complex Litigation, Fourth § 21.632-21.635 (2007).

In the ultimate review of the substance of a settlement agreement for fairness, reasonableness and adequacy, courts in the Second Circuit look to the so-called Grinnell factors. Bourlas, 237 F.R.D. at 355, n. 7 citing, City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds*, Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000). The six factors relevant to the present case, which does not seek damages but rather systemic declaratory and injunctive relief, include the following (utilizing the Grinnell numbering):

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(6) the risks of maintaining the class action through the trial; and

(7) the ability of the defendants to withstand a greater judgment.

Grinnell, 495 F.2d at 463; Heyer v. New York City Housing Authority, No. 80 Civ. 1196(RWS), 05 Civ.5286(RWS), 2006 WL 1148689, at *3 (S.D.N.Y. Apr. 28, 2006).

### C. Preliminary approval of the Settlement Agreement

As described above, the Settlement Agreement before this Court is the product of serious, well-researched, non-collusive negotiations, which took place for longer than two years and was informed by consultation with national level experts. The Settlement Agreement comprehensively addresses the access problems faced by persons with disabilities to DSS programs, benefits and services, raised in the litigation. It provides no preferential treatment to class representatives or any other segment of the class. Further, it falls within the reasonable range of potential approvable resolutions that could follow full litigation of such claims. For these reasons, it should be preliminarily approved.

### D. Notice of the proposed settlement

The parties have jointly proposed a form of class notice, in English and Spanish, which includes a large print single page summary of the Settlement Agreement, followed by a more detailed summary of the settlement terms, both identifying the date, time and location of the fairness hearing, to be mailed to identified DSS program applicants and recipients. The more detailed summary provides information regarding the nature of the action, the definition of the certified class, the binding nature of the agreement and contact information for Plaintiffs' counsel to obtain additional information and a complete copy of the Settlement Agreement. The parties also propose bilingual posters of at least 11" by 17" to be prominently displayed in the waiting rooms of all DSS offices, with copies of the full notice in English and Spanish available either next to the poster or nearby, and prominent posting on the DSS website of the notice in English and Spanish

and the Settlement Agreement. An English version of the proposed notice and poster are attached to the "Joint Motion for Preliminary Approval of Settlement Agreement and Class Notice, to Set a Date for a Final Fairness Hearing and Final Settlement Approval."

The parties propose individual mailed notice to be sent by DSS to applicants and recipients of DSS benefits, identified by the likelihood of the potential presence of a disability that would qualify the individual as a class member. These include: pending applicants and recipients of the AABD and SAGA cash assistance programs; pending TFA applicants and TFA recipients who are exempt from work requirements based on incapacity or have received at least 18 months of time-limited assistance; recipients of benefits in the Food Stamp program who are exempt from work requirements based on disability; pending applicants and recipients of the following Medicaid programs: Community Aged, Blind and Disabled, including persons in a spend-down period who have not met the spend-down, Long Term Care, and Medicaid/Medicare Savings programs; and pending applicants and recipients of the AABD, SAGA, TFA, Food Stamp and Medicaid programs with an impairment coding in the DSS computer system indicating disability.[7] The parties propose determining pending applicants by those applicants entered in the DSS computer system at the time DSS extracts the list of notice recipients from such system, approximately two weeks prior to completion of notice mailing. They also propose provision of notice in Spanish to all persons identified in the

---

[7] The program applicants and recipients who will not receive individual mailed notice include the following, except where the DSS computer otherwise has them coded as having an impairment: TFA households who have received assistance for less than 19 months and are not exempt based on disability; TFA child only cases; Food Stamp recipients who are not exempt from work requirements based on disability; Food Stamp applicants who are not identified as disabled; and children receiving only Medicaid and their caretakers in the HUSKY A program. There are also a number of subprograms with limited participation where notice will not be provided unless the DSS computer has the participant coded as having an impairment.

13

computer system as preferring Spanish; all others will be provided with the English version of the notice.

The parties believe the proposed notice will reach the members of the certified Plaintiff class, fairly apprise them of the Settlement Agreement terms, and allow them to participate in the final fairness hearing should they choose to do so. Therefore, the proposed form and manner of notice and delivery should be approved.

### E. Final approval of the Settlement Agreement before the Court

A review of the Grinnell factors in this litigation, with the exception of the reaction of the class to the settlement, can be evaluated in advance of the full fairness hearing. Such a review demonstrates that the Settlement Agreement, drawing on the expertise gained by counsel in the course of litigating this case, embodies practical solutions informed by discovery and expert assistance, for a range of issues potentially hindering Plaintiff class members in obtaining and maintaining subsistence benefits through the Connecticut Department of Social Services. It is a fully informed document, crafted at arm's length, and it will provide a working, detailed outline for improvements to DSS operations and physical layout over the course of the next six years. For these reasons, it should be approved by the Court.

#### 1. The complexity, expense and likely duration of the litigation

This case is fairly complex both factually and legally. Trial would require presentation of evidence regarding DSS policy and practice, computer, telephone and document imaging systems, physical plant, the programs administered by DSS, and the disabilities and needs of the members of the Plaintiff class.

DSS administers AABD, TFA, SAGA medical and cash assistance, the Food Stamp program and Medicaid, all programs of great complexity, each with subcategories and different rules embodying state and federal requirements, through twelve offices in three regions staffed by over a thousand employees who process program eligibility for class members. Each office has a somewhat different demographic breakdown, staff is organized according to local practice, and the physical plant involved is different in each location.

The range of disabling conditions reflected in program applicants and beneficiaries is also quite broad, with an extensive range of needs among class members which must be taken into account, along with the variations in each of the offices and programs administered. At the time of certification of the class by this Court, DSS records indicated it served 377,862 beneficiaries statewide in the programs with which this litigation is concerned. While the precise number of individuals who meet the criteria for membership in the Plaintiff class is unknown, as the Court noted in its class certification decision: "The U.S. Department of Health and Human Services estimates that as many as forty percent of the adult welfare population may have learning disabilities and up to twenty eight percent of welfare beneficiaries may have mental health conditions." Additionally, many beneficiaries receive assistance based on a broad range of other disabilities.[8]

The parties have completed extensive discovery and have no pending motions. However, the expense and delay of continued litigation could be substantial. Prior to trial, the parties would anticipate extensive dispositive motions for summary judgment being filed. Should the case proceed to trial on relevant issues of disputed fact and contested

---

[8] Raymond, 220 F.R.D. at 178 (March 12, 2004).

matters of law, motions in limine would be anticipated to exclude the testimony of various experts, with accompanying briefing and hearings.

The parties estimate a trial on the merits would take approximately two weeks and would likely involve testimony of at least six experts; expert testimony would entail additional expense. The trial would also involve testimony of many agency staff; time spent by DSS employees and administrators preparing for and attending court hearings would be time not spent assisting needy individuals. Class members would provide testimony; many class members are fragile due to disability and/or transient because of their limited income, and the process of preparing for and attending court hearings would be daunting. There is extensive documentation that would be submitted as evidence. Pretrial matters and preparation and conduct of the trial and preparation of briefings would involve many hundreds of hours of attorney time and great expense to Plaintiffs' counsel and the state, as well as difficulty for members of the Plaintiff class participating in the trial. In assessing liability and potentially devising relief for the class, the Court would likely have to immerse itself in the details of DSS operations and become familiar with current standards of practice regarding effective delivery of services and benefits to persons with disabilities.

### 2. The stage of the proceedings and the amount of discovery completed

This factor is relevant to the ability of the Court and parties to assess the strength of the case and the relative efficacy of the settlement agreement. Wal-

Mart Stores, Inc., 396 F.3d at 118, In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 312.

The present case was filed in January 2003. Plaintiffs have conducted extensive discovery, now complete, and retained and disclosed four national level experts, two regarding screening and assessment of persons with disabilities and two on devising ADA compliant programs. Defendants disclosed two experts, one on its programs and the other on universal design, and after significant negotiation, retained expert assistance on design barriers to persons with disabilities.

In addition to the efforts of counsel for the parties in crafting the Settlement Agreement before the Court, the Connecticut General Assembly is required to approve this settlement. Such approval was obtained, effective May 13, 2007.

### 3. The risks of establishing liability and maintaining the class action through trial

As a result of the extensive discovery in this case, as well as research and the assistance of the experts, the parties became well-versed in the range of approaches comparable agencies around the country have taken to identify and afford services to persons with disabling conditions. To some extent, this was and remains uncharted territory; states are only beginning to implement improvements in the delivery of social services that take account of the cognitive, mental and other limitations of many individuals who seek subsistence benefits. How the courts will ultimately interpret the responsibilities of welfare agencies to persons

with disabilities in the eligibility processes is unknown. The range of potential remedial steps that could be ordered by a court, could create an unknown but extraordinarily expensive level of required investment by a state agency to achieve compliance with the law.

A trial, as well as the likely appeals in this relatively new area of determining the parameters of the legal obligations of welfare agencies to persons with disabilities, would entail delay in improvements to DSS' service to disabled applicants and recipients. This delay could be years.

Partly as a result of the discovery process, it became clear the parties had a mutual interest in improving DSS access to people with disabling conditions, leading to the negotiations described above. The negotiations were informed by the discovery and legal and scientific research over the course of the four years this case has been pending. The assistance of experts proved invaluable in developing alternatives and evaluating appropriate remedial steps, leading to the Settlement Agreement before the Court. All parties participated in the crafting of the resolution reflected in the agreement, and Defendants were able to cost out state expenses related to improvements in DSS regulations, systems and practice, and physical plant improvements.

### 4. The ability of the defendants to withstand a greater judgment

Connecticut adopts a biennial budget in each odd numbered year, with adjustments made in even numbered years. Conn. Gen. Stat. § 4-71. While the state may well be able to afford increased costs resulting from a trial and judgment, it is unnecessary in this case where the parties have reached an

informed settlement. This settlement, addressing the claims of the Plaintiff class, has predictable expenses, facilitating state budget planning.

### III. Conclusion

The parties believe resolution of this matter through negotiation, rather than further lengthy and expensive adversarial litigation, is in the best interests of both Defendants and the Plaintiff class. The Settlement Agreement includes terms and conditions that are fair, reasonable and adequate, addressing the issues raised on behalf of the Plaintiff class. It will result in systemic improvements more quickly than if the lawsuit was fully litigated, and without the expense and uncertainty associated with such litigation and any potential appeals.

For the reasons articulated above, the parties request that the Court enter an order preliminarily approving the Settlement Agreement and the proposed form of notice and manner of its delivery, and ultimately approve the Settlement Agreement following full review at a fairness hearing.

Plaintiffs, by Undersigned, Authorized Counsel of Record:

_____
Joanne Gibau
Federal Bar No. ct05730
New Haven Legal Assistance Assoc.
426 State Street
New Haven, CT 06510-2018
(203) 946-4811
(203) 498-9271 (fax)
jgibau@nhlegal.org

Michael Starkowski, Commissioner, Department of Social Services, by Undersigned, Authorized Counsel of Record:

_____
Hugh Barber, Assistant Attorney General
Federal Bar No. ct05731
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5210
(860) 808-5385 (fax)
hugh.barber@po.state.ct.us